UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**NCF FREEDOM, INC.,**                    )
a Florida not-for-profit corporation,      )
**SARAH HERNANDEZ**,                       )
**MARIBETH CLARK**,                        )
**KIM ANDERSON**,                          )
**SARA J. ENGELS**,                        )
**CARLTON LEFFLER**, and                   )
**SHELBY A. NAGLE**,                       )
                                           ) **CASE NO.:**
     Plaintiffs,        )
                                           )
**v.**                                     )
                                           )
**MANNY DIAZ, JR.,** in his official capacity )
as the Commissioner of the Florida State   )
Board of Education and member of the       )
Florida Board of Governors;                )
**TIMOTHY M. CERIO,**                      )
**AUBREY EDGE, PATRICIA FROST,**           )
**EDWARD HADDOCK,**                        )
**JACK HITCHCOCK, KEN JONES,**             )
**DARLENE LUCCIO JORDAN,**                 )
**BRIAN LAMB, ALAN LEVINE**                )
**CHARLES H. LYDECKER,**                   )
**CRAIG MATEER, JOSE OLIVA,**              )
and **ERIC SILAGY** in their official capacities )
as members of the Florida Board of Governors )
of the State University System;            )
**CHRISTOPHER RUFO, DEBRA A. JENKS**,      )
**AMY REID, CHARLES R. KESLER,**           )
**LANCE KARP, MARK BAUERLEIN,**            )
**MATTHEW SPALDING,**                      )
**RYAN T. ANDERSON, SARAH MACKIE,**        )
**GRACE KEENAN, JOE JACQUOT** and          )
**RON CHRISTALDI**, in their official       )

capacities as members of the New College )
of Florida Board of Trustees, and )
**RICHARD CORCORAN**, in his official )
capacity as Interim President of New College )
of Florida, )
)
Defendants. )
_____/

# COMPLAINT FOR DECLARATORY JUDGMENT
## AND PERMANENT INJUNCTION

Plaintiffs bring this suit pursuant to 42 U.S.C. §1983, seeking a judgment declaring that certain provisions of Chapter 2023-082, Laws of Florida ("SB 266"), violate the First and Fourteenth Amendments on their face and as applied to these Plaintiffs. Plaintiffs further pray for issuance of an injunction against that unconstitutional statute.

## INTRODUCTION

1.      Since the Scopes monkey trial,[1] it has been rare for state legislatures to outlaw the teaching of particular thoughts and ideas which are viewed by scientists, philosophers and academicians as being within the legitimate scope of academic inquiry. However, the Florida Legislature has done just that, adopting as state policy the goal of prohibiting the dissemination of certain ideas:

_____

[1] Scopes v. State, 154 Tenn. 105, 289 S.W. 363, 366 (1927).

The board shall include in its review a directive to each constituent university regarding its programs for any curriculum that violates s. 1000.05 or that is based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities.

Section 1, §1001.706(5)(a) of SB 266.

2.     Beginning in 2020, dozens of state governments took steps to prohibit educators and students from discussing certain "divisive concepts" - viewpoints often addressing race, gender, sex, and history. Increasingly, this movement has targeted public universities and colleges in flagrant disregard of "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment" recognized by our Courts. *See*, <u>Bishop v. Aronov</u>, 926 F.2d 1066, 1075 (11th Cir. 1991).

3.     The State of Florida leads the country in efforts to censor academic freedom and instruction in its college classrooms. Up to this point, the flagship law promoting this ideological attack on professor's speech was §1000.05, Fla.Stat. – the so-called "Stop WOKE Act".[2] The Stop WOKE Act prohibited professors in

---

[2] While formally titled the "Individual Freedom Act" the outline of the law was originally introduced to the public by Governor DeSantis as the "Stop Wrongs to Our Kids and Employees (W.O.K.E.) Act. That moniker has stuck to the law ever since.

public universities from teaching any of eight disfavored concepts which focused on race, ethnic background and gender.

4.     This Court quickly determined that the Stop WOKE Act was a content and viewpoint based restriction on speech which violated the First Amendment. *See*, Pernell v. Florida Bd. of Governors of State Univ. Sys., __F.Supp. 3d __, 2022 WL 16985720 (N.D. Fla. Nov. 17, 2022).

5.     Not chastened by the setback experienced in Pernell, the State has doubled down on its investment in ideological censorship through the enactment of SB 266, which was enrolled as Chapter 2023-82, Laws of Florida.[3] SB 266 outlaws college courses thought to advance "political or social activism" and other disfavored concepts and prohibits the expenditure of funds associated with any program promoting "diversity, inclusion and equity" (commonly referred to as "DEI"). A copy of SB 266 is attached as Exhibit "1" to this Complaint.

6.     In dictating to faculty and students what ideas are true and false, Florida runs headlong into the Bill of Rights. More than a half-century ago, the Supreme Court of the United States recognized that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom," where "truth" is

---

[3] The subject law was introduced into the Legislature as Senate Bill 266. The bill was enrolled on May 3, 2023, with an effective date of July 1, 2023.

discovered not by "authoritative selection," but "out of a multitude of tongues." Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967) (cleaned up). This is because professor and student alike "must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." Keyishian, 385 U.S. at 603 (*quoting, in part*, Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957)).

7.      Plaintiffs – an independent organization founded to protect and promote the academic mission of New College; Professors of Sociology, Art and Music at New College; and undergraduate students enrolled there - bring this challenge to vindicate the constitutional and statutory rights of faculty and students in college classrooms to engage in debate and inquiry uninhibited by state orthodoxy.

8.      Plaintiffs assert four counts in this litigation: (1) content based and viewpoint based censorship of speech in violation of the First Amendment; (2) vagueness; (3) overbreadth; and (4) invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

## JURISDICTION

9.      This suit is brought pursuant to 42 U.S.C. §1983:

Every person who, under color of any statute, statute, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the

United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

10.   This Court has "Federal Question" jurisdiction pursuant to 28 U.S.C. §1331 to hear cases arising under the Constitution of the United States, under 28 U.S.C. §1343(3) to redress the deprivation under color of state law of any right, privilege or immunity secured by the Constitution and under 28 U.SC. §1343(4) to secure equitable relief or other relief for the protection of civil rights.

11.   The Court has the authority to issue declaratory judgments and permanent injunctions pursuant to 28 U.S.C. §§2201 and 2202, and Rule 65, Fed.R.Civ.P.

12.   The Court may enter an award of attorney's fees pursuant to 42 U.S.C. §1988.

13.   This Complaint seeks declaratory and injunctive relief to prevent violations of the Plaintiffs' rights, privileges and immunities under the Constitution of the United States and Title 42 U.S.C. §§1983 and 1988, specifically seeking redress for the deprivation under color of state statute, statute, regulation, custom or usage of rights, privileges, and immunities secured by the Constitution and laws of the United States. The rights sought to be protected in this cause of action arise and are secured under the First and Fourteenth Amendments to the Constitution.

14.     This action seeks a judicial determination of issues, rights and liabilities embodied in an actual and present controversy between the parties involving the constitutionality of certain policies and practices of the Defendant. There are substantial *bona fide* doubts, disputes, and questions that must be resolved concerning the Defendants' actions taken under color and authority of "state" law and procedures, in violation of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

## VENUE

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District. Furthermore, the local venue privilege provides that jurisdiction lies in this District and Division as many of the officials sued have their official headquarters in this Division.

## PARTIES

16.     NCF FREEDOM, INC. (hereinafter "NCFF") is a Florida not-for-profit corporation with its principal place of business located at 5340 Traylor Avenue, Sarasota, Florida. NCFF is a pending 501(c)(3) public interest entity organized for the following purpose:

> The mission of NCFF Freedom is to fully protect and promote the future of New College of Florida as a unique public liberal arts college that honors academic freedom, educational innovation,

collaborative student-guided learning, and its foundational values of open discourse within a just, diverse, equitable, and inclusive community.

17.     NCFF exists to ensure that academic freedom is upheld at all levels of New College of Florida – a pursuit essential to upholding the U.S. Constitution and to fulfilling the mission of New College, Florida's designated Honors College, as well as other institutions of higher education in Florida.

18.     NCFF is the entity beneficially interested in the relief herein sought and seeks to invoke the original jurisdiction of this Court on account of the facts and matters herein stated.

19.     NCFF's asserted claims and requested relief do not require the participation of its individual members.

20.     NCFF has both associational standing and organizational standing to maintain its claims.

21.     With respect to the instant action NCFF opposes any restriction on the academic freedom of professors at New College and elsewhere in Florida and opposes any attempt to limit the scope of free thought, inquiry and speech by professors and their students.

22.     Plaintiffs Hernandez, Clark, Anderson and Engels are members of NCFF, along with many other concerned citizens.

23.    Plaintiff, SARAH HERNANDEZ (hereinafter "Hernandez"), is an individual, *sui juris*, residing within Sarasota County, Florida. Dr. Hernandez received a doctorate in sociology and, at all times material hereto, was and is a tenured professor on the faculty of New College teaching a variety of sociology classes. Dr. Hernandez has received multiple grants and awards and was recently featured in Sarasota Magazine for her work promoting social justice and racial equality.[4] Dr. Hernandez has received and administered a variety of grants associated with her scholarship and academic work including, a U.S. Fulbright-García Robles grant to teach university professors in Mexico and, most recently, a grant from the Andrew W. Mellon Foundation to support New College's radio broadcasting internship program. Dr. Hernandez is a member of NCFF Freedom.

24.    As will be described in detail below, many of Dr. Hernandez's teachings and course materials would be prohibited under SB 266 and lessons involving those issues could not be funded and would not be eligible for college credit under that statute.

25.    As a private citizen, Dr. Hernandez has continued to pursue her interest in the operations of New College, and has added her voice to that of many

---

[4] *See*, Sarasota Magazine, (Jan. 12, 2021)  https://www.sarasotamagazine.com/news-and-profiles/2021/01/sarah-hernandez-new-college (last accessed 8/4/23).

other citizens concerned with the evisceration of its core educational mission by the current Administration and through legislative acts, including SB 266.

26.     Plaintiff, MARIBETH CLARK (hereinafter "Clark"), is an individual, *sui juris*, residing within Sarasota County, Florida. Dr. Clark received a doctorate in music and, at all times material hereto, was and is tenured as a full professor on the faculty of New College teaching a variety of music classes. Dr. Clark was previously an Associate Provost for New College and is the current Chair of New College's Division of Humanities. Dr. Clark has received multiple grants in her field including funding as a participant in the NEH Summer Institute program on "Ethnomusicology and Global Culture." Dr. Clark is a published author in her field, including reviews and a study of the utility of Wikipedia as an instructional tool across multiple curricula. Dr. Clark is a member of NCFF Freedom.

27.     As will be described in detail below, many of Dr. Clark's teachings and course materials would be prohibited under SB 266 and courses involving those issues could not be funded and would not be eligible for college credit under that statute.

28.     Plaintiff, KIM ANDERSON (hereinafter "Anderson"), is an individual, *sui juris*, residing within Manatee County, Florida. At all times material hereto, Professor Anderson was and is tenured as a full professor on the faculty of New College teaching a variety of art classes. Professor Anderson has been

awarded honors and recognition as an artist and has also received funding for her work including a 2023 Fellowship from the HALO Arts Project. Professor Anderson is a member of NCFF Freedom.

29.     As will be described in detail below, many of Professor Anderson's teachings and course materials would be prohibited under SB 266 and lessons involving those issues could not be funded or would not be eligible for college credit under that statute.

30.     Plaintiffs Hernandez, Clark and Anderson are sometimes referred to herein as the "Professor Plaintiffs".

31.     Plaintiff, SARA J. ENGELS (hereinafter "Engels"), is an individual, *sui juris*, residing within Sarasota County, Florida. Ms. Engels is a veteran of the U.S. Air Force. She is presently enrolled as an undergraduate at New College making active progress toward a degree in Political Psychology / Health, Culture and Societies and a minor concentration in gender studies. Ms. Engels is enrolled to take a class – Social Movements - in Fall 2023 taught by Dr. Hernandez  and wishes to receive instruction on issues and topics which are now outlawed by SB 266. Engels is a member of NCFF Freedom.

32.     Plaintiff, CARLTON LEFFLER (hereinafter "Leffler"), is an individual, *sui juris*, residing within Sarasota County, Florida. Mr. Leffler is presently enrolled as an undergraduate at New College making active progress

toward a dual degree in Urban Studies and Chinese language, history and culture. Mr. Leffler is enrolled to take a class in Fall 2023 taught by Dr. Hernandez (Social Movements) and wishes to receive instruction on issues and values which are now outlawed by SB 266. Mr. Leffler's final course in Urban Studies, to be taken in the Spring, routinely addresses topics and issues prohibited by SB 266, including such practices as redlining.

33.    Plaintiff, SHELBY A. NAGLE (hereinafter "Nagle"), is an individual, *sui juris*, residing within Sarasota County, Florida. Ms. Nagle is presently enrolled as an undergraduate at New College making active progress toward a degree in "General Studies". That degree is interdisciplinary and includes studies in psychology, neuroscience, programming, mathematics, history and art. Ms. Nagle expect to graduate from New College in May of 2024.

34.    Plaintiffs Engels, Leffler and Nagle are sometimes referred to herein as the "Student Plaintiffs".

35.    Defendant MANNY DIAZ, JR. was a principal sponsor of the Stop WOKE Act when he served previously as a member of the Florida Senate. Currently, he serves as the Commissioner of the Department of Education. As Commissioner, Diaz has oversight over the Chancellor of the Florida College System. By statute, the Commissioner of Education is a member of the Florida Board of Governors of the State University System. §1001.70(1), Fla. Stat.

Defendant DIAZ is sued only in his official capacities as the Commissioner of the Department of Education and as a member of the Board of Governors.

36.    The Florida Board of Governors of the State University System is endowed with the responsibility to govern the state university system and has the authority to adopt rules for implementing and enforcing SB 266. *See*, FLA. CONST. Art. IX § 7(b); Fla. Stat. §§ 20.155(4)(a), 1000.05(6)(b).

37.    Defendant BRIAN LAMB is a member and officer of the Board of Governors, serving as its Chair. In that capacity, Lamb presides over meetings of the Board of Governors and exercises all of the "powers and duties that inure to the office of Chair of a body corporate." Bd. of Govs. Op. Procedures, Art. IV, § D. LAMB is sued only in his official capacity.

38.    Defendant ERIC SILAGY is a member and officer of the Board of Governors, serving as its Vice Chair. In that capacity, Silagy possess "the same power and authority in the absence or disability of the Chair." Bd. of Govs. Op. Procedures, Art. IV, § E. SILAGY is sued only in his official capacity.

39.    Defendants TIMOTHY M. CERIO, AUBREY EDGE, PATRICIA FROST, EDWARD HADDOCK, JACK HITCHCOCK, KEN JONES, DARLENE LUCCIO JORDAN, ALAN LEVINE, CHARLES H. LYDECKER, CRAIG MATEER and JOSE OLIVA are the remaining members of the Board of Governors and are sued only in their official capacities.

40.    The New College of Florida Board of Trustees is a corporate body established by the State of Florida with the capacity to be sued. *See*, §§ 1001.72(1), 1004.097(4), Fla. Stat.

41.    The New College of Florida Board of Trustees sets policy for and serves as the legal owner and final authority for the New College of Florida. The Board "is vested with the authority to govern and administer NCF as necessary to carry out its mission in accordance with law, and regulations and agreements of the [Board of Governors]". *See*, New College of Florida Regulations Manual, Chap. 2, §2-1001.

42.    Defendant DEBRA A. JENKS is a member and officer of the New College of Florida Board of Trustees, serving as its Chair. In that capacity, JENKS is "[t]o preside over all meetings of the BOT and, in that capacity, to fix the order of business, call special meetings of the BOT, attest to actions of the BOT, [and] appoint all standing and special committees…". *See*, New College of Florida Regulations Manual, Chap. 2, §2-1005(4)(a). As Chair, JENKS also serves as "spokesman" for the Board. Id. at §2-1005(4)(b). JENKS is sued only in her official capacity.

43.    Defendant RON CHRISTALDI is a member and officer of the New College of Florida Board of Trustees, serving as its Vice Chair. In that capacity, Christaldi is authorized "[i]n the absence of the Chair, to preside at meetings of the

BOT." *See*, New College of Florida Regulations Manual, Chap. 2, §2-1005(5)(a). CHRISTALDI is sued only in his official capacity.

44.     Defendants CHRISTOPHER RUFO, AMY REID, CHARLES R. KESLER, LANCE KARP, MARK BAUERLEIN, MATTHEW SPALDING, RYAN T. ANDERSON, SARAH MACKIE, GRACE KEENAN and JOE JACQUOT are members of the New College of Florida Board of Trustees and are sued only in their official capacities.

45.     Defendant RICHARD CORCORAN, is currently serving as the Interim President of New College of Florida. In that capacity, CORCORAN is responsible for all operations of the College:

> The president is the Chief Executive Officer of New College of Florida ("NCF") and reports to the New College Board of Trustees (the "Board"). Subject to the oversight and governance of the Board, the president is responsible for all operations of the NCF and for assuring that all of those operations uphold and are consistent with the mission of the NCF. These responsibilities include overall leadership and management of the institution, its academic and educational functions, its institutional fundraising, the development of strategic plans, and fiscal and budgetary plans and the allocation of resources. … The president will advance NCF's academic, and outreach efforts to enhance its programs and ensure that student services and support are provided to create appropriate learning environments.[5]

_____

[5] Source: Job Listing posted 6/5/23 on higheredjobs.com for "President of New College of Florida" accessible at https://www.higheredjobs.com/executive/details.cfm?JobCode=178419035 (last accessed 8/2/23).

CORCORAN has made public comments indicating his opposition to DEI initiatives: "The current use of DEI programs has propagated homogenous opinions, inequality, and exclusion of all but pre-approved ideas. Students and parents don't sign up for college to have an agenda foisted on them."[6] At least one Federal Judge has noted that "Richard Corcoran [ ] embraced rhetoric directed at the 'woke' boogeyman of the day" which "signaled a suspicion of, and outright hostility toward, certain viewpoints in Florida's public education system."[7] CORCORAN is sued only in his official capacity.

## COLOR OF STATE LAW

46.    At all relevant times to the Complaint, Defendants and their agents were, and are, acting under color of state law.

## NEW COLLEGE

47.    Founded in Sarasota in 1960, New College of Florida is unique in the Florida university system for a number of reasons:

---

[6] Source: Response to written questions tendered by Sarasota Herald-Tribune and republished by New College of Florida on its website: https://www.ncf.edu/news/ richard-corcoran-qa-new-college-interim-president-outlines-vision-defends-salary/ (last accessed 8/8/23).

[7] Link v. Diaz, No. 4:21CV271-MW/MAF, 2023 WL 2984726 at *1 (N.D. Fla. Apr. 17, 2023).

A.     It is a dedicated liberal arts college; it has been ranked by U.S. News and World Report as the number five public liberal arts college in the nation.[8]

B.     It is an honors college catering to students who are particularly high performing in academics.

C.     It offers a degree of academic flexibility not found anywhere else in the Florida university system. In particular, rather than being confined to specific majors or even an interdisciplinary study, students can design an individualized degree and course of study. New College offers "an academic 'contract' each semester instead of a one-size-fits-all traditional degree program."[9]

D.     New College faculty generally provide narrative reports of a student's accomplishments rather than assigning letter or numerical grades.

E.     New  College has a very low student to instructor ratio, even in  lower division classes, with an average of only eleven students in each class.[10]

F.     New College requires each of its graduates to complete a number of independent student projects and to submit a senior "capstone" project or thesis.[11]

---

[8] *See*, New College, https://www.ncf.edu/ (last accessed 8/3/23).

[9] *See*, New College, https://www.ncf.edu/ (last accessed 8/8/23).

[10] *See*, New College, https://www.ncf.edu/why-new/  (last accessed 8/3/23).

G.      Historically, New College has had a reputation for welcoming LGBTQ+ students and unconventional individuals of every sort. The landing page for the College's website proclaims that it is a "Community of Free Thinkers, Risk Takers and Trailblazers."[12]

H.      That diversity of thought is mirrored in student clubs and organizations on campus ranging from the "New College Feral Pigeons" to the "Indigenous Student Union"[13] to "Queery" an organization which "serves to maintain New College as a safe place for LGBTQ+ identified individuals and their allies to socialize and engage with the larger community."[14]

I.       New College's unique approach to liberal education has paid rich dividends in the form of academic success for its students; the College is rated number one among public universities as a producer of Ph.D. degrees.[15]

---

[11]  *See*, New College, https://www.ncf.edu/why-new/curriculum/ (last accessed 8/3/23).

[12]  *See*, New College, https://www.ncf.edu/ (last accessed 8/3/23).

[13]  This organization states that it is "A space for indigeneity to thrive on stolen land." *See*, New College, https://novoconnect.ncf.edu/organizations (last accessed 8/3/23).

[14]  *See*, New College, https://novoconnect.ncf.edu/organizations (last accessed 8/3/23).

48.     There are a host of programs, majors, courses, and textbooks / assignments at New College which are either directly prohibited by SB 266 or which will be severely curtailed, censored and limited by that law. Plaintiffs allege the following examples of programs and courses currently available at New College which will be affected in this way:[16]

A.     Gender Studies is described as "an interdisciplinary academic program… [that] draws on curricula across the campus (and beyond) to introduce students to the complex focal problem of 'gender.'"[17] Among the classes likely to be prohibited outright, or at risk of being chilled by SB 266 are:

- Queer History: Sexuality in the 20th Century United States

- Queer Studies

- Race, Gender and Sexuality

- Sociology of Gender and the Body

- Topics in Feminist Philosophy

---

[15] *See*, New College, https://www.ncf.edu/why-new/personalized-career-planning/ (last accessed 8/3/23).

[16] These programs and courses are all listed as undergraduate majors on the New College website available at https://www.ncf.edu/programs/ (last accessed 8/2/23).

[17] *See*, New College, https://www.ncf.edu/programs/gender-studies/ (last accessed 8/8/23).

- Women Writing of/from Africa: Feminist Truths, Feminist Fiction.[18]

Such classes cannot be taught consistently with the prohibitions against DEI, identity politics, the notion that sexism is imbedded in our institutions or the concepts incorporated from the Stop WOKE Act, §1000.05. *See*, Section 4, §1004.06(2)(a) and (2)(b); Section 9, §1007.25(c).

B.    History, is an "area of concentration" ("AOC") in which "[s]tudents … engage with a broad range of historical sources to develop an understanding of the complexities of the past as well as our own role in its interpretation." It is clear that there are multiple opportunities for professors and students to run afoul of the proscription in SB 266 against "distortion of history". The New College Website goes on to note:

> The AOC in History includes in-depth attention to particular historical moments as well as geographical and chronological breadth, helping students to understand the past on its own terms as well as how past events have formed the world today. Students learn to recognize multiple perspectives, to analyze historical patterns such as continuity and change, and to accept that *all historical understanding is provisional*. ….
>
> As a core part of a liberal-arts curriculum, *the History program embraces the interdisciplinarity of historical study; students frequently combine History with AOCs like Gender Studies,*

---

[18] All references in this subparagraph are found on the New College website at https://www.ncf.edu/programs/gender-studies/ (last accessed 8/2/23).

International Studies, Political Science, and Urban Studies.  (emphasis added).

Individual courses which have been taught in the past cannot be taught under SB 266 or the ability to teach them is so uncertain that no administrator would allow a professor to teach it and few professors would risk their tenure to do so. Among those courses on the chopping block is "The Rise of Urban America: How Race, Region, Gender and Class Shaped the Modern American City".[19]

C.    A student majoring in Art History is apparently encouraged to evaluate the most off-limits of all subjects – "critical race theory":

> [A] theory and method course that introduces students to a variety of critical frameworks central to art history (including, but not limited to, social history, semiotics, feminist and gender theory, critical race and post-colonial theory, and globalization.[20]

D.    A novel major known as "Health, Culture and Societies" invites students to inquire about ideas which SB 266 considers to be off-limits - how present inequities in our society affect health:

> We support students in exploring different aspects and conceptions of health in social and cultural contexts. A concern for long standing

---

[19] All references in this subparagraph are found on the New College website at https://www.ncf.edu/programs/history/ (last accessed 8/2/23).

[20]    *See*, https://www.ncf.edu/programs/art-history/ (last accessed 8/2/23).

histories of health inequities, expert and local knowledge, and contemporary disparities is central to this program.[21]

E.    The Anthropology major has offered classes in "Heritage: History and Past Today" and "Race and Ethnicity in Global Perspectives."[22]

F.    The Creative Writing major includes a course titled "How a Woman Becomes a Lake" and Other Unheroic Acts: A Craft Seminar in Gender and Genre Bending", both of which are of questionable legality under SB 266.[23]

G.    English majors are vulnerable to censorship if they take a problematic course called "Performing Gender, Class, and Identity in Early Modern Drama."[24]

H.    Philosophy majors will rightly fear that a course entitled "Hegel and Marx" may be deemed to "distort" our capitalist history while "Topics in Feminist Philosophy" clearly cannot be taught under SB 266.[25]

---

[21]  *See*, https://www.ncf.edu/programs/health-culture-societies/ (last accessed 8/2/23).

[22]  *See*, https://www.ncf.edu/programs/anthropology/ (last accessed 8/8/23).

[23]  *See*, https://www.ncf.edu/programs/creative-writing/ (last accessed 8/2/23).

[24]  *See*, https://www.ncf.edu/programs/english/ (last accessed 8/2/23).

[25]  *See*,  https://www.ncf.edu/programs/philosophy/ (last accessed 8/2/23).

I.    The Social Sciences major invites trouble with courses such as "Distributive Justice: Different Viewpoints", "Heritage: History and the Past Today" and "Queer Studies".[26]

J.    New College's Sociology major potentially hits the third rail with courses in "Race and Ethnicity: An Interdisciplinary Exploration", "Contemporary Gender Seminar" and "Queer Studies".[27]

K.    The Urban Studies major includes course fraught with peril such as "Introduction to Sociology through Inequality" and "Death, Hell, and Capitalism".[28]

L.    It is doubtful that even the hard sciences escape the censor's cudgel of SB 266. For instance, New College's Biology major includes a class on "Sex, Gender, Mind and Brain" which likely violates provisions of SB 266.[29] And the "dismal science" of Economics includes a class in "Distributive Justice: Different Viewpoints" which is equally problematic under the law.[30]

---

[26] *See*, https://www.ncf.edu/programs/social-sciences/ (last accessed 8/2/23).

[27] *See*, https://www.ncf.edu/programs/sociology/ (last accessed 8/2/23).

[28] *See*, https://www.ncf.edu/programs/urban-studies/ (last accessed 8/2/23).

[29] *See*, https://www.ncf.edu/programs/biology/ (last accessed 8/2/23).

[30] *See*, https://www.ncf.edu/programs/economics/ (last accessed 8/2/23).

M.    Given the politics of the moment, one must wonder where it is still lawful to fund a class in which a professor of Rhetoric and Writing would provide instruction on the "Rhetoric of Walt Disney World" – a class previously taught at New College.[31]

49.    The elimination or curtailment of many AOCs or majors directly affects the rights of current and future faculty and students, including the Plaintiffs bringing this action. Faculty and students at colleges and universities throughout Florida face the same censorship and the same injury to their rights of free speech and academic inquiry.

50.    Given its unique status as an honor college, dedicated to the liberal arts and attracting "free thinkers" from around the nation, New College is uniquely vulnerable to the censorship and pall of orthodoxy imposed by SB 266.[32]

51.    But for the enactment of SB 266, New College would be free to honor its long-standing commitment to the academic freedom of its professors:

---

[31]   *See*, https://www.ncf.edu/programs/rhetoric-writing/ (last accessed 8/8/23).

[32] Governor DeSantis signed SB 266 at the New College campus. *See*, Tampa Bay Times, *DeSantis signs 3 bills bringing major change to Florida universities*, https://www.tampabay.com/news/education/2023/05/15/desantis-new-college-higher-education-sb266-christopher-rufo-critical-race-theory-gender-major-changes-legislation-indoctrination/ (last accessed 8/3/23). The choice of New College for this public, televised event was no coincidence.

Because faculty have an expressive right in their research, lectures, writing, and commentary, the College does not interpret the shielding prohibition as requiring faculty to present all sides to an issue. Please note that under the First Amendment, to be protected, faculty comments in the classroom must still be germane to the course.

*See*, New College Regulations Manual, "House Bill 233 – Intellectual Freedom, Shielding, Recording of Lectures, Student discipline" https://www.NCFF.edu/wp-content/uploads/2022/01/House-Bill-233.pdf (last accessed 8/2/23).

## **SB 266**

52.  SB 266 is the latest salvo in the culture wars being fought in Florida by Governor DeSantis and the Florida legislature. The statute follows close on the heels of the Stop WOKE Act which outlawed the teaching of eight concepts focusing on race and identity issues in Florida public schools and universities. SB 266 essentially extends the scope of the Stop WOKE Act to prohibit the teaching of any subject matter which involves "diversity, equity and inclusion" "political or social activism" or which "distorts history".

53.  SB 266 censors speech in two separate but complementary ways:

A.  It directly censors the teaching of the disfavored topics by prohibiting them outright; and

B.  It denies funding to institutions which offer courses that address or include the prohibited topics.

54.    The particular topics which are censored, denied funding or limited are the following:

A.    Any curriculum that violates the eight prohibited concepts set forth in §1000.05, <u>Fla.Stat</u>. *See*, Section 1 §1001.706(5)(a); Section 4, §1004.06(2)(a); Section 9, §1007.25(3)(c).

B.    Courses or instruction "based on theories that suppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities". *See*, Section 1, §1001.706(5)(a).

C.    Any courses which "[a]dvocate for diversity, equity, and inclusion". *See*, Section 4, §1004.06.(2)(a).

D.    Any courses which "promote or engage in political or social activism". *See*, Section 4, §1004.06.(2)(a).

E.    Courses which "distort significant historical events". *See*, Section 9, §1007.25(3)(c).

F.    Courses which "include a curriculum that teaches identity politics". *See*, Section 9, §1007.25(3)(c).

G.    Courses "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities." *See*, Section 9,

§1007.25(3)(c).

H.    Instruction which includes "unproven, speculative, or exploratory content", which is to be confined to electives, rather than made a part of a general education courses. *See*, Section 10, §1007.55(1).

55.    The mechanisms by which the Defendants enforce the content and viewpoint based prohibitions are found in several separate provisions of the statute:

A.    The Board of Governors must regularly review the courses and curriculum at each university and is required to give a "directive" to each university which allows instruction on the prohibited topics:

> (a) … The Board of Governors shall periodically review the mission of each constituent university and make updates or revisions as needed. Upon completion of a review of the mission, the board shall review existing academic programs for alignment with the mission. The board shall include in its review a directive to each constituent university regarding its programs for any curriculum that violates s. 1000.05 or that is based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities.

Section 1, §1001.706(5(a).

B.    The statute prohibits the funding of any university programs or activities which "advocate" for any of the prohibited topics:

> (2)    A Florida College System institution, state university, Florida College System institution direct-support organization, or state university direct-support organization may not expend any state or

federal funds to promote, support, or maintain any programs or campus activities that:

(a)    Violate s. 1000.05; or[33]

(b)    Advocate for diversity, equity, and inclusion, or promote or engage in political or social activism, as defined by rules of the State Board of Education and regulations of the Board of Governors. …

Section 4, §1004.06(2) – Prohibited expenditures.

C.    General education courses which "distort significant historical events"

or which teach "identity politics" are prohibited outright:

(c)    General education core courses may not distort significant historical events or include a curriculum that teaches identity politics, violates s. 1000.05, or is based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities.

Section 9, §1007.25(c).

D.    The State Board of Education and the Board of Governors is required

to reject any courses which do not meet the specified standards, including the

prohibitions found in §1007.25 relative to distorted history and institutional

---

[33] Section 1000.05 is the Stop WOKE Act. It is difficult to conceive how the Defendants could enforce this requirement of SB 266 given the injunction enjoining enforcement of §1000.05 entered in <u>Pernell v. Florida Bd. of Governors of State Univ. Sys.</u>, _ F.Supp. 3d _, 2022 WL 16985720 (N.D. Fla. Nov. 17, 2022).

injustice:

> 1007.55.   General education course principles, standards, and content
>
> (1) …. General education courses must:
>
>> (a)   Meet the course standards as provided in s. 1007.25…
>
> (4)   … The State Board of Education and the Board of Governors must approve or reject the list of general education courses for each Florida College System institution and state university, respectively.

Section 10, §§1007.55(1)(a), (4).

E.     While not completely prohibiting courses involving some controversial content, SB 266 instructs universities to limit such content to elective courses and exclude them from general education courses:

> Courses with a curriculum based on unproven, speculative, or exploratory content are best suited as elective or specific program prerequisite credit, not general education credit.

Section 10, §1007.55(1).

F.     Universities which offer prohibited content are denied eligibility for "performance based funding":

> (5)   Public postsecondary educational institutions that fail to comply with the requirements of this section are not eligible to receive performance-based funding pursuant to s. 1001.66 or s. 1001.92.

Section 10, §1007.55(5).

56.     SB 266 applies to every aspect of a university professor's curriculum,

textbooks, assignments, classroom teaching, mentoring and any research associated with the faculty member's position (which is denied funding if not consistent with the viewpoints mandated by the law).

57.    In particular, SB 266 applies to every aspect of Plaintiffs' curriculum, textbooks, classroom teaching and research.

58.    In general, SB 266 also applies to every aspect of a student's educational experience at Florida colleges and universities with the exception of a carve out from some of the content-based prohibitions for some student organizations.

59.    The carve out for some students and some organizations appears in Section 4, §§1004.06(2), (3):

> (2)    A Florida College System institution, state university, Florida College System institution direct-support organization, or state university direct-support organization may not expend any state or federal funds to promote, support, or maintain any programs or campus activities that:

> (a)    Violate s. 1000.05; or

> (b)    Advocate for diversity, equity, and inclusion, or promote or engage in political or social activism, as defined by rules of the State Board of Education and regulations of the Board of Governors. Student fees to support student-led organizations are permitted notwithstanding any speech or expressive activity by such organizations which would otherwise violate this subsection, provided that the public funds must be allocated to student-led organizations pursuant to written policies or regulations of each Florida College System institution or state university, as applicable. Use of institution

facilities by student-led organizations is permitted notwithstanding any speech or expressive activity by such organizations which would otherwise violate this subsection, provided that such use must be granted to student-led organizations pursuant to written policies or regulations of each Florida College System institution or state university, as applicable.

(3)     Subsection (2) does not prohibit programs, campus activities, or functions required for compliance with general or federal laws or regulations; for obtaining or retaining institutional or discipline-specific accreditation with the approval of either the State Board of Education or the Board of Governors; or for access programs for military veterans, Pell Grant recipients, first generation college students, nontraditional students, "2+2" transfer students from the Florida College System, students from low-income families, or students with unique abilities.

60.     On its face, the carve out applies only to student organizations, to programs mandated by Federal law and to those students who fit within the narrow statutory categories.

61.     The Student Plaintiffs do not fit within any of the categories of students exempted by Section 4, §§1004.06(3); They are not first generation college students, nontraditional students, "2+2" transfer students, students from low-income families or a students with unique abilities.[34]

_____

[34] While Plaintiffs are generally proud of their achievements in life thus far and recognize that each human being is unique, they cannot in good faith claim that they have "unique abilities" which would exempt them from the funding limitations of SB 266.

62.     It is clear that the carve out only reaches some of the content prohibited by SB 266. In particular, the carve out expressly applies only to the speech identified in that section including:

A.     Speech which violates the Stop WOKE Act - §1000.05;

B.     Speech which "[a]dvocate[s] for diversity, equity, and inclusion" and

C.     Speech which "promote[s] or engage[s] in political or social activism".

63.     That exclusive list does not reach other content which is proscribed by SB 266, including courses which "distort significant historical events", "include a curriculum that teaches identity politics," or are "based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities."

64.     The carve out appears to govern only the funding of certain curriculum or programs, which is governed by Section 4, §§1004.06, and does not apply to the prohibitions against certain content found elsewhere in SB 266 (namely Section 1, §1001.706(5(a), Section 9, §1007.25(c) and Section 10, §§1007.55(1)(a), (4)).

65.     The carve out is currently unavailable for students and organizations who wish to qualify for funding under "rules of the State Board of Education and

regulations of the Board of Governors" because those entities have not yet promulgated any rules or regulations for that purpose.

66.     In summary, the carve out provision in Section 4, §§1004.06(2), (3) is not effective as a safe harbor or savings clause and does not protect any of the Plaintiffs from the full force and effect of SB 266's censorship scheme.

67.     If New College permits instruction on any of the prohibited topics or funds organizations or activities which advocate for those concepts, it stands to lose all of its "performance based funding". *See*, SB 266, Section 10, §1007.55(5).

68.     For the 2022-23 school year, New College was allocated $1,814,987.00 in performance based funding.[35]

69.     On its face, SB 266 applies to all of the Plaintiffs and directly infringes upon their academic freedom as well as their right to freely engage in free speech and debate on all topics of interest and concern.

70.     SB 266 directly restricts the Professor Plaintiffs' ability to teach their students within the established curriculum. Without the censorship and limitations

---

[35] *See*, State University System of Florida, *Performance-Based Funding Metric Scores and Allocations* at 5, accessible at https://www.flbog.edu/wp-content/uploads/2023/04/PBF-Information -2022-23.pdf (last accessed 8/2/23); *See, also*, *Performance-Based Funding Model* at https://www.flbog.edu/wp-content/uploads/2022/08/22-23-PBF-Allocation.pdf (last accessed 8/2/23).

on funding found in the law, each of the Professor Plaintiffs would provide instruction in their respective fields and would utilize textbooks and materials which run afoul of many of the prohibited concepts in the law.

71.    In addition to directly censoring speech, SB 266 dramatically scaled back the protections of faculty tenure. *See*, Section 1, §1001.706(6) and Section 3, §1001.741(2).

72.    The loss of tenure rights and reordering of control over universities dramatically increases the chilling effect of the censorship provisions of SB 266; without the traditional protections of tenure an eligible professor is far less likely to engage in controversial speech and far less likely to approach the highly ambiguous line set by the statute for prohibited content.

73.    The Professor Plaintiffs are faced with the prospect of reordering their teaching methods, course materials and classroom instruction in order to comply with the content and viewpoint based requirements of SB 266, or they can continue with their current practices and risk loss of tenure and/or termination. This Hobson's choice has a chilling effect on Plaintiffs' speech.

74.    The Professor Plaintiffs will also be forced to self-censor during debates amongst students, prohibiting them from engaging in the free exchange of ideas that are the hallmark of learning in a college setting.

75.   SB 266 directly restricts the ability of the Student Plaintiffs, as well as other students at New College and at public universities around the state, to obtain a high quality education and to be exposed to the full range of information which their professors, including Professor Hernandez, would otherwise impart to them.

76.   The Student Plaintiffs are adults capable of determining for themselves whether the viewpoints advanced by their various instructors, including Professor Hernandez, have merit.

77.   The Student Plaintiffs expect to engage their professors and their fellow students on controversial and difficult subjects including race, gender, economic inequality, inherent bias in governmental institutions and the need to address those shortcomings in contemporary society.

78.   In order to know whether the viewpoints advanced by their professors have merit, the Student Plaintiffs must first have an opportunity to encounter them; that is, they must be permitted to listen to the professors' instruction in class.

79.   The Professor Plaintiffs are willing speakers and the Student Plaintiffs are willing listeners. They desire to engage in academic discussion concerning topics prohibited by SB 266.

80.   As students enrolled at New College, the Student Plaintiffs benefit from a learning environment in which academic freedom is uninhibited by the "pall of orthodoxy."

81.    Other  students at New College, including members of NCFF, are also interested in taking courses taught by the Professor Plaintiffs and other instructors at New College, free from the censorship imposed by SB 266.

82.    Plaintiffs fear that, if they engage in studies which are prohibited by SB 266, or speak on matters prohibited by the statute, they will face discipline, be denied funding and potentially face ouster from the public university system altogether.

83.    The Student Plaintiffs fear that they will not qualify for funding available to other students – for scholarship, research grants, etc. – because they regularly engage in speech and discussion prohibited by SB 266 and they advocate for and promote many of the prohibited concepts. As previously noted, the Student Plaintiffs do not fall within any of the carve outs created by Section 4, §§1004.06(2), (3).

84.    The Student Plaintiffs also fear that courses which they believed would be available to them when they enrolled in New College will be cancelled on account of the content and viewpoint based prohibitions found in SB 266 or because faculty will be unwilling to undertake the risk of instruction in the suspect fields.

85.    Plaintiffs also fear that their outspokenness and wish to study and teach "forbidden" topics will threaten the performance based funding which the

College needs in order to maintain its current level of academic excellence. *See*, Section 10, §1007.55(5) (prohibiting performance based funding for universities who do not comply with the curriculum requirements).

86.     A substantial portion of New College's budget is now dependent upon its diligent policing and prohibition of any courses or instruction which may even arguably violate the content and viewpoint based provisions of SB 266.

87.     New College therefore has a strong financial incentive to censor its faculty to ensure that they do not violate the content and viewpoint based provisions of SB 266.

88.     Likewise, professors concerned about their personal salaries and tenure track as well as those concerned about the general welfare of New College will have a strong incentive not to endanger the College's performance-based funding by instructing students on topics which might violate SB 266.

89.     SB 266 violates Plaintiffs' First and Fourteenth Amendment rights.

## **ALLEGATIONS IN SUPPORT OF STANDING AND INJUNCTIVE RELIEF**

90.     All of the Plaintiffs' speech rights have been chilled now, and in the future, as their fundamental speech rights are infringed by SB 266 and they face discipline, loss of funding and the diminution of the academic freedom that lies at the heart of every successful university.

91.    Unless Defendants are enjoined from enforcing SB 266, all of the Plaintiffs will suffer the continuing loss of their constitutional rights.

92.    All of the Plaintiffs have suffered irreparable injury and continue to suffer irreparable injury as a result of the subject statute.

93.    Plaintiffs have already suffered injury to their First Amendment rights as a result of the enactment of SB 266. Plaintiffs assert the following particulars:

A.    <u>With regard to Plaintiff Hernandez</u>:

(1)    Dr. Hernandez's salary and tenure are in jeopardy because SB 266 prohibits the funding of certain concepts which have been an integral part of her instruction over the years and which would again be part of her course instruction in Fall 2023 if the law is not enjoined.

(2)    As an experienced scholar and professor, Dr. Hernandez is of the firm opinion that SB 266 essentially prohibits the teaching of sociology as a scientific discipline, or at the very least, most subfields within sociology. In Dr. Hernandez's words:

> Because the basis of much sociological analysis is to explore how social organization is anchored in institutions and hence social structures, discriminatory behaviors are understood not as individual preferences but rather structurally embedded. As such most scholarship will demonstrate that racism, sexism, classism, ageism, disability discrimination and other forms oppression are supported (explicitly or implicitly) by the institutions of any country, including those of the United States. … However, it is clear to me that the intent of the law is to prohibit me from telling the students that the

institutional systems and social structures in the United States were indeed created to sustain systems of inequality and oppression. Most sociologists, myself included, argue social inequality is embedded in the social structures. … As such, I would easily be prohibited from teaching my area of expertise in Florida. All of my courses explicate social organization as social constructions that have rules and regulations in institutions that expressly or implicitly sustain inequality.

(3)     In response to the original Stop WOKE Act Dr. Hernandez modified her instruction to highlight the impact of the law on her lessons had the law not been enjoined. *See*, <u>Pernell</u>, *supra*. However, SB 266 not only incorporates the eight prohibited concepts from §1000.05, but expands the list of outlawed ideas to include "diversity equity, and inclusion", "political or social activism", and the possibility that "systemic racism, sexism, oppression and privilege are inherent in the institutions of the United States and were created to maintain social, political and economic inequities", all of which have been regular topics of study and discussion within the established curriculum she teaches.

(4)     Last semester (Spring 2023) Dr. Hernandez taught a sociology course entitled "Alternatives to Capitalism and Socialism". Dr. Hernandez reasonably believes that this course would be unlawful under SB 266 because, through the assigned readings based on established scholarship, the course promotes the idea that institutional racism, sexism, classism and oppression are common features of many societies, including our own, and that social activism

can eliminate those undesirable forms of discrimination. In past years, Dr. Hernandez made use of one of her own works, entitled *"Striving for Control: Democracy and Oligarchy at a Mexican Cooperative"*, as instructional material in the Alternatives to Capitalism course. It is likely that this material – while well within the mainstream of academic thought – could be viewed as promoting political activism by the politicians and administrators responsible for enforcing SB 266. Alternatives to Capitalism is a recurring course and Hernandez expects to teach it again in the future.

(5)     Dr. Hernandez regularly teaches a variety of other courses which are likely to be either prohibited outright or will have to be significantly scaled back and "dumbed down" in order to be taught in accordance with the strictures imposed by SB 266. The affected courses include:

Globalization, Social Justice, Human Rights

Sociology of Development

Social Movements

Social Theory (an upper division course for sociology majors)

Introduction to Sociology

Sociological Research Methods

Sociology of Race and Ethnicity

(6)    For Fall 2023, Dr. Hernandez is scheduled to teach Social Theory (a general education class) and Social Movements. Because both classes address basic, foundational principles of sociology and because those principles violate numerous provisions of SB 266 - including the prohibitions and funding restrictions addressing diversity, equity, inclusion, political and social activism, systemic discrimination (racism, gender inequality, etc.) and privilege in institutions, and arguably controversial historical perspectives – Dr. Hernandez reasonably believes that she cannot effectively teach that subject matter and will have to censor essentially all aspects of her instruction.

(7)    Dr. Hernandez will be unable to serve as Co-Director of the Initiative on Diversity and Equity in Academics in Fall 2023 as that Initiative is now clearly illegal and cannot be funded under SB 266.

(8)    Dr. Hernandez is unsure whether she will be able to act as faculty sponsor of the New College Club, "People of Color Union" which is organized as "a safe space for people of color at New College." While Section 4, §1004.06(2)(b) nominally exempts student-led organizations from the content and viewpoint based restrictions of SB 266, that exemption is conditioned on approval of the Florida College System or by New College, neither of which have promulgated rules to implement SB 266.

B.      <u>With regard to Plaintiff Clark</u>:

(1)     Dr. Clark's salary and tenure are in jeopardy because SB 266 prohibits the funding of certain concepts which have been an integral part of her instruction over the years and which would again be part of her course instruction in Fall 2023 if the law is not enjoined.

(2)     In her past research and writing, Dr. Clark has explored a variety of cultural themes which run afoul of SB 266, particularly with respect to the reflection of women and feminist concepts in art and the close relationship between art and cultural processes. Dr. Clark believes that several of her prior publications could not be assigned reading in courses impacted by SB 266, including Clark, M. (2001), *Bodies at the opera: Art and the hermaphrodite in the dance criticism of Theophile Gautier*, in R. Parker, & M. A. Smart (Eds.), Opera and Ballet Criticism in France from the Revolution to 1848 (pp. 237-253), Oxford University Press; and Clark, M. (2001) *Feminization of Ballet*, in A. Latham, & R. Parker (Eds.), Verdi in Performance (pp. 120-124), Oxford University Press.

(3)     As a professor of music and the Chair of the Humanities Division, Dr. Clark takes an interdisciplinary approach to music instruction to ask probing questions about the relationship between the arts and culture and how music may reflect aspects of social class, gender disparities, conditions of servitude, social progress and social discord. She asks her students to not only

examine how music and the arts are related to culture, but how they are *used* within a culture (examples being minstrel shows and "black face"). Dr. Clark explores the "anthropology of music" and dance history to demonstrate the ways that experiences of music are culturally constructed and historically situated. She has previously researched and provided instruction in "Ethnomusicology and Global Culture" and most recently has researched and published about the concept of "Whistling as Women's Work" which reflects upon the changing roles and responsibilities of women through time and in a cultural context. Dr. Clark infuses social awareness in all aspects of her instruction, largely from a progressive and inclusive point of view. Dr. Clark reasonably believes that her specific viewpoint with respect to music and its place in our culture cannot be taught to her university students given the restrictions imposed by SB 266

(4)     In the Fall 2023 semester, Dr. Clark will be teaching "The Western Art Music Tradition" a general education course similar to others she has taught in the past. Dr. Clark has already determined that she will have to revise the content of her course to avoid the censorial effects of SB 266 with regard to at least two items on her published syllabus:

What are the changing narratives of music's power?

How do people in different times and places describe the creative act of making music, and toward what ends?

Dr. Clark reasonably believes that those aspects of her instruction run afoul of Section 4, §1004.06(2)(b) because they touch on aspects of DEI and reflect upon the role of music and the arts in political and social activism. She fears that many of the social / cultural aspects of her teaching are subject to censorship under Section 9, §1007.25(c) because they are associated with "identity politics" "systemic racism" and "sexism". Dr. Clark is also concerned that her instruction – like any exploration of the arts and the meaning of art - may be considered to be "unproven, speculative and exploratory" under Section 10, §1007.55(1), and therefore inappropriate for her Fall 2023 class or for other general education classes she will teach in the future.

C.    <u>With regard to Kim Anderson</u>:

(1)    Professor Anderson's salary and tenure are in jeopardy because SB 266 prohibits the funding of certain concepts which have been an integral part of her instruction over the years and which would again be part of her course instruction in Fall 2023 if the law is not enjoined.

(2)    Professor Anderson is largely responsible for providing foundational instruction for art students at New College as she regularly teaches Drawing I and II and Painting I and II. In her own work and gallery displays, Professor Anderson examines historical relationships between painting and photography, often scrutinizing the ways women have historically navigated

distinctive positions as subjects, consumers and practitioners of art. Her paintings reflect on how images and objects are imbued with meaning, gain value, and become stratified within hierarchies of visual culture. Professor Anderson is of the opinion that art cannot be understood without reference to the society which spawns it – including the darker and more oppressive aspects of culture. Professor Anderson teaches that the reverse is true as well: art, in all its manifestations, is a reflection of both history and contemporary culture.

(3)     In addition to her own views on art and culture, Professor Anderson regularly engages guest lecturers who are working artists in their respective fields. Those guest artists have often developed careers informed by identity politics, social inequities and gender inequities which they express both in their art and their presentations. Professor Anderson reasonably believes that instruction of this nature will need to be curtailed or eliminated in order to comply with the requirements of SB 266 relative to the prohibited concepts in §1000.05 and because they involve advocacy for DEI and social and political causes. *See*, Section 4, §1004.06(2)(a) and (2)(b). Professor Anderson also believes that instruction of this nature could be perceived as advancing critical race theory and other theories suggesting that racism, sexism, oppression and privilege are inherent in contemporary institutions. *See*, Section 9, §1007.25(3)(c).

(3)     Professor Anderson reasonably believes that SB 266 will limit her ability to properly educate her students within the established curriculum because it eliminates all discussion of some of the most important aspects of our historical and contemporary culture, including the observation that women and minorities have been and continue to be vastly underrepresented in the arts – both as creators and as subjects. Such observations and instruction are prohibited and denied funding under multiple provisions of SB 266 including Section 4, §1000.06(2)(a) and (2)(b) (incorporating prohibited concepts from the Stop WOKE Act and denying funding to DEI initiatives as well as promotion of political or social activism) and Section 9, §1007.25(3)(c) (prohibiting instruction which includes the §1000.05 concepts, identity politics or which advances theories that systemic racism, sexism, oppression and privilege are inherent in our institutions).

(4)     Professor Anderson has routinely made use of images of artwork created by her favorite artists in conjunction with information about the artists' backstory, personal journey and the motivations for their work. Plaintiff has also assigned reading such as Linda Nochlin's seminal 1971 essay entitled, "Why Have There Been No Great Women Artists". Based on her experience as an artist and educator, Professor Anderson believes that exposure to such material is essential for her students' future success as artists and art educators. Professor Anderson reasonably believes that many of those artists, artistic works and

writings directly implicate the concepts, theories and viewpoints outlawed by SB 266. Accordingly, Professor Anderson is put to the choice of self-censoring her instruction and depriving her students of basic instruction in the approved curricula or of teaching in the full-throated, honest and intellectually curious manner that has been her style thus far – or being disciplined, denied tenure and/or denied funding under SB 266 for that effort.

(4)     Professor Anderson believes that the risk of adverse funding decisions, including the cancellation of courses or denial of course credit may accompany the independent study programs adopted by upper division students. Professor Anderson has previously overseen senior thesis studies (the "capstone" projects required for graduation from New College) which involve themes which are intensely personal to her students and are oftentimes highly critical of the way oppressed peoples have been treated in our society. Professor Anderson reasonably believes that many of those independent thesis projects will be disallowed by SB 266 or will be so altered in content as to be of no pedagogic value for her students.

(5)     In the Fall 2022 Semester, Professor Anderson taught a class entitled "Site/Sight: Mural Painting". As the concluding project in that class, Professor Anderson's students painted a mural on a New College campus building (with the permission of grounds staff). Much of the individual student's work on the mural reflected their multi-cultural experiences. This summer the mural was

painted over although the remainder of the building was not painted or renovated. Professor Anderson reasonably believes that the mural was destroyed by the current New College administration because the themes portrayed conflicted with the restrictions against DEI and other viewpoint based prohibitions adopted in SB 266.

(6)    For the upcoming Fall 2023 semester, Professor Anderson is scheduled to teach "Principles of Painting" and "Perceptual Drawing Methods", both of which are general education level classes. Professor Anderson reasonably believes that aspects of her instruction run afoul of Section 4, §1004.06(2)(b) because they touch on aspects of DEI and reflect upon the role of the arts in political and social activism. She fears that many of the social / cultural aspects of her teaching are subject to censorship under Section 9, §1007.25(c) because they are associated with "identity politics" "systemic racism" and "sexism". Professor Anderson is also concerned that her instruction may be considered to be "unproven, speculative and exploratory" under Section 10, §1007.55(1) and therefore inappropriate for her Fall 2023 class or other for general education classes she will teach in the future.

D.    With regard to Plaintiff Engels:

(1)    Ms. Engels is a student at New College about to enter the equivalent of her Junior Year. Her first area of concentration (equivalent to a

major) is Political Psychology[36] with a second concentration in Health, Culture and Societies. Ms. Engels anticipates that her course of study will also qualify her for a minor in Gender Studies.

(2)    Ms. Engels was initially drawn to New College precisely because it offered a flexible course of study tailored to her individual interests with a great deal of academic freedom complemented by small classes and a dedicated, highly-qualified faculty.

(3)    Ms. Engels will be taking three courses at New College in the fall: a statistics class (Dealing with Data I) as well as two courses directly impacted by SB 266: "Social Movements" (Course # 3600) and "Health, Culture and Societies: Interdisciplinary Explorations" (Course # 2200).

(4)    Ms. Engels reasonably fears that her  Social Movements course will either not be taught in the fall or that the subject matter will be censored as a direct result of SB 266. Social Movements will be taught by Dr. Hernandez in the Fall. Plaintiffs have previously explained how and why SB 266 will impact Dr. Hernandez's ability to teach the Social Movements class. Ms. Engels fears that the

---

[36] Political Psychology is not a designated major at New College but is a custom, interdisciplinary course of study hand-tailored for this Plaintiff by her professors and academic advisors.

viewpoint and content-based restrictions on Dr. Hernandez's instruction will destroy the fundamental purpose of that class, negatively impact the quality and scope of her education and prevent her from learning information she has specifically sought out as a willing listener.

(5)     Ms. Engels reasonably fears that her Health, Culture and Societies course will either not be taught in the fall or that the subject matter will be censored as a direct result of SB 266. That course would ordinarily address a wide range of issues including access to health care and  disparate health outcomes related to race, class, gender and ethnic background. The course is intended to emphasize the documented impact which institutions and cultures have on health and disease. These subjects are likely to run afoul of numerous prohibitions in SB 266 including the denial of funding for courses advancing the concepts subject to the Stop WOKE Act, as well as DEI and social and political activism (Section 4, §1004.06(2)(a) and (2)(b)). The curriculum is also likely to violate the prohibition against instruction involving identity politics, systemic racism, sexism, oppression and privilege as being embedded in American institutions (Section 9, §1007.25(3)(c)).

(5)     Ms. Engels has previously attended meetings of the "Feminist Fridays" student organization. This group is organized "to bring a feminist

perspective to a variety of topics."[37] Ms. Engels has supported and furthered those goals by addressing the New College Board of Trustees to protest changes to the curriculum, faculty and culture of the College. Ms. Engels reasonably fears that this organization will be disbanded or will not be allowed to meet on campus because of the prohibitions contained in SB 266 and because of her individual activism. While Section 4, §1004.06(2)(b) nominally exempts student-led organizations from the content and viewpoint based restrictions of SB 266, that exemption is conditioned on approval of the Florida College System or by New College, neither of which have promulgated rules to implement SB 266.

E.   <u>With regard to Plaintiff Leffler</u>:

(1)   Mr. Leffler is a student at New College about to enter the equivalent of his Senior Year. His first area of concentration (equivalent to a major) is Urban Studies with a second concentration in Chinese language, history and culture.

(2)   Mr. Leffler will be taking two classes at New College in the Fall, one of which – Social Movements - will inevitably be impacted by the prohibitions found in SB 266. Mr. Leffler reasonably fears that his Social

---

[37] *See*, New College, https://novoconnect.ncf.edu/organizations (last accessed 8/3/23).

Movements course will either not be taught in the Fall or that the subject matter will be censored as a direct result of SB 266. Social Movements will be taught by Dr. Hernandez. Plaintiffs have previously explained how and why SB 266 will impact Dr. Hernandez's ability to teach the Social Movements class. Mr. Leffler fears that the viewpoint and content-based restrictions on Dr. Hernandez's instruction will destroy the fundamental purpose of that class, negatively impact the quality and scope of his education and prevent him from learning information he has specifically sought out as a willing listener.

(3)   Mr. Leffler's principal major – Urban Studies – focuses on many concepts which are directly prohibited by the censorship and funding restrictions implemented through SB 266. Those concepts range the gamut from the continuing impacts of redlining on urban planning and financing, public housing projects, exclusionary zoning, systemic problems with the Census (e.g., questions pertaining to racial / immigration status, statistical adjustments for undercounts, etc.) and similar academic issues. While Urban Studies remains an approved curriculum within the Florida university system, Mr. Leffler reasonably believes that the discipline cannot be effectively taught and his degree will not be meaningful unless it is grounded in core concepts now outlawed by SB 266. *See*, Section 4, §1004.06(2)(a) and (2)(b); Section 9, §1007.25(3)(c). Removing those

topics from instruction and classroom discussion would be like prohibiting the teaching of evolution in a biology class.

(4)    Mr. Leffler also has a reasonable fear that his remaining Chinese history class(es) will be negatively impacted by the restrictions found in SB 266. China's current position in the world cannot be understood without reference to Mao, his controversial "Little Red Book" and the Cultural Revolution. Mr. Leffler reasonably believes that professor's classroom instruction regarding those historic facts and ideas will be chilled out of a fear of the prohibition against courses which "distort significant historical events" *See*, Section 9, §1007.25(3)(c).

F.    <u>With regard to Plaintiff Nagle:</u>

(1)    Ms. Nagle is a student at New College about to enter the equivalent of her Senior Year. As noted above, she is pursuing a general studies degree which takes full advantage of New College's status as Florida's premier liberal arts college.

(2)    Ms. Nagle will be taking four courses in the Fall 2023 semester: Psychology of Religion; a Polish History tutorial; Perceptual Drawing Methods and Introduction to Sociology. Ms. Nagle reasonably fears that at least two of those classes will either not be taught in the Fall or that the subject matter will be censored as a direct result of SB 266. Plaintiff alleges the following particulars:

(a)    Plaintiffs have previously explained how it would be effectively impossible to teach a course in sociology at any level without violating SB 266 because sociology examines all aspects of human culture, including those concepts prohibited by the statute (*e.g.*, DEI, social and political activism, identity politics, racial and gender discrimination, and the role society plays in the propagation of those practices). The Introduction to Sociology course would likely be severely hampered by Section 4, §1004.06(2)(a) and (2)(b) and Section 9, §1007.25(3)(c) of SB 266.

(b)    Content typically taught in Psychology of Religion is also subject to censorship and defunding by SB 266. The syllabus for that course states that "[t]opics covered will include… connections between religion and morality, and connections between religion and social behavior."[38] Many religions involve radical social messages and calls to activism; Jesus Christ's remarks in the Temple ("a den of thieves") being a prime example.[39] A professor may also wish to comment on the Rev. Martin Luther King's frequent resort to Scripture in his quest to bring equality and justice to African-Americans. SB 266 calls into question

---

[38]    *See*, New College, https://files.ncf.edu/wp-content/uploads/simple-file-list/202308_PSYC_3200_001.pdf (last accessed 8/10/23).

[39]    Matthew 21:13.

whether Black Lives still matter – or at least whether a professor of religion can comment on those social concerns without losing his job. *See*, Section 4, §1004.06(2)(a) and (2)(b) and Section 9, §1007.25(3)(c).

G.   <u>With regard to Plaintiff NCFF Freedom, Inc.</u>:

(1)   NCFF's support for academic freedom at New College is compromised by SB 266 as professors who are members of the Plaintiff organization cannot effectively teach or engage in academic discourse on account of the censorship and pall of orthodoxy created by the subject law.

(2)   NCFF reasonably fears that its fundraising efforts and its ability to solicit new members among New College students and faculty will be impaired because SB 266 is antithetical to NCFF's purpose and the statute prohibits discussion or instruction concerning ideas which lie at the core of NCFF's mission.

(3)   NCFF reasonably fears that it will be denied the use of campus facilities for programs and recruiting efforts as SB 266 prohibits the expenditure of funds or access to facilities for those organizations, such as NCFF, that advocate for social causes and remind society of its obligation to correct lingering inequalities in our culture.

(4)   NCFF reasonably fears that its student members, such as Plaintiff Engels, and its faculty members, will variously suffer discipline, loss of tenure and/or employment, loss of funding, loss of college credits and deprivation

of a high quality education in approved (and required) curriculum if SB 266 is not enjoined.

94.   None of the Plaintiffs has a plain, adequate or complete remedy to protect their constitutional rights and to redress the wrongs and illegal acts complained of, other than immediate and continuing injunctive relief.

95.   None of the Plaintiffs has an adequate remedy at law. Deprivation of rights guaranteed under the Constitution is an irreparable injury for purposes of injunctive relief. In cases involving the loss of First Amendment rights, such as in this case, damages are both inadequate and unascertainable.

96.   The public interest would be served by the granting of injunctive relief. In fact, the public interest is disserved by laws, such as the challenged statute, which interfere with the public's rights guaranteed under the First and Fourteenth Amendments.

97.   A permanent injunction will preserve Plaintiffs' civil rights and will minimize the need to award extensive compensatory damages.

**ATTORNEY'S FEES**

98.   Plaintiffs have retained Benjamin, Aaronson, Edinger & Patanzo, P.A. as their attorneys to represent them in this action and have agreed to pay them a reasonable fee, which fee Defendants must pay pursuant to 42 U.S.C. §1988.

## COUNT I

## SB 266 IMPOSES A VIEWPOINT BASED BAN ON PROTECTED SPEECH IN VIOLATION OF THE FIRST AMENDMENT

99.     Plaintiffs reallege the facts set forth in Paragraphs 1 through 98 and incorporate those facts into this Count by reference.

100.    This is an action for declaratory relief and injunctive relief brought by each of the Plaintiffs against each of the Defendants under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

101.    Plaintiffs are uncertain as to their rights and remedies under SB 266 as it has been applied to Plaintiffs in violation of the First Amendment to the United States Constitution.

102.    At public universities and colleges, faculty members' speech related to scholarship or teaching, and classroom speech related to matters of public concern, are protected by the First Amendment.

103.    Students have a corresponding First Amendment right to listen to and engage their professors in debate in furtherance of their education.

104.    NCFF has a right to fundraise and advocate for the benefit of New College's faculty and students free from the fear that its actions will imperil New College's supplemental funding from the Legislature.

105.   SB 266 is a content based law on its face because it is both defined and justified in terms of the content of speech. *See*, Reed v. Town of Gilbert, 576 U.S. 155 (2015).

106.   SB 266 creates a list of concepts, topics and ideas[40] – defined exclusively in terms of content - which it then censors through both direct prohibitions and through withholding of funds.

107.   SB 266 is a viewpoint based restriction because it favors and permits speech which opposes ideas such as diversity, equity and inclusion and social activism, etc. but disfavors and censors speech which promotes those ideas. While that discrimination is baked into the entirety of the statute it is most apparent in Section 4, §1004.06(2)(b) which prohibits funding only for speech which "advocates" for the disfavored speech:

> (2)    A Florida College System institution, state university, Florida College System institution direct-support organization, or state university direct-support organization may not expend any state or federal funds to promote, support, or maintain any programs or campus activities that:
> …
>     (b)    *Advocate* for diversity, equity, and inclusion, or promote or engage in political or social activism….    (emphasis added)

---

[40] Those content-based terms are set forth in paragraph 54 above.

108.   The First Amendment does not permit the government to favor some viewpoints over others, as that inevitably skews the marketplace of ideas to the detriment of all those who seek truth.

109.   Even the government acknowledges that SB 266 is intended to suppress ideologies which offend those in power. A recent press release from Governor DeSantis' office commenting on the enactment of SB 266 leaves nothing to the imagination:

> SB 266 takes several steps to prevent woke ideologies from continuing to coopt our state universities and state colleges. The bill prohibits higher education institutions from spending public dollars on initiatives that promote dangerous political and social activism, such as DEI initiatives. This bill prohibits programs, majors, minors, curriculum, and general education core courses that violate Florida law regarding prohibited discrimination or that are based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities. Additionally, this bill will require that our university presidents renew their ownership of and accountability for hiring, promoting, and when necessary, disciplining faculty.

Gov. DeSantis press release of May 15, 2023, https://www.flgov.com/2023/05/15 /governor-ron-desantis-signs-legislation-to-strengthen-floridas-position-as- national-leader-in-higher-education/ (last accessed 8/2/23).

110.   Defendant Diaz has likewise acknowledged publicly that SB 266 is intended to combat "ideology" that proponents of the law believe is associated with diversity, equity and inclusion principles:

>DEI divides students and at its very core is the antithesis to its so-called mission… These initiatives have completely transformed over the years, from what were once simple efforts to ensure equal access to all students, to now focusing on ideology over merit.

TV 6 Orlando, *Gov. DeSantis calls out diversity in Florida schools, 'woke mob' in roundtable* (March 13, 2023) accessible at https://www.clickorlando.com/news/politics/2023/03/13/gov-desantis-hosts-roundtable-with-education-officials/ (last accessed on 8/2/23).

111. Each of the concepts prohibited by SB 266 addresses matters of public or social concern, regardless of whether some find those concepts uncomfortable, unwelcome, disagreeable, or offensive.

112. As a content based and viewpoint based law which infringes speech rights, SB 266 is subject to strict scrutiny.

113. SB 266 cannot survive strict scrutiny because it is not justified by a compelling governmental interest and it does not adopt the least restrictive means of regulation.

114. SB 266 cannot survive the balancing test adopted by the Eleventh Circuit in Bishop v. Aronov, 926 F.2d 1066 (11th Cir. 1991) for the following reasons:

A. The State has no legitimate or substantial interest in regulating on the basis of viewpoint or of suppressing certain viewpoints.

B.     SB 266 engages in wholesale censorship which is not tied to any particular curriculum or course of study. A curriculum is usually thought of as a course of study within an established branch of knowledge.[41] For instance, a biology curriculum might include the study of evolution, Linnean classification, ecology, cell structure, anatomy, etc. In contrast, SB 266 attempts to prohibit *ideas* rather than regulate the academic content of specific curricula.

C.     The State has no pedagogical interest in regulating thoughts, concepts and ideas that lie at the heart of numerous disciplines and which are accepted as proper grounds for study, scholarship and debate by learned scientists and scholars.

D.     The Plaintiffs and other faculty members have a vital interest in studying, researching and teaching ideas addressing a host of issues present in our society including such concepts as "white privilege" institutional racism, the wisdom and legal basis for reparations, gender fluidity and a host of similar social, political and scientific theories, concepts and ideas.

---

[41]   Conventional definitions of "curriculum" include "the courses offered by an educational institution" and "a set of courses constituting an area of specialization" ["curriculum" *Merriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/curriculum] or "the courses that are taught by a school, college, etc. - the undergraduate/mathematics curriculum; The college has a liberal arts curriculum" ["curriculum" *Britannica Dictionary*, https://www.britannica.com /dictionary/curriculum.

E.     The Student Plaintiffs, together with other students at New College and throughout the public university system,  have a vital interest in learning about ideas addressing those same controversial (and not-so-controversial) ideas so that they are well prepared to participate in our thriving, diverse, multi-cultural and, occasionally, fractious society.

F.     SB 266 allows the funding of viewpoints favored by politicians (such as the notion that "white privilege" and the "patriarchy" do not exist or only existed in the past) and only prohibits "advocat[ing]" "promot[ing]" or "engaging" in the prohibited concepts. The law is fundamentally viewpoint-discriminatory. *See*, Section 4, §1004.06(2)(a) and (2)(b).

G.     The marketplace of ideas cannot thrive if politicians simply declare a significant number of ideas to be off-limits for discussion or debate in colleges and universities.

115.   SB 266 imposes a categorical ban on speech which is not tied to individual speakers in context, but acts as a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 466–67 (1995). Even in the context of public employees, the broad scope of the statute is not constitutionally permissible – particularly in the absence of any legislative findings of fact to justify the categorical censorship of speech. Id.

116.   SB 266 cannot survive intermediate scrutiny because it is not narrowly tailored, because there is a lack of alternative avenues of communication and because the government interest in censoring speech is not legitimate, much less substantial.

117.   SB 266 does not include time, place or manner  limitations that might otherwise limit its censorial effect. Plaintiffs allege the following particulars:

A.      The law is triggered by even a single major, a single class, a single lecture or a single textbook.

B.      There is no time, no place and no manner in which a professor may advocate, promote or engage in any of the disfavored concepts.

C.      The censorship imposed by SB 266 is not limited strictly to the classroom, but would include faculty mentoring of students – an important feature of New College instruction – students' independent research projects and even those student organizations not specifically permitted by the institution.

118.   Existing law, policy and practices already include a wide variety of less restrictive means to ensure that professors teach within an established curriculum and that teachers who promulgate objectively unsupported positions are denied tenure or suffer appropriate discipline or academic censure. The Court's resolution of the dispute in Bishop, *supra*, is one such example. Federal anti-

discrimination laws also serve the State's interests without unnecessarily infringing on speech rights.

119.   Section 4, §1004.06(2)(a) and Section 9, §1007.25(3)(c) expressly incorporate the eight prohibited concepts in the Stop WOKE Act, §1000.05, Fla.Stat. The Stop WOKE Act was determined to be unconstitutional under the First Amendment as a content-based and viewpoint based law. *See*, Pernell, *supra*. SB 266 is unconstitutional for the same reasons and to the same extent.

120.   The content based and viewpoint based purpose of SB 266 runs contrary to the public policy already in place in Florida which favors free and open debate by students. *See*, §1004.097, Fla.Stat. - Free expression on campus ("Expressive activities protected under the First Amendment to the United States Constitution and Art. I of the State Constitution include, but are not limited to, any lawful oral or written communication of ideas, including all forms of peaceful assembly, protests, and speeches; distributing literature; carrying signs; circulating petitions; faculty research, lectures, writings, and commentary, whether published or unpublished; and the recording and publication, including the Internet publication, of video or audio recorded in outdoor areas of campus.").

121.   Defendants are responsible for enforcing SB 266. There exists a credible threat that they will enforce that law against these Plaintiffs.

122.   As a direct and proximate result of the enactment of SB 266, Plaintiffs have already suffered irreparable injury in the form of violations of their constitutional rights and will continue to suffer this harm in the future.

123.   Plaintiffs are is entitled to preliminary and permanent injunctive relief, including but not limited to, an order enjoining all Defendants from enforcing SB 266.

124.   Plaintiffs are also entitled to declaratory relief. An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their rights under the United States Constitution.

WHEREFORE, Plaintiffs pray for the following relief:

A.   That this Court take jurisdiction over the parties and this cause.

B.   That this Court enter a judgment declaring that SB 266 is unconstitutional on its face and as applied to the Plaintiffs because it imposes content and viewpoint based restrictions on speech in violation of the First Amendment.

C.   That this Court enter a preliminary and permanent injunction forever enjoining Defendants and their officers, agents and employees, from enforcing SB 266 against Plaintiffs and all other similarly situated persons.

D.   That this Court award Plaintiffs their recoverable costs, including reasonable attorney's fees pursuant to 42 U.S.C. §1988.

E.     That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

## COUNT II
## SB 266 IS UNCONSTITUTIONALLY VAGUE

125.   Plaintiffs reallege the facts set forth in Paragraphs 1 through 99 and incorporate those facts into this Count by reference.

126.   This is an action for declaratory relief and injunctive relief brought by each of the Plaintiffs against Defendants under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

127.   Plaintiffs are uncertain as to their rights and remedies under SB 266, as it has been applied to Plaintiffs in violation of the First and Fourteenth Amendment to the United States Constitution.

128.   The Due Process Clause of the Fourteenth Amendment is violated where a law "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." Johnson v. United States, 576 U.S. 591, 595 (2015). This is because a "fundamental principle" of the American legal system is that laws "must give fair notice of conduct that is forbidden or required." FCC v. Fox TV Stations, Inc., 567 U.S. 239, 253 (2012).

129.   Avoiding vagueness is critical in laws affecting speech because of the "obvious" potential for a "chilling effect on free speech." Reno v. ACLU, 521 U.S.

844, 871–72 (1997).

130.  SB 266 specifically incorporates the eight concepts prohibited by §1000.05, Fla.Stat. and outlaws any funding or any curriculum which furthers those concepts. *See*, Section 1 §1001.706(5)(a); Section 4, §1004.06(2)(a); Section 9, §1007.25(3)(c). Section §1000.05, Fla.Stat. has already been determined to be unconstitutionally vague. *See*, Pernell, *supra*. SB 266 is unconstitutionally vague for the same reasons and to the same extent as §1000.05, Fla.Stat.

131.  SB 266 is unconstitutionally vague because it infringes on Plaintiffs' constitutionally protected rights under the First Amendment and it provides inadequate notice of the conduct it purports to prohibit.

132.  None of the key terms and phrases recounted in paragraph 54 are defined in SB 266.

133.  The terms and phrases recounted in paragraph 54 are terms of art which, far from having commonly accepted definitions, are often hotly contested in terms of meaning, scope, context and application.

134.  All of the key terms of art employed by SB 266 (as listed in paragraph 54) are vague, undefined and effectively undefinable.

135.  SB 266 does not reference or incorporate definitions found in any other provisions of the Florida Statutes.

136.  After diligent search and inquiry, Plaintiffs represent that many of the

key terms and phrases are not defined anywhere else in the Florida Statutes. For

instance, the term "diversity, equity, or inclusion" ("DEI") is found in several other

Florida statutes - §1000.05,[42] §760.10[43] and 2023 Fla. Sess. Law Serv. Ch. 2023-

28[44] -  but does not appear to have been defined in any of them.

137.   SB 266 does not include legislative findings of fact which might

otherwise assist in construing the undefined terms of art.

138.   The Legislature intentionally left all of those key terms undefined

because it delegated that responsibility to the Board of Education and the Board of

Governors:

> (2)   A Florida College System institution, state university, Florida
> College System institution direct-support organization, or state
> university direct-support organization may not expend any state or
> federal funds to promote, support, or maintain any programs or
> campus activities that:

---

[42] As previously noted, the Stop WOKE Act was declared unconstitutional in
Pernell, *supra*, in part because it was unconstitutionally vague.

[43] An application of the Stop WOKE Act in the context of private employment
which was declared unconstitutional in Honeyfund.com, Inc. v. DeSantis, 622 F.
Supp. 3d 1159 (N.D. Fla. 2022), in part because it was unconstitutionally vague.

[44]   This law amends several Florida statutes having to do with investment
standards which reject "corporate activism". Curiously, the term "diversity, equity
and inclusion" is used to help define other terms in the Bill ("Qualified public
depository" and "unsafe and unsound practice") but is never itself defined
anywhere.

….
    (b) Advocate for diversity, equity, and inclusion, or promote or engage in political or social activism, *as defined by rules of the State Board of Education and regulations of the Board of Governors.*

Section 4, §1004.06(2)(b) (emphasis added).

    (4)    The State Board of Education and the Board of Governors shall adopt rules and regulations, respectively, to implement this section.

Section 4, §1004.06(4).

139.   To the best of Plaintiffs' knowledge and belief, and after the exercise of reasonable diligence, Plaintiffs allege that, as of the filing of this Complaint, neither the State Board of Education nor the Board of Governors has enacted any rules or regulations implementing SB 266 nor does it appear that any such rules have been publicly advertised.

140.   To the best of Plaintiffs' knowledge and belief, and after the exercise of reasonable diligence, Plaintiffs allege that, as of the filing of this Complaint, neither the New College Board of Trustees nor the New College administration have adopted any policies which define or interpret the key provisions set forth in paragraph 54.

141.   The attempt to delegate this legislative authority to the Board of Education and the Board of Governors is unavailing and only serves to enhance the facial vagueness of SB 266. Plaintiffs allege the following particulars:

    A.    It is clear that the Legislature knew that SB 266 left key terms

undefined and that it could not be effectively implemented without the adoption of additional rules and regulations - because it said as much in the law. Accordingly, SB 266 is unconstitutionally vague at least until an authoritative construction is adopted.

B.      The Legislature intentionally left a gap period when SB 266 would not include necessary definitions or implementing rules and regulations. That gap period began on July 1, 2023, when SB 266 went into effect, and will continue until such time as the Board of Education and the Board of Governors adopt rules of some kind. It appears that this gap period will extend well into the 2023 Fall Semester,[45] leaving Plaintiffs, and all other professors and students, uncertain as to what curriculum may be taught and/or funded.

C.      The failure to adopt state-wide regulations necessarily means that the implementation of SB 266 will vary from school to school based on individual policies adopted by individual Trustees and Presidents. That variation not only promises to create pockets of greater and lesser censorship but also impacts the freedom of professors and students to transfer from one public university to another. The inevitability of varied enforcement regimes dependent upon

---

[45] Fall classes begin at New College on Monday, August, 28, 2023. *See*, https://www.ncf.edu/academics/academic-calendar/ (last accessed 8/2/23).

individual administrators demonstrates the vagueness of the law.

D.     It is uncertain whether the Board of Education and the Board of Governors are constitutionally permitted to fill in the definitional gaps left by the Legislature. That sort of delegation to an executive branch agency[46] has traditionally been considered to be a violation of the separation of powers. *See*, Chiles v. Child. A, B, C, D, E, & F, 589 So. 2d 260, 264 (Fla. 1991) ("This Court has repeatedly held that, under the doctrine of separation of powers, the legislature may not delegate the power to enact laws or to declare what the law shall be to any other branch."). That is particularly true where the anticipated regulations would directly govern the expenditure of state funds. *See*, Section 4, §1004.06.

130.   The conditional carve out provisions of Section 4, §§1004.06(3) are also unconstitutionally vague. Plaintiffs note in particular that the terms "nontraditional students" and "students with unique abilities" are both undefined and without any context which would allow an administrator or student to determine whether they are exempt from or subject to the law.

142.   With respect to sociology  professors such as Dr. Hernandez,  SB  266

---

[46]  The Board of Governors is defined as part of the executive branch by both the Florida Constitution and statute. *See*, §7, Art. IX, FLA. CONST.; §1001.705, Fla.Stat.

is internally inconsistent and requires compliance with two utterly irreconcilable standards. Section 9, §1007.25(d)3 mandates the following standards for all general education social science courses:

> 3.    Social science courses must afford students an understanding of the basic social and behavioral science concepts and principles used in the analysis of behavior and past and present social, political, and economic issues.

However, §1007.25(c) prohibits instruction on basic concepts in that field, including the eight concepts incorporated from §1000.05 and the idea that "systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities."

143.   Those concepts and ideas lie at the heart of modern sociology and are widely taught, including by Dr. Hernandez and Dr. Clark. They are simultaneously mandated and prohibited. Even the most learned professor cannot determine how to thread that needle.

144.   Section 10, §1007.55(1) specifies that instructors should not offer general education classes "with a curriculum based on unproven, speculative, or exploratory content" without defining any of those terms. Those undefined terms are inherently vague – particularly in the social sciences and the arts and humanities where few if any concepts can be deemed "proven" or not

"speculative" and where exploratory content lies at the very heart of the academic discipline.

145. Professors Hernandez and Clark teach both general education and elective or upper-divisions courses. Plaintiffs cannot determine on the face of the statute whether any of their curricula, course materials or topics for instruction are or are not appropriate for their general education students. Plaintiffs must guess at the proper curriculum at the risk of being defunded, denied tenure or otherwise disciplined under SB 266.

146. Because of the vagueness found throughout SB 266, faculty are exposed to the possibility of arbitrary and discriminatory enforcement.

147. As a direct and proximate result of this unconstitutional vagueness, Plaintiffs are being deprived of their constitutional rights.

WHEREFORE Plaintiffs pray for the following relief:

A. That this Court takes jurisdiction over the parties in this cause;

B. That this Court determine and declare that all of the terms of art set forth in paragraph 54 of this Complaint are unconstitutionally vague.

C. That this Court determine that the vague terms are so pervasive and numerous that they cannot be severed from the law.

D.    That this Court enter an Order preliminarily and permanently enjoining the Defendants, and their officers, agents and employees, from enforcing SB 266 against Plaintiffs or any other similarly situated persons.

E.    That this court award Plaintiffs their recoverable costs, including reasonable attorney's fees pursuant to 42 U.S.C. §1988.

F.    That this Court award Plaintiff all other relief in law and in equity to which they may be entitled.

## COUNT III
## SB 266 IS FACIALLY OVERBROAD

148.   Plaintiffs reallege the facts set forth in Paragraphs 1 through 98 and incorporate those facts into this Count by reference.

149.   This is an action for declaratory relief and injunctive relief brought by each of the Plaintiffs under this Court's general jurisdiction and pursuant to 28 U.S.C. §2201 and 42 U.S.C. §1983.

150.   Plaintiffs are uncertain as to their rights and remedies under SB 266 as that law has been applied to Plaintiffs in violation of the First Amendment to the United States Constitution.

151.   SB 266 "prohibits a substantial amount of protected expression." United States v. Stevens, 559 U.S. 460, 473 (2010).

152.   SB 266 prohibits a sweeping amount of protected speech related to scholarship or teaching, or classroom speech over matters of public concern. The First Amendment protects that speech regardless of whether some find those concepts uncomfortable, unwelcome, disagreeable, or offensive.

153.   The censorship and prohibitions on funding imposed by SB 266 reach a real and substantial range of protected expression, including much of the Professor Plaintiffs' curriculum and many of the established courses and majors at New College.

154.   The categorical ban on speech imposed by SB 266 is not sensitive to specific speech in context and is not supported by legislative findings of fact which might serve to either justify or narrow the broad scope of the censorship scheme. In this regard, SB 266 does not comport with Nat'l Treasury Emps. Union, *supra*.

155.   SB 266 has a strong likelihood of deterring speech which is not properly subject to the law including discussion of almost all controversial historical, political and social topics, many of which are vital to the unimpeded flow of ideas in a free society.

156.   All of the key terms of art employed by SB 266 (as listed in paragraph 54) are vague, undefined and effectively undefinable.

157. That vagueness, coupled with threats to supplemental funding of schools, strongly encourages colleges and universities to "over police" the enforcement of the law so as to avoid those negative consequences.

158. That vagueness, coupled with the threat of discipline and loss of funding and tenure creates a chilling effect which forces professors to steer well clear of the controversial topics so as to avoid those negative consequences.

159. The censorship imposed by SB 266 is not limited strictly to the classroom, but would include faculty mentoring of students – an important feature of New College instruction – students' independent research projects and even those student organizations not specifically permitted by the institution.

160. The focus of the statute on speech which "[a]dvocate[s] for diversity, equity, and inclusion, or promote[s] … political or social activism" is so broad as to discourage any discussion of those important topics in any context. For example, a professor who is opposed to diversity, equity and inclusion principles may refrain from teaching methods such as the Socratic method or playing "devil's advocate" in the fear that his opposition may be mistaken for advocacy. *See*, Section 4. §1004.06(2)(b).

161. SB 266 serves no objective other than "prohibit[ing] a substantial amount of protected expression." Stevens, 559 U.S. at 473. This renders SB 266 facially unconstitutional, as the substantial protected expression the law prohibits is

well beyond any possible "plainly legitimate sweep" of the Act. *See*, Virginia v. Hicks, 539 U.S. 113, 118–19 (2003).

162.   The "likelihood that the statute's very existence will inhibit free expression" by "inhibiting the speech of third parties who are not before the Court" also shows why SB 266 is facially overbroad. Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 799, 800 (1984). These parties include the thousands of faculty members at Florida's colleges and universities who must consider self-censorship because of SB 266's sweeping prohibitions on matters of public concern.

WHEREFORE Plaintiffs pray for the following relief:

A.   That this Court takes jurisdiction over the parties in this cause.

B.   That this Court determine and declare that SB 266 is unconstitutional because it is substantially overbroad and chills protected speech.

C.   That this Court enter an Order preliminarily and permanently enjoining the Defendants and their agents and employees, from enforcing SB 266 against Plaintiffs or any other similarly situated persons.

D.   That this court award Plaintiffs their recoverable costs, including reasonable attorney's fees pursuant to 42 U.S.C. §1988.

E.    That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

## COUNT IV
## SB 266 VIOLATES THE EQUAL PROTECTION CLAUSE

163.   Plaintiffs Engels, Leffler and Nagel reallege each and every allegation set forth in Paragraphs 1 through 15, and 31 through 93, and incorporate them herein by reference.

164.   The Student Plaintiffs are uncertain as to their rights and remedies under SB 266, as it has been applied to Plaintiffs in violation of the First and Fourteenth Amendment to the United States Constitution.

165.   Section 4, §§1004.06(2), (3) of SB 266 establishes certain categories of students who are exempted from the speech prohibitions which otherwise apply to all other students at Florida's public universities. In addition to being free of the content restrictions on their speech, the favored students are entitled to apply for funding even if they engage in the speech or promote the concepts which the State otherwise prohibits.

166.   All other students who do not fall within one of the Section 4, §§1004.06(2), (3) categories are subject to the full weight of the law. In particular, they cannot pursue a course of studies involving any of the prohibited concepts and cannot seek funding for any curriculum which might promote those banned ideas.

167.   The Student Plaintiffs are among the individuals in the disfavored classes of students. They do not fall within any of the categories of students exempted from the law, they are not aware of any Federal protections (other than the Constitution) that would trump the SB 266 prohibitions and they must otherwise comply with all aspects of the statute.

168.   The Student Plaintiffs are not treated equally but have been singled out for restrictions on their fundamental speech rights which do not apply to the favored categories of students.

169.   There is nothing to distinguish the Student Plaintiffs from any other students at New College or at colleges and universities elsewhere in the State of Florida. In particular, the Student Plaintiffs attend similar classes, pursue similar majors, are instructed by the same professors, read the same textbooks and engage in speech which is not categorically different from any other students who attend Florida schools.

170.   The Defendants favor a select group of students over the Student Plaintiffs for impermissible and bad faith reasons having no rational relation to any public purpose or public benefit. The only difference between the Student Plaintiffs and other similarly situated students is that they are not a members of the arbitrary groups allowed favorable treatment under the statute (in that the favored

students are exempted from the restrictions on speech and funding applicable to all other students, including the Plaintiffs).

171.   There is no justification to treat the Student Plaintiffs differently from the favored group of students who attend New College or colleges and universities elsewhere in the State of Florida.

172.   There is no rational basis for the difference in treatment between the Student Plaintiffs and the favored group of students who attend New College or colleges and universities elsewhere in the State of Florida.

173.   The distinctions between students mandated by SB 266 are subject to heightened scrutiny because their disparate treatment of the Plaintiffs infringes upon a fundamental right – that of free speech.

174.   The Defendants treat the Student Plaintiffs differently for an invidious purpose and with the specific intent of discriminating against Plaintiffs and denying their rights.

175.   The Student Plaintiffs have a right to have this Court declare their rights under the Fourteenth Amendment as those rights are restricted and infringed by the policies, practices and actions complained of herein.

WHEREFORE Plaintiffs Engels, Leffler and Nagle pray for the following relief:

A.      That this Court take jurisdiction over the parties in this cause.

B.      That this Court declare that the distinctions between students created by Section 4, §§1004.06(2), (3) of SB 266 is a violation of the Plaintiffs' Equal Protection rights as guaranteed by the Fourteenth Amendment to the United States Constitution.

C.      That this Court enter an Order preliminarily and permanently enjoining the Defendants, and their officers, agents and employees, from enforcing Section 4, §§1004.06(2), (3)  of SB 266 against Plaintiffs or any other similarly situated persons.

D.      That this Court award Plaintiffs her recoverable costs, including a reasonable attorney's fee pursuant to 42 U.S.C. §1988.

E.      That this Court award Plaintiffs all other relief in law and in equity to which they may be entitled.

*Respectfully submitted,*

BENJAMIN, AARONSON, EDINGER
& PATANZO, P.A.


  /s/  Gary S. Edinger
GARY S. EDINGER, Esquire
Florida Bar No. 0606812
305 N.E. 1st Street
Gainesville, Florida 32601
(352) 338-4440  (Fax) (352) 337-0696
GSEdinger12@gmail.com

DANIEL R. AARONSON, Esquire
Florida Bar No.: 314579
1700 East Las Olas Blvd., Suite 202
Ft. Lauderdale, Florida 33301
(954) 779-1700 (Fax) (954) 779-1771
danaaron@bellsouth.net

*Attorneys for Plaintiffs*