UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**NCF FREEDOM, INC.,**           )
a Florida not-for-profit corporation,    )
**SARAH HERNANDEZ**,          )
**MARIBETH CLARK**,           )
**KIM ANDERSON**,            )
**SARA J. ENGELS**,           )
**CARLTON LEFFLER**, and     )
**SHELBY A. NAGLE**,         )
                            )  **CASE NO.: 4:23-cv-00360-MW-MAF**
     Plaintiffs,           )
                            )
**v.**                              )
                            )
**MANNY DIAZ, JR.,** in his official capacity )
as the Commissioner of the Florida State  )
Board of Education and member of the    )
Florida Board of Governors, et al.,      )
                            )
     Defendants.         )
_____/

# <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

# <u>AND SUPPORTING MEMORANDUM OF LAW</u>

Plaintiffs file their Motion for Preliminary Injunction, pursuant to Rule 65, <u>Fed.R.Civ.P.</u> and Rule 7.1 <u>N.D.Fla.Loc.R.</u>, and move this Court to enter a preliminary injunction prohibiting the Defendants from enforcing Chapter 2023-082, Laws of Florida ("SB 266"), and in support thereof state:

## MATERIAL FACTS AND SUMMARY OF CLAIMS

1.     Plaintiffs have filed a Complaint under 42 U.S.C. §1983 asserting that SB 266 violates the First and Fourteenth Amendments on its face and as applied to the Plaintiffs.

2.     Plaintiffs fall into one of three general categories:

A.     NCF Freedom, Inc. ("NCFF") is a non-profit corporation dedicated to academic freedom and the promotion of New College as a progressive honors college. (Miller Decl. at 2-3, ¶¶ 4-7, 11). NCFF asserts that SB 266 interferes with its ability to advocate for progressive and inclusive education and infringes upon the First Amendment rights of its members. NCFF properly alleges that it has standing to maintain this action in its own right as well as through organizational standing. (Miller Decl. at 3-5, ¶¶ 12-17).

B.     Sarah Hernandez, Maribeth Clark and Kim Anderson (the "Professor Plaintiffs") are professors at New College of Florida. (Doc. 1 at 9-11). Each of them has taught classes in the past which includes content that would be banned, defunded or both under SB 266. (Doc. 1 at 38-48; Hernandez Decl. at 2-9 ¶¶ 6, 8-10, 13). Each of the professors is scheduled to teach classes in the Fall 2023 semester[1] which

---

[1] Fall classes began at New College on Monday, August, 28, 2023. *See*, https://www.ncf.edu/academics/academic-calendar/ (last accessed 8/17/23).

include content and instructional materials which are prohibited under the plain language of SB 266. (Doc. 1 at 41-48, ¶ 93-A(6), ¶93-B(4); ¶93-C(5); Hernandez Decl. at 5, ¶10; Clark Decl.). The Professor Plaintiffs assert that SB 266 interferes with their First Amendment rights and their corollary interest in academic freedom. The Complaint alleges, in exhaustive detail, exactly which provisions of SB 266 affect each Professor's speech and exactly how their speech will be curtailed.

C.     Sara J. Engels, Carlton Leffler and Shelby A. Nagle (the "Student Plaintiffs") are adult students who are enrolled at New College for the Fall 2023 semester. (Doc. 1 at 11-12, ¶¶ 31-33). Each of the Plaintiffs is taking one or more classes that either cannot be taught or must be significantly curtailed in order to comply with SB 266. (Engels Decl. at 2-6, ¶¶ 8-9, 11; 48-55, Leffler Decl. at 2-6, ¶¶ 6-8; Doc. 1 at 48-55, ¶¶ 93-D(4-5), 93-E(2-4), 93-F(2)). Again, the Complaint matches specific courses and areas of study with specific provisions of SB 266 to explain how the Student Plaintiffs' access to speech is affected. The Social Movements course to be taught by Plaintiff Hernandez is especially vulnerable to being gutted by the speech restrictions imposed by SB 266. (Engels Decl. 2-3, ¶8, 4-6, ¶11). These Student Plaintiffs are not passive receptacles into which knowledge is poured; they anticipate activate debate and a healthy interchange of ideas with their Professors. SB 266 destroys that vital dialog.

3.      SB 266 went into effect on July 1, 2023. The Professor Plaintiffs recount how their syllabi and course preparations have already been altered to accommodate SB 266. (Hernandez Decl. at 5, ¶10, 6-9, ¶13; Doc. 1 at 43-44, ¶93-A(6), ¶93-B(4), ¶93-C(6)). There is no doubt whatsoever that the State will vigorously enforce this law and that a pre-enforcement challenge is appropriate. *See, generally*, Wollschlaeger v. Governor, Florida, 848 F.3d 1293, 1304–05 (11th Cir. 2017) (*en banc*) (Authorizing pre-enforcement facial challenge in a First Amendment context).

4.      Plaintiffs' legal arguments may be summarized as follows:[2]

A.      Controlling Case Law: This case is controlled by Bishop v. Aronov, 926 F.2d 1066, 1075 (11th Cir. 1991) (as to Plaintiffs' First Amendment claims) and the persuasive decision in Pernell v. Fla. Bd. of Governors of State Univ. Sys., F.Supp.3d __, 2022 WL 16985720 (N.D. Fla. Nov. 17, 2022) (as to both the First Amendment and vagueness claims).

B.      The Stop WOKE Act; Still Unconstitutional: SB 266 incorporates the eight prohibited concepts from §1000.05, Fla.Stat. – the "Stop WOKE Act". *See*, Section 4, §1004.06(2)(a) and (2)(b); Section 9, §1007.25(c). The Stop WOKE Act

---

[2] The Student Plaintiffs have also asserted an Equal Protection claim. That claim involves disputed issues of fact and is unsuitable for presentation at the preliminary injunction stage. The claim is not waived, but is retained for later adjudication.

was preliminarily enjoined in <u>Pernell</u>, *supra* as a viewpoint based restriction on speech and because it is unconstitutionally vague. The constitutional defects in the Stop WOKE are not cured simply by incorporating them into another statute.

C.     <u>Vagueness</u>: The First Amendment claims take up the vast majority of the Complaint because they are complex and nuanced. However, the most obvious and compelling challenge to SB 266 is the unconstitutional vagueness of the law under the Due Process Clause and the First Amendment. That challenge is neither complex nor nuanced. Rather, it is obvious that none of the material terms of the statute is defined and that many of the key concepts are either undefinable or subject to widespread disagreement as to their scope and meaning. What does it mean to advocate for "diversity, equity and inclusion"? When does a professor engage in "social advocacy" and how does a Professor know when they have gone from discussing a concept to "advocating for" a disfavored idea? Who decides when history is "distorted"? The statute apparently delegates all of those definitional tasks to the Board of Education and the Board of Governors. However, neither entity has promulgated rules nor is there any obvious way for rules to eliminate the facial vagueness of the statute.

D.     <u>First Amendment claims</u>:  As noted in the Complaint, SB 266 censors speech in two separate, but complementary respects: (1) it denies funding to

institutions which offer courses that address or include the prohibited topics; and (2) it directly censors the teaching of the disfavored topics by prohibiting them outright.

(1)    The statute openly favors certain viewpoints over others as it denies funding only for courses, facilities and organizations which "advocate for" the prohibited concepts. *See*, Section 4, §1004.06(2). However, professors remain free to teach that "social activism" is an evil that ought to be eradicated, that patriarchal institutions no longer deny opportunities to women, or that LGBTQ+ students have nothing to fear from a conservative Board of Trustees.

(2)    SB 266 censors certain ideas – including the concepts imported from the Stop WOKE Act, "identity politics, "distortion" of historic events and any notion that discrimination is imbedded into society's institutions – but only with respect to speakers who favor those viewpoints. *See*, Section 9, §1007.25(3)(c). It is noteworthy that those restrictions do not focus on specific curricula or directly eliminate any particular majors or programs. Rather, SB 266 focuses on ideas that would normally be taught as part of an approved curriculum. This censorship is especially problematic because it is imposed across the board rather than within the scope of individual disciplinary proceedings. *See, generally*, United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 468 (1995). There is no pedagogic justification for that discriminatory treatment either on the face of the statute or in the legislative history (which does not include any legislative findings). The

Professors' interest in academic freedom to teach accepted (if controversial) topics within an approved curriculum outweighs the impermissible government interest in censoring ideas.

(3)   SB 266 is overbroad because it sweeps up a great deal of protected speech unrelated to the government interest.

## MEMORANDUM OF LAW

## I.   PRELIMINARY INJUNCTION STANDARD.

In order to obtain a preliminary injunction, a plaintiff must show the following: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. Vital Pharms., Inc. v. Alfieri, 23 F.4th 1282, 1290–91 (11th Cir. 2022). Plaintiffs can easily meet each requirement.

## II.   PLAINTIFFS' SPEECH IS PROTECTED BY THE FIRST AMENDMENT.

This Court has correctly held that the First Amendment protects speech in the context of the state university system:

> "[S]tate colleges and universities are not enclaves immune from the sweep of the First Amendment." Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). As recently as 2003, the Supreme

> Court reaffirmed "that given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." Grutter v. Bollinger, 539 U.S. 306, 329, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (listing cases); *see also* Healy, 408 U.S. at 180–81, 92 S.Ct. 2338 ("The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom.").

Pernell, 2022 WL 16985720 at *6. This fact is well-summarized in the now-famous line from Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969) that "[n]either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[3]

The First Amendment rights of students has been zealously guarded ever since. *See, e.g.*, Jane Doe I v. Valencia Coll. Bd. of Trustees, 838 F.3d 1207 (11th Cir. 2016). The First Amendment rights of professors is more complicated as discussed immediately below. However, the Supreme Court has recognized the need to extend First Amendment protections to professors, including the collateral or

---

[3] While Tinker upheld the First Amendment rights of high school students, it also legitimized the imposition of some restrictions which would not be tolerated in the case of adult speakers. Courts have subsequently recognized that the modest restrictions allowed in a high school setting are inappropriate when applied to colleges and universities. *See, e.g.*, Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1127 (11th Cir. 2022) ("First, it's not at all clear that Tinker's more lenient standard applies in the university - as opposed to the elementary- and secondary-school - setting.").

associated right known as "academic freedom":[4]

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' Shelton v. Tucker, *supra*, 364 U.S., at 487, 81 S.Ct., at 251. The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.' (citation omitted).

Keyishian v. Bd. of Regs. of Univ. of State of N.Y., 385 U.S. 589, 603 (1967); *See, also*, Hardy v. Jefferson Cmty. Coll., 260 F.3d 671, 680 (6th Cir. 2001) ("[T]he argument that teachers have no First Amendment rights when teaching, or that the government can censor teacher speech without restriction, is totally unpersuasive."); Meriwether v. Hartop, 992 F.3d 492, 506 (6th Cir. 2021), *quoting* Hardy, *supra*, 260 F.3d 671, 680 (6th Cir. 2001) ("[A] teacher's in-class speech deserves constitutional protection.").

   In Pernell, the State argued that professors were engaged in "government speech" which took them completely outside the protections of the First

---

[4] The Eleventh Circuit has held that there is no independent or free-standing right of "academic freedom". *See*, Bishop, 926 F.2d at 1075. Rather that interest is recognized "as an adjunct of the free speech rights of the First Amendment." Id.

Amendment. *See*, Pernell, 2022 WL 16985720 at *5. That argument is premised on the Supreme Court's decision in Garcetti v. Ceballos, 547 U.S. 410 (2006) which determined that the First Amendment did not extend to speech by government employees speaking on matters within the scope of their official duties. However, the Garcetti Court specifically stated it was *not* deciding whether the same rules applied to speech at colleges and universities. Id. at 425.

This Court ultimately held that Garcetti provides no support for the notion that professor's instruction in the classroom is unprotected government speech:

> All this is to say that Defendants have identified no case, nor has this Court identified any authority - binding or persuasive - holding that Garcetti applies to university professors' in-class speech such that it amounts to government speech outside the First Amendment's protection. To the extent Defendants urge this Court to determine that university professors' in-class speech is always pure government speech, the weight of binding authority requires this Court to decline the invitation.

Pernell, 2022 WL 16985720 at *10.

This Court went on to find that the Eleventh Circuit protects classroom speech in universities under the balancing test enunciated in Bishop:

> In short, two things are clear: (1) the First Amendment protects university professors' in-class speech and (2) Bishop remains the binding authority guiding this Court's analysis of Plaintiffs' speech claims.

Pernell, at *12.

SB 266 also impacts the First Amendment rights of students who are not governed by the government speech doctrine because they are not government employees. SB 266 infringes on the Student Plaintiffs' First Amendment rights directly by depriving them of access to the very ideas and instruction which inspired them to attend New College in the first place. But SB 266 reaches outside of the classroom as well. Student organizations, including the Feminist Fridays club to which Engels belongs, can be denied funding and access to college facilities if they advocate for ideas banned by the statute – which the Friday Feminists clearly do.

Each of the Plaintiffs has properly alleged that they have First Amendment rights which have been infringed upon by SB 266.

## III. <u>PLAINTIFFS HAVE THE REQUISITE STANDING; THIS CASE IS RIPE; AND THERE ARE NO GROUNDS FOR ABSTENTION.</u>

Plaintiffs clearly have standing to challenge the constitutionality of SB 266. Plaintiffs documented the precise ways that each of the challenged provisions of SB 266 challenges their speech. (Doc. 1 at 38-56, ¶93; *See, also*, Declarations of Hernandez, Clark, Engels, Leffler and Miller).[5]

---

[5]  Plaintiffs can succeed on this Motion even if only one of them has standing to challenge the law. *See*, <u>Pernell</u>, 2022 WL 16985720 at *50 ("Only one Plaintiff needs standing to challenge a Defendant's enforcement of the [law]").

Plaintiffs have named the appropriate Defendants who control the implementation and enforcement of the statute. *Compare*, <u>Pernell</u>, 2022 WL 16985720 at *28 ("This Court finds that the Professor Plaintiffs' injuries are fairly traceable to the members of the Board of Governors and, for the Novoa Professor Plaintiff, to the members of the USF Board of Trustees in their official capacities."). The Board of Governors not only provides "directives" under the statute [Section 1, §1001.706(5)(a)], but it is specifically delegated the task of promulgating definitions and regulations [Section 4, §1004.06(2)(b)]. The Board is ultimately responsible for making the funding decisions mandated by SB 266. *See*, Section 4, §1004.06. The New College Board of Trustees is the authority responsible for implementing SB 266's censorship scheme at Plaintiffs' institution. *See*, Doc. 1 at 14, ¶41 *quoting* New College of Florida Regulations Manual, Chap. 2, §2-1001. The Trustees' role in interpreting and enforcing the statute is particularly important given the present dearth of any implementing regulations.

This Court can grant meaningful relief to the Plaintiffs. An injunction against enforcement of the challenged provisions of SB 266 will prevent the very censorship complained of in this lawsuit. *Compare*, <u>Pernell</u>.

There is no plausible reason for this Court to abstain from ruling in this case.[6]

## IV.   **PLAINTIFFS ARE THREATENED WITH IRREPARABLE INJURY**.

No lengthy argument on this point is necessary. The deprivation of rights guaranteed under the First Amendment is an irreparable injury as a matter of law. *See*, Elrod v. Burns, 427 U.S. 347 (1976). Since the Plaintiffs allege that they are threatened with the loss of First Amendment rights, irreparable injury is presumed. *See*, Deerfield Medical Center v. County of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981); *See, also,* FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017) ("[A]n ongoing violation of the First Amendment constitutes an irreparable injury.").

An injunction which prevents the enforcement of a patently unconstitutional Ordinance does not disserve the public interest. To the contrary, "enjoining the [statutes], if they were found to be in violation of the First Amendment, would advance the public's interest in freedom of speech." FF Cosmetics, 866 F.3d at 1298. The bond requirement, if any, should be *de minimis*.

---

[6] Abstention would not be proper under Younger v. Harris, 401 U.S. 37 (1971) because there are no pending state court proceedings or enforcement actions involving the Plaintiffs. This case does not present difficult and unsettled areas of state law so Railroad Comm'n v. Pullman, 312 U.S. 496 (1941) is inapplicable. As the Supreme Court said in Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813 (1976), "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule."

**V.     THERE IS A STRONG LIKELIHOOD THAT PLAINTIFFS WILL PREVAIL ON THE MERITS OF THEIR CLAIMS.**

**A.     The Incorporation of the Stop WOKE Act Provisions Renders SB 266 unconstitutional.**

SB 266 incorporates the entirety of §1000.05, <u>Fla.Stat.</u> – the so-called "Stop WOKE Act". *See*, Section 4, §1004.06(2)(a) and Section 9, §1007.25(3)(c). This Court enjoined the enforcement of §1000.05, <u>Fla.Stat.</u> because it was a viewpoint based restriction on free speech and was unconstitutionally vague to boot. *See*, <u>Pernell</u>, *supra*. That decision is imminently correct.[7] SB is unconstitutional at least insofar as it incorporated the unconstitutional provisions of the Stop WOKE Act.

**B.     Portions of SB 266 are Unconstitutionally Vague.**

A law is deemed void for vagueness if it fails to describe an offense "with  sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972). "This

---

[7] The Eleventh Circuit declined to stay the injunction while the <u>Pernell</u> case is on appeal. *See*, <u>Pernell v. Florida Bd. of Governors of State Univ.</u>, 22-13992-J, 2023 WL 2543659 at *1 (11th Cir. Mar. 16, 2023).

doctrine reflects the basic principle that a statute either forbidding or requiring an action 'in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application[ ] violates the first essential of due process of law.'" Wollschlaeger, 848 F.3d at 1320. Laws must be particularly precise where First Amendment rights are at issue. *See*, Id., at 1320, *citing* NAACP v. Button, 371 U.S. 415 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.").

As noted above, SB 266 incorporates the entirety of the Stop WOKE Act which this Court already enjoined for being unconstitutionally vague. In addition to making use of the "rarely seen triple negative" [Pernell, 2022 WL 16985720 at *44], the exception for speech which "objectively" teaches the otherwise prohibited concepts was deemed to be "utterly ambiguous" [Id. at *47]. The Stop WOKE Act did not become any less confusing by its incorporation into SB 266. Indeed, SB 266 is laden with even more undefined jargon than the older law. Thus, the ruling in Pernell applies directly to this case with respect to those provisions incorporating §1000.05.

Essentially every word in the other provisions challenged by Plaintiffs is vague. None of those terms of art is defined in SB 266 or elsewhere in the Florida Statutes. It is no defense to say that some of the terms of art adopted by the statute have ordinary or dictionary meanings. A statute that uses seemingly ordinary words

- as many laws do - can still fail to notify citizens of what conduct it prohibits. *See*, Honeyfund.com, Inc. v. DeSantis, 622 F.Supp. 3d 1159, 1181 (N.D. Fla. 2022), *citing* Yates v. United States, 574 U.S. 528, 537 (2015) ("[T]he fact that the IFA uses real words found in an English dictionary does not magically extinguish vagueness concerns.").

The centerpiece of SB 266 appears to be the prohibition of funding for DEI - "diversity, equity and inclusion". *See*, Section 4. §1004.06(2)(b). But what does that term mean? A common dictionary definition says that DEI is " a conceptual framework that promotes the fair treatment and full participation of all people, especially in the workplace, including populations who have historically been underrepresented or subject to discrimination because of their background, identity, disability, etc.".[8] Florida State University proudly states that it's "continuing efforts to move diversity and inclusion to the forefront of the university mission have also received national recognition…"[9] – which would seem to be a good thing.

However, certain government officials appear to take a far dimmer view of DEI. Governor DeSantis equates DEI with "dangerous political and social

---

[8] *See*, DEI, https://www.dictionary.com/browse/dei (last accessed 8/21/23).

[9] *See*, https://www.fsu.edu/highlights/rankings.html "Diversity" (last accessed 8/21/23).

activism"[10] and was quoted as saying that "DEI has been [an] attempt to impose orthodoxy on the university...."[11] – an unintentionally ironic comment given the orthodoxy imposed by SB 266. Chris Rufo, a newly-appointed and highly controversial[12] Trustee at New College, co-authored a study where he defined DEI as a set of "interrelated concepts":

> Including unconscious or implicit bias, cultural appropriation, allyship, transgenderism, microaggressions, micro-invalidation, group marginalization, anti-racism, systemic oppression, ethnocentrism, structural racism, structural inequity, social justice, intersectionality, neo-pronouns, inclusive language, heteronormativity, disparate impact, gender identity, gender theory, racial or sexual privilege, or related formulations of these concepts.[13]

This is nothing but gobbledygook.  It is impossible to escape the conclusion that DEI

---

[10] *See*, Governor's Press Release, 5/15/23, https://www.flgov.com/2023/05/15/governor-ron-desantis-signs-legislation-to-strengthen-floridas-position-as-national-leader-in-higher-education/ (last accessed 8/28/23).

[11] *See*, NBC 6, 5/16/23 What is DEI? DeSantis Signs SB 266 Targeting University Programs, (5/16/23 https://www.nbcmiami.com/news/local/what-is-dei-desantis-signs-sb-266-targeting-university-programs/3035514/ (last accessed 8/21/23).

[12] Mr. Rufo is widely credited / criticized for inventing the notion of "critical race theory" and its supposed ascendancy on college campuses. This is the subject of his new book: *America's Cultural Revolution: How the Radical Left Conquered Everything*.

[13] *See*, Abolish DEI Bureaucracies and Restore Colorblind Equality in Public Universities, Manhattan Institute (Jan. 23) at 7, available at https://manhattan.institute/article/abolish-dei-bureaucracies-and-restore-colorblind-equality-in-public-universities (last accessed 8/21/23).

means different things to different people.

How then can a professor determine when her lectures will risk funding for her school or will lead to a denial of tenure? The same question can be asked with respect to every other material term used in the statute: "political or social activism", "identity politics"[14] "oppression", and the rest. *Compare*, <u>Honeyfund.com</u>, 622 F. Supp.3d at 1183–84 (Discussing vagueness issues which naturally arise from attempts to control speech "discussing concepts rooted in historical phenomena, like systemic racism, critical race theory, white privilege, and male privilege."). SB 266 forces ordinary persons to guess at its meaning - with substantial consequences if they guess wrong.

The issue of vagueness truly comes to a head with the prohibition against lessons which "distort significant historical events". History is, almost by definition,

---

[14]   The term "identity politics" is so ideologically laden that academics have themselves defined the concept using those very words:

> Identity politics is an ideologically laden term that refers to social movements to gain recognition or independence for historically marginalized or oppressed groups.

"Identity Politics", <u>International Encyclopedia of Human Geography</u> (Second Edition) 2020, Pages 151-155, Abstract available at https://www.sciencedirect.com/science/article/abs/pii/B9780081022955101957 (last accessed 8/21/23).

a story told by the dominant forces in society.[15] As George Orwell said "He who controls the past, controls the future. He who controls the present, controls the past."[16] Who decides what history is being distorted and when instruction within an approved history curriculum goes too far? Are Columbus, Pizzaro, and Cortez explorers and grand conquistadores spreading civilization to pagans? Or does Neil Young have it right when he refers to "Cortez the Killer"?[17] Were lives saved or lost as a result of the bombing of Nagasaki?[18]  If the State of Florida believes that it has a mandate to indoctrinate students as to the one and only true history, it at least has an obligation to define what that history is and provide guidance to professors so they can avoid "distorting" the approved party line.[19]

---

[15]  The phrase "History is written by the victors" is commonly ascribed to Winston Churchill.  *See*,  https://www.azquotes.com/author/2886-Winston_Churchill/tag/history (last accessed 8/29/23).

[16]  George Orwell, *1984* (1949).

[17]  Neil Young, *Cortez the Killer*, Zuma (1975).

[18]  *See, generally*, Oppenheimer (film) (2023).

[19]  By way of example, a history professor would place himself at risk of discipline if he taught that slavery was an unmitigated evil as the State of Florida has determined that "slaves developed skills which, in some instances, could be applied for their personal benefit". *See*, Florida's State Academic Standards - Social Studies, 2023 at 6, 71 - SS.68.AA.2.3, https://www.fldoe.org/core/fileparse.php/20653/urlt/6-4.pdf (last accessed 8/18/23).

The Legislature all but confesses to the facial vagueness of SB 266 by delegating to the Board of Education and the Board of Governors the responsibility for defining the terms by rule:

> (2)     A Florida College System institution … may not expend any state or federal funds to promote, support, or maintain any programs or campus activities that:
> …
> (b)     Advocate for diversity, equity, and inclusion, or promote or engage in political or social activism, as defined by rules of the State Board of Education and regulations of the Board of Governors.

Section 4, §1004.06(2)(b).

> (4)     The State Board of Education and the Board of Governors shall adopt rules and regulations, respectively, to implement this section.

Section 4, §1004.06(4); *See, also*, Section 10, §1007.55(7) (Identical statutory language). Administrative agencies are not supposed to be the drivers of fundamental social change. *See, generally*, W. Virginia v. Env't Prot. Agency, __ U.S. __, 142 S. Ct. 2587, 2613 (2022) *quoting* W. Eskridge, Interpreting Law: A Primer on How to Read Statutes and the Constitution 288 (2016) ("Even if Congress has delegated an agency general rulemaking or adjudicatory power, judges presume that Congress does not delegate its authority to settle or amend major social and economic policy decisions.").

The fact that those administrative agencies have not actually promulgated any rules only puts an exclamation point on the facial vagueness of the law. That leaves

administrators at New College and other public institutions around the State scrambling to come up with their own definitions for every key concept listed in SB 266. Inevitably, different schools will settle on different interpretations of the law – how could they not given the disputes these terms engender at coffee shops and around breakfast tables across the nation?

SB 266 includes exceptions to its funding and censorship mandates which only add to the vagueness and uncertainty of the statute's reach. Section 4, §1004.06(3) includes a carve out from the otherwise comprehensive ban on disfavored concepts where funding is "required for compliance with general or federal laws or regulations" – none of which are listed or described. *Compare*, <u>Fly Fish, Inc. v. City of Cocoa Beach</u>, 337 F.3d 1301, 1312 (11th Cir. 2003) (Ordinance found to be a prior restraint where a license could be denied if "the granting of the application would violate either a statute or ordinance or an order from a Court of law…"). Equally vague are the exceptions for "nontraditional students" or "students with unique abilities". *See*, Section 4, §1004.06(3). Nontraditional students might identify as LGBTQ+, or as Wiccans, or they may come from an Amish household. Students with unique abilities might well refer to someone unusually skilled at juggling. These are not flippant comments but serve to demonstrate that these key funding decisions are left to the unfettered discretion of administrators who can make arbitrary enforcement decisions without legislative guidance.

The same is true when it comes to the funding of clubs and other student organizations. The statute says that student organizations can obtain funding and utilize state facilities even if they advocate for DEI or the other prohibited concepts. Section 4, §1004.06(2)(b). However, the exception applies only if the organization or use is approved "pursuant to written policies or regulations of each Florida College System institution or state university, as applicable." Id. The statute includes no standards whatsoever to guide colleges and universities in formulating those policies. One college might approve funding for a gay support group while another would reject the same application. Again, the opportunities for arbitrary decision making and censorship are apparent.

The discussion above highlights the "greatest hits" when it comes to vagueness. However, there are several "one hit wonders" which also merit attention. In Plaintiffs' Complaint, Dr. Hernandez explained how her instruction regarding the fundamental tenets of sociology inevitably conflict with the censorship imposed by SB 266. (Doc. 1 at 38-41). That same tension is apparent on the face of the statute which requires that social science classes include instruction in "basic social and behavioral science concepts and principles used in the analysis of behavior and past and present social, political, and economic issues" [Section 9, §1007.25(3)(d)3] while simultaneously prohibiting many of those same concepts [Section 9, §1007.25(3)(c)].

Section 10, §1007.55(1) specifies that instructors should not offer general education classes "with a curriculum based on unproven, speculative, or exploratory content" without defining any of those terms. Those undefined terms are inherently vague – particularly in the social sciences and the arts and humanities, where few if any concepts can be deemed "proven" or not "speculative" and where "exploratory content" lies at the very heart of the academic discipline. The division between general education classes and upper division classes is intrinsically arbitrary. That is especially true at New College where students are encouraged to design their own programs of study and even their own majors. (Doc. 1 at 17, 48-49, 51, 53).

SB 266 encourages arbitrary enforcement while simultaneously chilling speech. Some professors will boldly continue instruction as they always have. However, their less courageous peers are likely to avoid any content which could lead to them being labeled an "advocate" for "social activism". The facial vagueness apparent in every jot and tittle of the law practically forces professors to chill their speech if they wish to retain their positions. *See*, Reno v. ACLU, 521 U.S. 844, 871–72 (1997) (a vague regulation "raises special First Amendment concerns because of its obvious chilling effect on free speech"). The Supreme Court has warned that, particularly in the education context, "[t]he danger of [the] chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed." Keyishian, 385 U.S. at 604.

The law is unconstitutionally vague in all of its applications – including as applied to these Plaintiffs.

**C.**   **SB 266 Violates The First Amendment.**

**(1)**   **Introduction.**

SB 266 is a confusing hybrid of a statute which means that the First Amendment analysis is not as straightforward as it otherwise might be. A curious feature of SB 266 is the fact that the restrictions turn not on any particular curriculum, but on concepts, theories and ideas which may be discussed in a variety of approved curricula. For example, the State has approved degrees in sociology together with standards for instruction in the social sciences. *See*, Section 9. §§1007.25(3)(a) and (3)(d)3. As detailed in Plaintiffs' Complaint and in Dr. Hernandez's Declaration, sociologists study and teach about the prevalence of discrimination  - racism, sexism, classism, ageism, disability discrimination, etc. – as a feature of our institutions. SB 266 outright prohibits any such inquiry. *See*, Section 4, §§1004.06(2)(a), (2)(b) and Section 9, §1007.25(3)(c).[20] However, those

_____

[20] For the most part, Section 9 of the statute applies to general education classes and implies that the prohibited concepts might still be taught as electives or in upper division classes. However, that distinction is only an illusion as the statute denies all funding for essentially the same concepts without regard to the level of the class. *See*, Section 4, §1004.06(2). In addition, "narrow tailoring", which is an important consideration in cases applying strict or intermediate scrutiny in a typical First Amendment dispute, seems to play no part in the balancing test adopted by the

ideas are not confined to the social sciences; they are found in other approved curriculum including the arts and humanities. *See*, Clark Decl. at 2-4.

It must also be noted that SB 266 is not confined to the curriculum taught by professors, it is not limited to government employees, and it is not even limited to the classroom. Rather, the law applies to student groups and extracurricular activities as well. SB 266 prohibits funding and access to facilities for those organizations which might wish to pursue activist policies or even discuss the possibility that the prohibited concepts are worth discussion.[21]

Ultimately, the State is not regulating curriculum at all. Instead, it is has enacted a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." NTEU, 513 U.S. 454, 466–67 (1995). And it does so based on the viewpoint of the speaker, allowing some viewpoints while censoring others.

Viewpoint based discrimination is unconstitutional regardless of the means chosen to implement it. The statute relies in part on the denial of funding, but caselaw holds that funding decisions cannot be used to suppress "dangerous ideas". Regan v.

_____

Eleventh Circuit in Bishop. *See*, discussion *infra*.

[21] SB 266 excludes some students and some organizations from the ban on speech. However, the exclusion is largely illusory as it applies only to some students and to those organizations fortunate enough to be approved by their schools. *See*, Section 4, §§1004.06(2), (3).

Taxation Without Representation of Wash., 461 U.S. 540, 548 (1983). In addition, viewpoint discrimination is inherently incompatible with any "legitimate pedagogical concerns". *See*, Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988).

Plaintiffs acknowledge that review of speech regulations in the context of colleges and universities is simply different from other First Amendment inquiries. Rather than being controlled by cases such as Reed v. Town of Gilbert, Ariz., 576 U.S. 155 (2015), which bring a strictly binary approach to content-based laws, the Eleventh Circuit applies the balancing test established in Bishop, supra. That is the test adopted by this Court in Pernell to review the Stop WOKE Act and it is the test which must be applied here – with exactly the same outcome.

### (2)   **SB 266 is Viewpoint Based**

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 641 (1994). Usually content-based restrictions on speech are deemed unconstitutional on their face. *See*, Reed, 576 U.S. at 163–64. In the school context, however, it is generally acknowledged that government has discretion to regulate the content of its curriculum. *See, generally*, Hazelwood, *supra*; Bishop, 926 F.2d at 1074 ("As a place of schooling with a teaching mission, we consider the University's

authority to reasonably control the content of its curriculum, particularly that content imparted during class time."). That discretion is exceeded when the government moves beyond determining the appropriate content for school curriculum and attempts to favor some viewpoints over others.

SB 266 is unconstitutional because it tries to force professors and their students to believe only what the State deems to be true by restricting speech on the basis of a speaker's viewpoint. At one level, viewpoint discrimination is simply a case of content-based discrimination on steroids:

> When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. *See* R.A.V. v. St. Paul, 505 U.S. 377, 391, 112 S.Ct. 2538, 2547, 120 L.Ed.2d 305 (1992). Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. *See* Perry Ed. Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995). However, viewpoint-based discrimination is particularly insidious because the marketplace of ideas does not function correctly when the State attempts to "tilt public debate in a preferred direction." Sorrell v. IMS Health Inc., 564 U.S. 552, 578–79 (2011). The threat to speech is particularly pronounced in a university setting. *See*, Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1127 (11th Cir. 2022)

("[W]e have emphasized 'that the dangers of viewpoint discrimination are *heightened* in the university setting.'" (citation omitted) (emphasis original)).

The Eleventh Circuit's decision in <u>Searcey</u>, *supra* sets the appropriate parameters:

> In a nonpublic forum, the government may limit the subject matter discussed by all speakers in a forum but it may not distinguish between particular speakers based on their view of the approved subject matter. As the <u>Cornelius</u> Court stated "... the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses or an otherwise includable subject." 473 U.S. at 806, 105 S.Ct. at 3451; *see also* <u>Perry</u>, 460 U.S. at 62, 103 S.Ct. at 964 (Brennan, J., dissenting) ("We have never held that government may allow discussion of a subject and then discriminate among viewpoints on that particular topic, even if the government for certain reasons may entirely exclude discussion of the subject from the forum.") Thus, as with any other nonpublic forum, once the School Board determines that certain speech is appropriate for its students, it may not discriminate between speakers who will speak on the topic merely because it disagrees with their views. …
>
> The Board argues that <u>Hazelwood</u> does not prohibit school officials from engaging in viewpoint based discrimination. We disagree. … Although <u>Hazelwood</u> provides reasons for allowing a school official to discriminate based on content, we do not believe it offers any justification for allowing educators to discriminate based on viewpoint. The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis. <u>Perry</u>, 460 U.S. at 62, 103 S.Ct. at 964 (Brennan, J., dissenting). *See, e.g.*, <u>Cornelius</u>, 473 U.S. at 812–13, 105 S.Ct. at 3454–55 (on remand, respondents free to argue that regulations were viewpoint based). Without more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral.

888 F.2d at 1324–25.

SB 266 regulates the content of speech within established curriculum. However, it goes a step further by authorizing viewpoints which criticize DEI, identity policies and other controversial theories while disallowing any speech which presents those ideas in a favorable light. The viewpoint-based heart of SB 266 is found in three key provisions:

1. Section 4, §1000.06(2)(a) and Section 9, §1007.25(3)(c) incorporate the Stop WOKE Act which prohibits instruction which "espouses, promotes, advances, inculcates, or compels" a student "to believe" any of eight enumerated viewpoints, but not speech which criticizes those ideas. §1000.05(4)(a), Fla. Stat.

2. Section 4, §1000.06(2)(b) prohibits any funding for instruction which "[a]dvocate[s] for diversity, equity, and inclusion, or promote[s] or engage[s] in political or social activism" but would allow funding and access for speech which denigrates those concepts.

3. Section 9, §1007.25(3)(c) censors any "curriculum that teaches identity politics, violates s. 1000.05, or is based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities"[22] but permits

---

[22] That section also prohibits speech which "distort[s] significant historical events". The language suggests that the Legislature has some orthodox view of history which

speech which teaches that those concepts are invalid or dangerous or that we live in a "color blind" nation.

As this Court found in Pernell:

> [T]he State of Florida, as an employer and educator, cannot restrict university employees from expressing a disfavored viewpoint about a matter within the established curriculum while instructing on that curriculum. Such viewpoint discrimination "is poison to a free society." Iancu, 139 S. Ct. at 2302 (Alito, J., concurring).

Pernell, 2022 WL 16985720 at *41.

### (3)    SB 266 Serves no Pedagogic Purpose.

As noted above, SB 266 imposes both direct and indirect forms of censorship through controls over funding and outright prohibitions on specified viewpoints. While courts typically defer when it comes to the selection of appropriate curricula for students, that deference comes to an end when the State attempts to regulate thought and debate for reasons which do not advance the cause of education. In the words of the Supreme Court, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities *so long as their actions are reasonably related to legitimate pedagogical concerns*." Hazelwood Sch. Dist., 484 U.S. at 273  (emphasis

_____

it seeks to promote at the expense of competing ideas. However, the prohibition is so amorphous that it is difficult to extract any real meaning from the term.

added).

It is difficult to discern what those pedagogical concerns might be because SB 266 does not include any legislative findings of fact or statement of purpose. Some guidance comes from Florida's Governor who announced that SB 266 was designed to "prevent woke ideologies".[23]

SB 266 does not make choices based on specific curricula and does not identify particular textbooks which are either permissible or impermissible. Rather, the concentration is on topics, ideas and theories that the government finds objectionable *wherever they may appear in the approved curriculum*. "Unlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens." <u>NTEU</u>, 513 U.S. at 468. Having already approved classes in the social sciences, history, arts and humanities, and the like, the government cannot then reach into the classroom to reject ideas which it finds objectionable. *See*, <u>Searcey</u>, 888 F.2d at 1325 ("In this case, the School Board has determined that the students should learn about career and educational opportunities. Having done so, the Board cannot exclude the APA solely because it disagreed with the APA's views about the career choices students should make."). This Court reached the same

---

[23] *See*, Gov. DeSantis press release of May 15, 2023, *supra*.

conclusion in <u>Pernell</u> finding that the viewpoint based restrictions on classroom instruction were unrelated to legitimate pedagogical concerns and unreasonable:

> But even if this Court agrees this is a legitimate concern motivating the IFA's enactment, the restriction the State of Florida imposes upon its public university employees - a viewpoint-discriminatory ban targeting protected in-class speech - is certainly not reasonable.

<u>Pernell</u>, 2022 WL 16985720 at *38.

### (4)   The Funding Cases do not Excuse the Censorship Imposed by SB 266

SB 266 denies funding and the use of college facilities for speech which addresses the eight prohibited concepts in the Stop WOKE Act and any instruction which advocates or promotes DEI and "political or social activism".[24] The general rule is that "government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." <u>Rosenberger</u>, 515 U.S. at 828–29. However, the rules are somewhat different where government is spending its own money for its own purposes. *See*, <u>Rust v. Sullivan</u>, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program…").

---

[24] SB 266 also works through outright censorship removed from any funding considerations. Thus, even if portions of the statute could be justified on the basis of the "funding cases", the remainder of the law would be unconstitutional.

There are also exceptions to the exception to the general rule. In this case, SB 266 cannot be justified based on any funding authority because it seeks to suppress "dangerous ideas" and because its regulations far exceed any legitimate program for the selection of college-level curricula.

In <u>Nat'l Endowment for the Arts v. Finley</u>, 524 U.S. 569 (1998), the Supreme Court reiterated that government cannot use its funding decisions to camouflage invidious discrimination:

> If the [Government] were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case. We have stated that, even in the provision of subsidies, the Government may not "ai[m] at the suppression of dangerous ideas," <u>Regan v. Taxation With Representation of Wash.</u>, 461 U.S. 540, 550, 103 S.Ct. 1997, 2003, 76 L.Ed.2d 129 (1983) (internal quotation marks omitted), and if a subsidy were "manipulated" to have a "coercive effect," then relief could be appropriate.

<u>Id</u>. at 587. Here, we know that the government is using SB 266 to fight against what it perceives to be "dangerous ideas" because the Governor has said so himself.[25]

---

[25] *See*, Gov. DeSantis press release of May 15, 2023, *supra*, equating DEI with "dangerous political and social activism". The Governor has also been quoted as saying that "woke" ideas are "a form of cultural Marxism" and that "it's basically a war on the truth". *See*, Daily Beast, "Ron DeSantis Finally Asked to Define 'Woke' at Iowa Campaign Stop" 6/4/23 https://www.thedailybeast.com/ron-desantis-finally-asked-to-define-woke-at-iowa-campaign-stop (last accessed 8/29/23).

In addition, the government cannot use a legitimate program as an excuse to censor speech which lies beyond the scope of the program goals:

> [T]he relevant distinction that has emerged from our cases is between conditions that define the limits of the government spending program - those that specify the activities Congress wants to subsidize -and conditions that seek to leverage funding to regulate speech outside the contours of the program itself. The line is hardly clear, in part because the definition of a particular program can always be manipulated to subsume the challenged condition. We have held, however, that "Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." (citation omitted).

Agency for Intern. Dev., 570 U.S. 205, 214–15 (2013). The Board of Governors and Board of Trustees have a legitimate interest in determining appropriate curricula for colleges, but that program cannot be used to promote government-approved ideas while squelching competing viewpoints.

### (5)   SB 266 Fails the Balancing Test Established in Bishop

In Pernell, this Court determined "that the Eleventh Circuit's balancing test in Bishop provides the operative analytical framework for evaluating Plaintiffs' First Amendment claims." Pernell, 2022 WL 16985720 at *6. The same test applies in this case for much the same reasons: SB 266 imposes viewpoint-based restrictions on protected academic speech.

In Bishop, the Eleventh Circuit candidly acknowledged that its balancing test was "somewhat amorphous". Bishop, 926 F.2d at 1074. This Court was able to

extract three elements or factors that govern the test:

> In Bishop, the Eleventh Circuit considered three factors under its "case-by-case" approach - namely, (1) "the context," (2) "the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than those of other persons," specifically with respect "to reasonably control[ling] the content of its curriculum, particularly that content imparted during class time," and (3) "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." Id. at 1074–75.

Pernell, 2022 WL 16985720 at *35.

The "context" in this case is the same as in Pernell: protected speech in a classroom setting teaching an approved curriculum. This is not a case involving a rogue professor teaching an unsanctioned course or material unconnected to the approved curriculum.

In Pernell the Court found that the second factor did not favor the government because the interest in restricting speech on the basis of viewpoint was "unreasonable" which trumped any deference to which a government employer might otherwise be entitled. Id. at *38. In the instant case, the government's position is even weaker as SB 266 applies to students and their organizations as well as to professors.

As to the third factor, the Pernell Court had no difficulty in finding that the interests of the professors and students in academic freedom far outweighed the government's interest in censorship:

> But here, in these cases now before this Court, Plaintiffs' free speech claims present an interest in academic freedom of the highest degree. Professor Plaintiffs are not attempting to alter the permitted curriculum. Instead, they seek to prevent the State of Florida from imposing its orthodoxy of viewpoint about that curriculum in university classrooms across the state.

Id. at *41. The same is true here where SB 266 only expands on the "pall of orthodoxy" pioneered by the Stop WOKE Act. *See*, *generally*, Keyishian, 385 U.S. at 683. SB 266 is unconstitutional because the Bishop factors militate strongly in favor of Plaintiffs' academic speech and strongly against the State's authoritarian impulses.

**D.    SB 266 is Unconstitutionally Overbroad.**

The purpose of the overbreadth doctrine is to avoid "chilling" of constitutionally protected speech. *See, generally*, Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 129 (1992) ("[T]he very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court."); FF Cosmetics, 866 F.3d at 1303 ("The overbreadth doctrine is designed to remedy the chilling effects of overbroad statutes…"). The overbreadth doctrine creates an exception to the usual rules pertaining to standing. In particular, a litigant can assert the rights of persons not before the Court even if an ordinance could legitimately apply to the plaintiff. *See*, Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973).

Like the plaintiffs in <u>Pernell</u>, these Plaintiffs argue that the law is unconstitutionally overbroad because there is no legitimate government interest which would permit viewpoint-based discrimination in the classroom on the scale contemplated by the statute. In <u>Pernell</u>, this Court held that the overbreadth doctrine was inapplicable to the Stop WOKE Act because "the challenged provisions of the IFA have no legitimate sweep":

> And the very concept of overbreadth presupposes that there is some legitimate sweep. So, because the challenged provisions have no legitimate sweep, the overbreadth doctrine does not apply.

<u>Pernell</u>, 2022 WL 16985720 at *49.

Plaintiffs respectfully suggest that this portion of the ruling was in error. The overbreadth doctrine does not turn so much on the government interest as it does on the chilling effect the law has on the speech of those not properly subject to regulation. The Professor Plaintiffs have alleged in detail exactly how their instruction, syllabus and classroom materials will have to be modified in order to comply with SB 266. However, there is no doubt that professors who teach subjects or content which are permissible under SB 266 will nevertheless change their teaching style out of fear that they might be disciplined, denied funding or have their tenure rejected. Because of the risk of self-censorship by third parties not before the Court, the overbreadth doctrine applies here.

In addition, the remedy afforded by the overbreadth doctrine is unique. Rather than striking individual definitions (as may occur in response to Plaintiffs' vagueness challenge) or enjoining only certain viewpoint-based provisions (as may occur in response to Plaintiffs conventional First Amendment claims), a finding of overbreadth means that no part of the law can be enforced. *See*, Virginia v. Hicks, 539 U.S. 113, 118–19 (2003) ("The showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,' … suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression[.]'" (citations omitted)).

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(K), Plaintiffs request oral argument on this Motion and estimate that ninety (90) minutes will be required. Additional time will be required if this Court prefers testimony.

WHEREFORE, Plaintiffs pray for entry of a Preliminary Injunction enjoining Defendants and their officers and agents from enforcing Chapter 2023-082, Laws of Florida ("SB 266"), in whole or in part.

BENJAMIN, AARONSON, EDINGER
& PATANZO, P.A.


_/s/  Gary S. Edinger_

| | |
|---|---|
| DANIEL R. AARONSON, Esquire | GARY S. EDINGER, Esquire |
| Florida Bar No.: 314579 | Florida Bar No. 0606812 |
| JAMES S. BENJAMIN, Esquire | 305 N.E. 1st Street |
| Florida Bar No.: 293245 | Gainesville, Florida 32601 |
| 1700 East Las Olas Blvd., Suite 202 | (352) 338-4440  (Fax) (352) 337-0696 |
| Ft. Lauderdale, Florida 33301 | GSEdinger12@gmail.com |
| (954) 779-1700 (Fax) (954) 779-1771 | |
| sexlaw@bellsouth.net | |
| danaaron@bellsouth.net | |

*Attorneys for Plaintiffs*


## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

On August 28th and again on this date, Plaintiffs' counsel contacted the Defendants' attorneys by e-mail to inform them of their intent to seek a preliminary injunction. Counsel for all of the Defendants advise that they will oppose the motion and file an appropriate response.


_/s/  Gary S. Edinger_
GARY S. EDINGER, Esquire

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

I hereby certify that this motion and memorandum of law contains 7,927 words.

    /s/  Gary S. Edinger
GARY S. EDINGER, Esquire