## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**NFC FREEDOM, INC., et al.,**

      *Plaintiffs*,

v.                              **Case No.: 4:23cv360-MW/MAF**

**MANNY DIAZ, JR., et al.,**

      *Defendants*.

_____/

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

This Court is once again faced with another case involving Florida's alleged attempts to combat what it calls indoctrination in its public universities with state-sponsored indoctrination. Plaintiffs, a collection of professors and students at New College, and an organization that seeks to promote New College as a progressive honors college, have sued to enjoin Defendants' enforcement of certain provisions of state law that were amended this year under SB 266. They assert the laws at issue directly censor what can be taught in class and threaten to defund their teaching and scholarship in the event they promote forbidden viewpoints.

This state-sponsored censorship of the university is even more pernicious, according to Plaintiffs, because the provisions at issue are irredeemably vague. When, for instance, is a professor's discussion of a significant historical event to be deemed a "distortion" of that event? Is it a distortion of the history of American

slavery to claim enslaved people personally benefitted from their less-than-human treatment as chattel? Defendants assert the answer is simple—a distortion of significant historical events is self-evident, or, perhaps, falls outside of whatever the Florida Legislature and other state rulemakers decide the proper view of history ought to be. But how are professors to determine what is self-evident when we cannot even agree if the right way to teach American history includes teaching that there was an upside to slavery for enslaved people? *See* ECF No. 5 at 19.[1]

Before this Court can even reach the questions Plaintiffs pose with respect to the constitutionality of the challenged provisions, this Court must first satisfy itself that Plaintiffs have standing to move for a preliminary injunction. Here, because Plaintiffs have not come forward with sufficient evidence to establish standing, this Court cannot reach the merits of this particular dispute. This Court heard Plaintiffs'

---

[1] On the record at the hearing, this Court invoked a different example when discussing how difficult it is to determine whether a lesson or theory can be viewed as "distorting history"—namely, the Dunning School. The Dunning School is named for early-twentieth-century Columbia University historian, William A. Dunning, whose historical analysis "downplay[ed] the conflicts that led to the Civil War and focused instead on Reconstruction as the pivotal moment of sectional discord." Laura Edwards, "Southern History as U.S. History," *The Journal of Southern History*, August 2009, Vol. 75, No. 3, at 547. The work of Dunning School historians in the first thirty years of the twentieth century has been criticized as both racist and paternalistic. "Dunning School scholars never entertained the possibility that education would lead to racial equality, so convinced were they of slaves' innate inferiority." *Id*. at 548. "The challenge with emancipation was to establish a new system of control to replace [slavery]," and "[i]n the work of the Dunning School scholars, it was northern radicals who prevented white southerners from doing so." *Id*. While the Dunning School fell out of vogue later in the 20th century, for decades it was considered a "traditional" historical analysis of the Reconstruction Era rather than a distortion of that history with racist undertones.

2

motion for preliminary injunction, ECF No. 5, and Defendants' arguments in opposition at a hearing on October 23, 2023. For the reasons stated below, Plaintiffs' motion, ECF No. 5, is **DENIED**.

I

Before this Court addresses whether Plaintiffs have standing for purposes of a preliminary injunction, a little context helps. Plaintiffs include three professors, three students, and an organization dedicated to academic freedom and promoting New College as a progressive honors college. They have sued the individual members of the Board of Governors and the New College Board of Trustees, along with the President of New College, all in their official capacities. Plaintiffs seek to enjoin Defendants' enforcement of SB 266, a bill that amended several provisions of Florida's statutes governing Florida's public colleges and universities.[2]

SB 266, in turn, modifies Florida law in several ways. Relevant here are the changes SB 266 made to (1) Florida's general education core course standards, *see* section 1007.25(3)(c), Florida Statutes (2023); (2) how Florida's universities may spend state and federal funds, *see* section 1004.06(2), Florida Statutes (2023); and how tenure works for Florida professors, *see* section 1001.706(6)(b), Florida

---

[2] At the hearing, Plaintiffs clarified that they are asking this Court to enjoin Defendants from enforcing only two provisions amended by SB 266, which will be discussed in more detail *infra*.

3

Statutes (2023). In their motion and at the hearing, Plaintiffs asserted that these changes, particularly the general education standards and the funding provisions, are viewpoint discriminatory in violation of the First Amendment, unconstitutionally overbroad in violation of the First Amendment, and unconstitutionally vague in violation of the Fourteenth Amendment.

What's at stake, according to Plaintiffs, is this. The professors are currently teaching—and the students are enrolled in—classes that ordinarily include discussions that run afoul of certain prohibited ideas and viewpoints that the general education standards and funding provisions appear to prohibit. The professors fear they may be disciplined, defunded, or even dismissed in the event they run afoul of the challenged provisions. The students fear that they will miss out on discussions and other academic work that they otherwise would have been able to engage in but for the challenged provisions. These professors and students are also members of campus organizations and the plaintiff organization, all of which presumably fall in the "woke" category of promoting disfavored views, and they fear that these organizations will be disbanded or otherwise prohibited from organizing on campus.

As evidence of the reasonableness of their subjective fears, Plaintiffs point to a handful of public statements from Governor DeSantis, who is not a Defendant in this case, Defendant Diaz, who is not responsible for personnel decisions at the institutional level, Defendant Corcoran, who is quoted with respect to his opposition

to "DEI programs" in general, and Defendant Rufo, who is quoted for his proffered definition of "DEI." In the absence of other evidence, Plaintiffs rely heavily on the fact that this Court has already enjoined enforcement of a different statute directed at Florida's public universities in two prior cases. *See Pernell v. Fla. Bd. of Govs. of the St. Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022) (granting in part two motions for preliminary injunction in consolidated cases, *Pernell* and *Novoa*).

But Plaintiffs' suggestion that their standing in this case is analogous to the plaintiffs' standing in *Pernell* and *Novoa* is misplaced. In those cases, this Court addressed a provision of state law that categorized the expression of certain viewpoints during classroom instruction about several ideas concerning race, sex, and privilege as an act of unlawful discrimination. *See* § 1000.05(4), Fla. Stat. (2022). The statute tasked the Board of Governors with promulgating regulations to implement the provision with respect to state universities. § 1000.05(6)(b), Fla. Stat. And, when the parties had filed suit, the Board of Governors had already promulgated a regulation that required (1) each state university to adopt a regulation that prohibits subjecting any student or employee to training or instruction that expressed the forbidden viewpoints of section 1000.05(4), (2) investigate complaints regarding alleged violations of such university regulation, and (3) discipline employees—including professors—for their failure to comply with the regulation, including "termination if appropriate." *See* Board of Governors Regulation

5

10.005(2)–(3), available at https://www.flbog.edu/wp-content/uploads/ 2022/08/10.005-Prohibition-of-Discrimination-in-University-Training-or-Instructi on.pdf (last visited Nov. 2, 2023). Thus, the plaintiffs in *Pernell* and *Novoa* were able to establish that their free-speech injuries concerning their classroom speech were objectively reasonable and traceable to the Board of Governors based in large part on the regulation that the Board of Governors had adopted, which ordered their universities to investigate and punish them for alleged violations of school policy implementing section 1000.05(4).

This is not to say that a future plaintiff must be able to point to a law that directly targets their speech or a regulation akin to what this Court reviewed in *Pernell* to establish standing. Indeed, in another case involving a challenge to Florida laws governing state colleges and universities, this Court heard lengthy evidence concerning various institutions' administrations' attempts to interpret and enforce a challenged law such that the plaintiffs may have been able to establish standing against their respective employers had they sued the right defendants. *See, Link v. Diaz*, --- F. Supp. 3d ---, 2023 WL 2984726, at *5 (N.D. Fla. 2023) (noting that "this Court heard ample evidence concerning various colleges' and universities' independent attempts to interpret this provision and provide some guidance to faculty members with respect to whether a given course may be considered a 'class lecture' subject to the recording provision" and that the *Link* plaintiffs' "standing

6

arguments may have been stronger had they sued the members of their respective Boards of Trustees, who appear to have taken the lead with respect to 'enforcing' the recording provision at the institutional level"). Moreover, the Eleventh Circuit has also recognized that formal punishment or the formal power to impose it is not strictly necessary to impermissibly chill free speech. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1123 (11th Cir. 2022) (discussing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) and *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003)). Instead, when there is record evidence demonstrating the defendants used indirect pressure—including thinly veiled threats to institute criminal proceedings and other "informal sanctions" like "coercion, persuasion, and intimidation"—to chill free expression, this could be sufficient to establish standing. *Id.*

But with respect to the case now before this Court, it is clear that the record lacks the necessary connective tissue to establish standing. What's missing in this record is any evidence that (1) the challenged provisions target individual professors, (2) the parties responsible for enforcing the challenged provisions have adopted any regulations that target individual professors, or (3) any Defendant said or did anything at all with respect enforcing these provisions in the way Plaintiffs fear. For these reasons, their motion, ECF No. 5, is due to be denied for lack of standing.

II

Plaintiffs bear the burden of establishing standing for purposes of a preliminary injunction. Standing exists when a plaintiff shows (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.' " *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)). Thus, "a plaintiff cannot 'rest on such mere allegations, [as would be appropriate at the pleading stage,] but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.' " *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (some alteration in original) (quoting *Lujan*, 504 U.S. at 561). Here, only Plaintiffs NCF Freedom, Inc., Hernandez, Clark, Anderson, Engels, and Leffler have filed evidence in support of their motion. Accordingly, this Court limits its discussion of standing to these Plaintiffs.

Plaintiffs ask this Court to preliminarily enjoin Defendants from enforcing SB 266 "in whole or in part." ECF No. 5 at 38. But this Court can only grant Plaintiffs' motion with respect to those provisions for which they have standing to challenge.

8

*See CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1271–72 (11th Cir. 2006). Although Plaintiffs discuss the enacting legislation, SB 266, as the target of their challenge throughout their motion, they agreed at the hearing that their motion is focused on two provisions that have been amended by SB 266; namely, section 1007.25(3)(c), Florida Statutes (2023), and section 1004.06(2), Florida Statutes (2023). For ease of reference, this Court will refer to these provisions as the "general education requirements" and the "funding provisions," throughout this Order. Accordingly, this Court will determine whether at least one Plaintiff has standing to challenge either the general education requirements or the funding provisions, beginning with the general education requirements.

A

Plaintiffs assert that the general education requirements serve to directly censor classroom speech in violation of the First Amendment and are unconstitutionally vague because they fail to provide fair notice of what is prohibited in the classroom. According to Plaintiffs, this direct censorship and vagueness result in self-censorship and chilled speech for fear of punishment and loss of performance-based funding for their institution. Ultimately, this Court must determine whether Plaintiffs have met their burden to prove, "through affidavit or other evidence," that their injuries are cognizable, traceable to Defendants' conduct, and redressable with an injunction directed at these Defendants. *See Cacchillo*, 638 F.3d at 404.

9

This Court pauses to note that Plaintiffs challenge the general education requirements in a pre-enforcement posture. In other words, nobody has been disciplined or defunded yet. Without question, *threatened* enforcement of a law can create an injury-in-fact. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). A person "c[an] bring a pre-enforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution[.]' " *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (quoting *Susan B. Anthony List*, 573 U.S. at 159). And when First Amendment rights are involved, courts apply the injury-in-fact requirement most loosely. *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). Ultimately, for self-censorship injuries, "[t]he fundamental question . . . is whether the challenged policy 'objectively chills' protected expression." *Speech First, Inc.*, 32 F.4th at 1120.

Consistent with governing law, this Court categorically rejects the notion that punishment must occur *before* a plaintiff may challenge state action. Indeed, this Court has not shied away from granting preliminary injunctive relief in other cases that involved First Amendment pre-enforcement challenges. *See, e.g.*, *Gale Force Roofing & Restoration, LLC v. Brown*, 548 F. Supp. 3d 1143 (N.D. Fla. 2021) (granting motion for preliminary injunction involving First Amendment pre-enforcement challenge to advertising regulation that subjected violators to specific

10

penalties, including civil penalties and up to $10,000 fine for each violation); *Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238 (N.D. Fla. 2021) (granting in part motion for preliminary injunction involving First Amendment pre-enforcement challenge to Florida's anti-riot statute on overbreadth and vagueness grounds); *Pernell*, 641 F. Supp. 3d 1218 (granting in part motions for preliminary injunction in two cases involving First Amendment and vagueness challenges to statutes amended by the Individual Freedom Act).

But every case is different, and this Court will only order such relief so long as a plaintiff has met their burden of demonstrating their legal entitlement to such relief. In the cases this Court has previously granted preliminary injunctive relief, at least one plaintiff submitted sufficient evidence demonstrating a cognizable injury under each challenged provision—often chilled speech that was objectively reasonable based on the evidence in the record—that was traceable to the defendant's conduct and would be redressed by an injunction against that defendant from enforcing the provision at issue.

Here, with respect to whether at least one Plaintiff has established an injury-in-fact, Plaintiffs point to their declarations, which generally demonstrate that the Professor Plaintiffs regularly teach courses, including general education courses, that either promote some of the forbidden ideas or, at least, touch on some of the prohibited topics. Likewise, some of the Student Plaintiffs are enrolled in courses

the Professor Plaintiffs teach, or other courses that they fear will be censored as a result of the challenged provisions. Accordingly, for fear of punishment for running afoul of the asserted prohibitions, the Professor Plaintiffs have changed the way they plan to teach this semester and revised the content of their courses. *See, e.g.*, ECF No. 5-4 ¶ 9.

The questions before this Court are twofold. Namely, (1) whether Plaintiffs' injuries—charitably, chilled speech or self-censorship—are objectively reasonable based on the evidence in this record, and (2) assuming *arguendo* that Plaintiffs can demonstrate an injury-in-fact, whether they have met their burden to establish that such injury is traceable to any of the Defendants' conduct. To answer these questions, this Court must examine the challenged provision at issue and explain how this statutory scheme works together.

1

With respect to the general education requirements, SB 266 amended section 1007.25, in relevant part, to require the chairs of the State Board of Education and the Board of Governors to appoint faculty committees to review and recommend statewide general education core course options for inclusion in the statewide course numbering system. *See* § 1007.25(3), Fla. Stat. (2023). These faculty committees must "review and submit recommendations to the Articulation Coordinating

Committee[3] and the commissioner for the removal, alignment, realignment, or addition of general education core courses that satisfy the requirements of this subsection." *Id*. This review and submission of recommendations must take place "by July 1, 2024, and by July 1 every 4 years thereafter . . . ." *Id*.

The requirements for general education core courses include section 1007.25(3)(c), which states that "[g]eneral education core courses may not distort significant historical events or include a curriculum that teaches identity politics, violates s. 1000.05, or is based on theories that systemic racism, sexism, oppression, and privilege are inherent in the institutions of the United States and were created to maintain social, political, and economic inequities." Accordingly, for purposes of conducting their review and making necessary recommendations, the faculty committees must consider whether general education core courses "distort significant historical events" or "include a curriculum" that teaches certain concepts, runs afoul of the Florida Educational Equity Act, including the viewpoint-based restrictions that this Court has already found to be unconstitutional in other cases, or

---

[3] The Articulation Coordinating Committee is established by statute and required to, among other things, monitor the exit requirements of one education system and admission requirements of another education system for students who ordinarily transfer from one to the other, review the statewide course numbering system, and publish the list of courses meeting common general education and common degree prerequisite requirements established under section 1007.25. *See* § 1007.01(3), Fla. Stat. This committee is made up of elected members, including "two members each representing the State University System, the Florida College System, public career and technical education, K-12 education, and nonpublic postsecondary education and one member representing students." *Id*.

is based on certain theories regarding social, political, and economic inequities in the United States. If such courses include this prohibited material, they do not meet the standards for general education core courses and cannot be listed as general education core courses in the statewide course numbering system. *See* §§ 1007.25(3), 1007.55(1)(a), Fla. Stat. (2023).

Relatedly, section 1007.55(2) requires public postsecondary educational institution boards of trustees and presidents to annually review and approve, at a public meeting, courses that meet the general education course requirements under section 1007.25. § 1007.55(2), Fla. Stat. (2023). In turn, by December 1, 2024, and each December 1 thereafter, the Articulation Coordinating Committee shall submit those courses that each institution has approved as meeting general education requirements to the State Board of Education and the Board of Governors. § 1007.55(4), Fla. Stat. (2023). In turn, "[t]he State Board of Education and Board of Governors must approve or reject the list of general education courses for each Florida College System institution and state university, respectively." *Id.*

Finally, a public postsecondary educational institution—like New College—that fails to comply with its requirements under section 1007.55 is not eligible to receive performance-based funding. § 1007.55(5), Fla. Stat. (2023). The Board of Governors is responsible for adopting regulations to implement section 1007.55. *See* § 1007.55(7), Fla. Stat. And the New College Board of Trustees is free to adopt its

14

own school policies with respect to course instruction and the selection of courses offered to students. *See* Board of Governors Regulation 1.001(1), (3), and (4). At this juncture, however, neither the Board of Governors nor the Board of Trustees of New College has taken any action to implement these challenged provisions by regulation or school policy. Nor have Plaintiffs submitted any evidence demonstrating any Defendant's intentions with respect to such implementation.

Having set out the relevant regulatory framework, this Court returns to Plaintiffs' theory of standing to enjoin Defendants' enforcement of section 1007.25(3)(c).

2

Both at the hearing and in their motion, Plaintiffs argued that the record before this Court is sufficient to establish that their self-censorship is objectively reasonable and traceable to Defendants' conduct. But this Court is not convinced.

According to Plaintiffs, it's simple. Plaintiffs are injured because of the challenged provisions, and they have sued the parties responsible for implementing and enforcing those provisions. ECF No. 22 at 12. To support this argument with respect to the members of the Board of Governors, Plaintiffs simply point to the Board's authority to pass regulations and allocate funds to colleges and universities and compare this case to *Pernell*, where this Court agreed that most of the plaintiffs in that case had injuries traceable to the conduct of the members of the Board of

Governors. *Id*. at 13–14. As for the members of the Board of Trustees, Plaintiffs note that the Board is the Professor Plaintiffs' direct employer and can discipline them if they violate state law. Likewise, Plaintiffs note that President Corcoran is charged with making tenure decisions concerning faculty, including the Professor Plaintiffs, suggesting that their tenure is in jeopardy if they violate the challenged provision. And Plaintiffs argue that this case is like *Pernell* in that performance-based funding is off the table for any institutions that violate the general education requirements, and thus, the Board of Trustees has a strong incentive to punish professors who violate the general education requirements. But Plaintiffs' arguments are flawed for a few reasons.

First, Plaintiffs view the challenged provision, section 1007.25(3)(c), in a vacuum. They argue that this provision, which sets out some of the standards for general education core courses, is a direct prohibition on professors' speech regarding certain topics. However, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) (quoting *Davis v. Mich. Dept. of Treas.*, 489 U.S. 803, 809 (1989)). And, as this Court explained above, section 1007.25(3)(c) is a sub-section within a broader statute that directs the Board of Governors and the Board of Education to appoint faculty committees to review general education courses for

16

their continued inclusion as general education courses in the statewide course numbering system. In other words, this subsection provides some of the criteria that the faculty review committees must consider when determining whether a course ought to be included in the statewide course numbering system as a designated general education core course. In turn, section 1007.55 requires colleges and universities to undergo a similar review for compliance with the State's general education standards and to choose which courses are to be included as general education core courses in the statewide course numbering system. In the event the educational institutions do not comply with the requirements of section 1007.55, those institutions may lose performance-based funding.

Nothing in either section 1007.25 or section 1007.55 is directed at individual professors. Moreover, Plaintiffs' counsel agreed at the hearing that professors do not have a constitutional right to teach general education courses. Instead, the commands of both statutes are directed at (1) the Board of Governors and the Board of Education to form the faculty review committees and ultimately approve which courses are listed as general education core courses in the statewide course numbering system, (2) the Boards of Trustees of each educational institution to perform their own course reviews, and (2) the Articulation Coordinating Committee to present the recommended course listings to the Board of Governors and the Board of Education for approval.

17

Second, Plaintiffs ask this Court to speculate that, because the Board of Governors has implementing authority under section 1007.55, it will necessarily promulgate regulations that reach through to individual professors in such a way as to ensure discipline or other consequences if those professors discuss prohibited topics or viewpoints in the general education courses that they teach.[4] *See* ECF No. 22 at 13 n.5. Although Plaintiffs acknowledge that the Board of Trustees—not the Board of Governors—is responsible for personnel decisions for individual professors, they suggest that the Board of Governors will likely implement regulations that direct the Board of Trustees to punish professors, like the regulations this Court reviewed in *Pernell*, and thus, they have satisfied their burden of proving standing to challenge the Board of Governors's enforcement of section 1007.25(3)(c). *See id.* at 13–14. But Plaintiffs have asked this Court to assume something without pointing to any evidence to support this leap in logic.

Contrary to Plaintiffs' suggestion, their claim challenging the Board's role in enforcing the general education requirements closely resembles what this Court addressed in *Falls v. DeSantis*, Case No.: 4:22cv166-MW/MJF, 2023 WL 3568526, *1 (N.D. Fla. May 19, 2023). In that case, this Court dismissed a university

---

[4] Plaintiffs have demonstrated that at least two of the Professor Plaintiffs, Anderson and Clark, are currently teaching general education core courses, and thus, they fear that their speech in these classes is now subject to punishment if they run afoul of the law's prohibitions.

professor's challenge to the Board's role in enforcing the Individual Freedom Act because he had failed to show how his free-speech injury was traceable to the Board of Governors based on the facts as they existed at the time he filed his complaint. Absent any factual development regarding Professor Cassanello's theory of standing, this Court concluded that he was asking this Court to speculate as to how the Board's conduct—which, at the time *Falls* was filed, was originally only tied to punishing educational institutions—caused his free-speech injury. So too here. Rather than supplement the record with evidence linking the Board members' intentions to reach through to individual professors through coercive regulations, Plaintiffs ask this Court to assume that the Board will act like it did in *Pernell*. To support this theory, Plaintiffs point to statements from the Governor and a single member of the Board of Governors. But the Governor is not a party, and his statements regarding SB 266 offer little in the way of evidence to establish either that Plaintiffs' fears of punishment are objectively reasonable and not speculative or that Plaintiffs' self-censorship is traceable to the Board of Governors's conduct. And the statement from the Commissioner of Education, though a member of the Board of Governors, is not related to any proposed enforcement of the challenged provision and, instead, is evidence of his views of "DEI" more generally. Absent evidence that allows for a reasonable inference that Defendants intend to enforce the challenged provision in the manner that Plaintiffs fear, this Court cannot fill in the blanks for

19

Plaintiffs where they have offered only a mere scintilla of evidence that their injuries are traceable to the conduct of the members of the Board of Governors.[5]

Plaintiffs face the same problem with respect to the members of the Board of Trustees. True, these Defendants have the general authority to take disciplinary action against individual professors if they violate state law, among several other bases for discipline. Here, Plaintiffs ask this Court to speculate that the Board of Trustees would construe an individual teacher's in-class speech that falls outside section 1007.25(3)(c)'s restrictions to be a "violation of state law." But Plaintiffs have offered no evidence to support the reasonableness of their fears that this would be the case.

Indeed, as this Court mentioned above, section 1007.25(3)(c) is just one of several criteria that faculty review committees and state universities must consider when determining whether to categorize certain courses as general education core

_____

[5] It is no answer for Plaintiffs to point to Defendants' defense in this case as evidence demonstrating that their claims are ripe, or that their injuries are actual, imminent, and traceable to these Defendants. *See* ECF No. 5 at 4 (citing *Wollschlaeger*, 848 F.3d at 1304–05). In *Wollschlaeger*, the Eleventh Circuit held that the court could infer an intent to enforce a challenged provision when the plaintiffs had challenged the law soon after it was enacted, and the state had then vigorously defended the law. 848 F.3d at 1305. But the plaintiffs in *Wollschlaeger* had already established that their free-speech injuries were traceable to the disciplinary authority of the Board of Medicine—indeed, the plain language of the statute deemed violations of the challenged provisions to be "grounds for disciplinary action by Florida's Board of Medicine." *Id*. at 1303; *see also id*. at 1304 ("Due to the challenged provisions of FOPA, and in order to avoid discipline by the Board of Medicine, these doctors are engaged in self-censorship."). But here, Plaintiffs have failed to establish how their fears of discipline are objectively reasonably because the laws at issue do not tie disciplinary action to their individual violations of the challenged provisions.

courses. Notwithstanding Plaintiffs' subjective fears, it is not a mandate to individual professors or students, nor does it set out any disciplinary consequences for individual professors whose in-class speech runs counter to the criteria's restrictions. Here, rather than submit evidence demonstrating (or permitting a reasonable inference) that the members of the Board of Trustees will construe a teacher's speech to amount to a "violation of state law" and thus expose them to disciplinary action, Plaintiffs have instead offered Defendant Rufo's definition of "DEI" and an anecdotal story about a student-painted mural that was "destroyed." This Court will examine both of Plaintiffs' arguments concerning this evidence, starting with Defendant Rufo's statement.

With respect to Defendant Rufo's statement, Plaintiffs point to his co-authored "study where he defined DEI as a set of 'interrelated concepts.' " ECF No. 5 at 17. This statement only goes to show that Defendant Rufo apparently believes that "DEI" includes some of the ideas listed under section 1007.25(3)(c). But his definition of "DEI" does nothing to show how he construes the challenged provision or plans to enforce it, if at all, against individual professors or students.

Moreover, Plaintiffs' source for this quotation also permits a reasonable inference that Defendant Rufo *does not* intend to enforce the challenged provision against individual professors' classroom speech. *See* ECF No. 5 at 17 n.13. Specifically, this source also includes model legislative text, the purpose of which is

described as ensuring "that public universities succeed in their mission to promote the search for truth and knowledge while maintaining academic freedom and integrity, without being transformed into factories of ideological conformity." *Abolish DEI Bureaucracies and Restore Colorblind Equality in Public Universities*, Manhattan Institute (Jan. 23) at 2, available at https://media4.manhattan-institute.org/sites/default/files/model_dei_legislation013023.pdf (last visited Oct. 31, 2023). Notably, the model legislation that Defendant Rufo endorses specifically excludes restrictions on funding for academic course instruction, registered student organizations, guest speakers or performers, etc. *Id*. ("For the avoidance of doubt, nothing in this section shall be construed to cover or affect an institution of higher education's funding of . . . academic course instruction, research and creative works by the institution's students, faculty, or other research personnel, and the dissemination thereof, [etc.].").

Similarly, with respect to model legislation to limit mandatory diversity training, the text that Defendant Rufo endorses specifically excludes "an academic course offered for credit" and "activities of a registered student organization affecting only its members" from the model legislation's definition of and proposed restrictions on "diversity training." *Id*. at 7. In other words, the fact that Defendant Rufo has endorsed legislative text that explicitly excludes scholarship and teaching from its various restrictions suggests that he would, in practice, not construe the

challenged provision at issue here in the manner that Plaintiffs suggest—namely, as grounds for punishing or firing professors based on their in-class speech.

Plaintiffs also cite an anecdotal example to demonstrate that the Board of Trustees intends to enforce the general education requirements against them in the manner that they fear. Specifically, Plaintiffs provide an affidavit from Professor Anderson which details how her art class painted a mural on a New College campus building in the Fall of 2022. *See* ECF No. 22-1 at 5. The mural, which "reflected [her students'] multi-cultural experiences," "was painted over" this summer. *Id*. Professor Anderson believes "that the mural was destroyed by the current New College administration because the themes portrayed conflicted with the restrictions against DEI and other viewpoint based prohibitions adopted in SB 266." *Id*. According to Professor Anderson, this incident "suggests that [she] will not be granted permission for similar access to college facilities in the future." *Id*. at 6.

Do Plaintiffs offer any additional evidence to substantiate Professor Anderson's opinion about (1) why the mural was painted over, (2) who made the decision to paint over the mural, or (3) whether she can assign a similar mural project to her students in the future? No, they do not. Instead, Plaintiffs effectively ask this Court to speculate that the Board of Trustees directed that the mural be painted over *because* of what it portrayed and that they will not permit Professor Anderson to engage in similar projects in the future because the message of her student's artwork,

which—according to Professor Anderson—will "inevitably conflict with the restrictions in SB 266." *Id*. at 5. But a Plaintiff's suspicions are not evidence—nor do they permit this Court to find standing based on supposition alone.

Finally, to demonstrate that their self-censorship in the face of this challenged provision is reasonable, Plaintiffs suggest that tenure decisions are now in jeopardy based on whether professors run afoul of the general education requirements. Again, Plaintiffs point to no evidence demonstrating whether the Board of Trustees or the President of New College will construe the statute to provide a sufficient basis to punish an individual professor's speech associated with scholarship or teaching. Moreover, while the Legislature has recently changed the way tenure works in Florida, *see* section 1001.706(6)(b), Florida Statutes (2023), the Board of Governors has explicitly prohibited considering a professor's viewpoint while conducting post-tenure review. *See* Board of Governors Regulation 10.003(3)(b), *available at* https://www.flbog.edu/wp-content/uploads/2023/03/10.003-Post-Tenure-Review_0 32923.pdf (last visited Oct. 31, 2023) ("The review shall not consider or otherwise discriminate based on the faculty members' political or ideological viewpoints."). Absent other evidence, including public records or statements of the party opponents regarding enforcement of the law at issue, this Court cannot simply assume that Plaintiffs' fears are reasonable in light of the general authority of the Board of Trustees to punish violations of state law or engage in post-tenure review of faculty.

3

For these reasons, Plaintiffs have failed to establish, through affidavit or other evidence, that their self-censorship in the face of the challenged provision, section 1007.25(3)(c), is objectively reasonable based on this record *and* that any injury they have suffered is traceable to the conduct of any Defendant. Instead, Plaintiffs' scant evidence demonstrates only that they subjectively fear potential consequences that may come about based on the general hostility toward certain viewpoints that specific state officials have expressed. Plaintiffs' theory of standing is entirely too speculative to entitle them to seek preliminary injunctive relief. They have failed to meet their burden of proof and therefore their motion challenging the general education requirements is due to be denied for lack of standing.

Next this Court examines Plaintiffs' standing to challenge the funding provision.

B

Plaintiffs also allege the funding provisions violate the First and Fourteenth Amendments because they unconstitutionally discriminate against funding speech or providing access to campus facilities based on viewpoint discrimination, and because the law is drafted in such a way that a person of ordinary intelligence would not know what is prohibited.

25

Here, the Professor Plaintiffs fear that "no funding" means "no salary" if their classroom speech or research runs afoul of the prohibited viewpoints or subject matter. And the Student Plaintiffs fear that the funding prohibition's carve out for student organizations will be applied to them in an unconstitutional manner such that their student organizations will lose access to funds and campus facilities or be disbanded altogether.

Again, with respect to these Plaintiffs' standing to challenge this provision, the questions before this Court are twofold. Namely, (1) whether Plaintiffs' injuries are objectively reasonable based on the evidence in this record, and (2) assuming *arguendo* that Plaintiffs can demonstrate an injury-in-fact, whether they have met their burden to establish that such injury is traceable to any of the Defendants' conduct. And again, to answer these questions, this Court must examine the challenged provision at issue and explain how this statutory scheme works together.

1

With respect to the funding provisions, SB 266 amended section 1004.06, in relevant part, to expand the prohibition on spending public funds for certain programs. Specifically, section 1004.06(2) now prohibits state universities from expending "any state or federal funds to promote, support, or maintain any programs or campus activities that (a) violate s. 1000.05; or (b) advocate for diversity, equity, and inclusion, or promote or engage in political or social activism, as defined by

26

rules of the State Board of Education and regulations of the board of Governors." §

1004.06(2), Fla. Stat. (2023). This section includes a carve out for "student fees to

support student-led organizations" and "use of institution facilities by student-led

organizations," "notwithstanding any speech or expressive activity by such

organizations that would otherwise violate" section 1004.06(2). *Id*. In other words,

student-led organizations that, for example, promote or engage in political or social

activism, like New College's chapter of Turning Point USA,[6] will not be denied

funding or access to campus facilities based on their speech or expressive activity if

such funding or access is granted by written school policy.

In addition, section 1004.06(3) provides an exception to the funding

prohibitions for "programs, campus activities, or functions required for compliance

with general or federal laws or regulations," or "for obtaining or retaining

institutional or discipline-specific accreditation with the approval of either the State

Board of Education or the Board of Governors," or "for access programs for military

veterans, Pell Grant recipients, first generation college students, nontraditional

students, '2+2' transfer students from the Florida College System, students from

---

[6] Turning Point USA New College's constitution and bylaws are available on New College's publicly available website and provide that the mission of this organization is "to educate students about the importance of fiscal responsibility, free markets, and constitutional rights through innovative campus activism and non-partisan, thought-provoking discussion." *See* Turning Point USA New College Constitution/Bylaws, *available at* https://novoconnect.ncf.edu/organization/tpusanewcollege (last visited Oct. 31, 2023).

low-income families, or students with unique abilities." § 1004.06(3), Fla. Stat. (2023). Finally, the Board of Governors must adopt regulations to implement this section. § 1004.06(4), Fla. Stat. (2023).

So, what does this statute do? First, with certain exceptions, it prohibits New College from spending public funds[7] "to promote, support, or maintain" certain programs or campus activities that violate section 1000.05, Florida Statutes, or to "advocate for diversity, equity, and inclusion, or promote or engage in political or social activism." Second, it grants the Board of Governors authority to define "diversity, equity, and inclusion" and "political or social activism." Third, the statute contemplates that New College will implement its own policies or regulations—if it hasn't already—to determine how to allocate funds and facility access to student-led organizations. Based on the plain language of the statute, these institutional policies must be viewpoint-neutral. And it grants the Board of Governors authority to "implement this section." At this juncture, neither side has presented any evidence demonstrating that either the Board of Governors or the Board of Trustees have taken any action to implement or enforce these provisions.

---

[7] Of course, the statute allows New College to spend private funds to support these programs or campus activities.

Accordingly, having described the relevant statutory scheme, this Court again turns to Plaintiffs' standing arguments with respect to challenging section 1004.06(2).

2

Plaintiffs again assert the record is sufficient to establish their standing to seek a preliminary injunction against the funding provisions—namely, section 1004.06(2). But this Court harbors many of the same concerns outlined above with respect to whether Plaintiffs have demonstrated that their asserted injuries are objectively reasonable and traceable to the conduct of the Defendants. Plaintiffs' fears can be generally grouped in two categories—namely, how these provisions will impact their organizations' abilities to continue to exist on New College's campus and how these provisions will impact scholarship and teaching. This Court will address each category in turn.

With respect to the Student Plaintiffs, Plaintiff Engels has provided a declaration setting out her fears that a student organization for which she has previously attended meetings—"Feminist Fridays"—may be disbanded. *See* ECF No. 5-2 at 3. Likewise, Professor Plaintiff Hernandez asserts she is uncertain whether she will continue to be able to act as a faculty sponsor of the New College Club, "People of Color Union." *See* ECF No. 5-1 at 5. But a plaintiff's subjective fear that their organization may be forced to disband is not an injury-in-fact. *See*

29

*Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) ("[T]hreatened injury must be *certainly impending* to constitute an injury in fact and . . . allegations of *possible* future injury are not sufficient." (cleaned up)); *City of South Miami v. Governor*, 65 F.4th 631, 638 (11th Cir. 2023) ("And we have rejected the argument that plaintiffs have standing based on their subjective fear of harm and its chilling effect." (citation and quotation marks omitted)). And Plaintiffs have offered no evidence demonstrating the reasonableness of their fears concerning how the Board of Governors and the Board of Trustees will enforce the student organization carve out to section 1004.06(2).[8] Indeed, the plain language of the statute suggests the policies governing funding and facility access for student organizations must be viewpoint neutral. *See, e.g.*, § 1004.06(2)(a), Fla. Stat. ("Student fees to support student-led organizations are permitted *notwithstanding any speech or expressive activity by such organizations which would otherwise violate this section* . . . ." (emphasis added)). Accordingly, Plaintiffs have not demonstrated that they have standing to challenge the student-organization carve out to the funding provision.

---

[8] Plaintiff Engels also does not assert that she even plans to continue attending Feminist Fridays meetings, and thus, she has not demonstrated how she, individually, would be injured if Feminist Fridays were disbanded. *See, e.g.*, *LaCroix v. Lee Cnty.*, 819 F. App'x 839, 842 (11th Cir. 2020) (noting that, in a First Amendment case seeking injunctive relief, "the plaintiff must still demonstrate an unambiguous intention at a reasonably foreseeable time to engage in a course of conduct arguably affected with a constitutional interest").

As for Plaintiffs' standing to challenge the funding provision's prohibition on public expenditures for certain programs and campus activities including scholarship and teaching, Plaintiffs again fail to point to record evidence to establish that any injury related to the funding provision is objectively reasonable, certainly impending, or traceable to the conduct of Defendants. To start, Plaintiffs frame their asserted injuries as their subjective fears and resulting self-censorship or uncertainty regarding what they can say in class. According to Plaintiffs, they fear that if their classroom speech could be construed as advocating for diversity, equity, and inclusion or as promoting social activism, then the Professor Plaintiffs' salaries and other public funding could be in jeopardy. *See* ECF No. 22-1 at 5 ("I am also concerned about the risk of adverse funding decisions, including the cancellation of courses or denial of course credit which may accompany the independent study programs adopted by upper division students.").

But Plaintiffs' argument depends upon assigning the worst possible construction of the statute to conclude that "no funding" for "programs or campus activities" means cutting professors' salaries based on their individual, in-class speech. Not only is this reading of the statute unsupported by record evidence, but it also makes little sense when read in conjunction with the general education core course requirement provisions. Here, the Florida Legislature determined that certain viewpoints and topics should be excluded from general education core courses—

31

however defined—and thus, may be taught instead in upper-level or more advanced elective courses. But Plaintiffs ask this Court to construe the funding provision to mean that, notwithstanding the shift of certain topics to upper-level elective courses, these courses are always inappropriate and cannot be funded—through payment of professor salaries—with public dollars.

At the hearing, counsel for the members of the Board of Governors and the Board of Trustees offered competing definitions for "program" versus "general education core courses," which were not tethered to any statutory or regulatory language and only seemed to confuse the issues further. But Plaintiffs' counsel also failed to identify any evidence suggesting that any of the Defendants intends to construe and apply the funding provisions to cut salaries for professors based on their speech in individual courses.

For what it's worth, the definitions for "degree program" and "program major" in Board of Governors Regulation 8.011(2) appear to undercut Plaintiffs' reading of the funding provisions—namely, that defunding "programs" means cutting salaries for professors based on their speech in individual courses. Specifically, a "degree program" is defined as "[a]n organized curriculum leading to a degree in an area of study recognized as an academic discipline by the higher education community, as demonstrated by the assignment of a Classification of Instructional Programs (CIP) code by the National Center for Educational Statistics

or as demonstrated by the existence of similar degree programs at other colleges and universities." *See* Board of Governors Regulation 8.011(2)(a), *available at* https://www.flbog.edu/wp-content/uploads/2022/06/Regulation8.011_Final_A mended.pdf (last visited Nov. 1, 2023). Likewise, a "program major" is defined as "[a]n organized curriculum offered as part or all of an existing or proposed degree program," and it must be "reasonably associated with the degree program under which it is offered and shall share core courses with all the other majors within the same degree program." Board of Governors Regulation 8.011(2)(b), *available at* https://www.flbog.edu/wp-content/uploads/2022/06/Regulation-8.011_Final_Am ended.pdf (last visited Nov. 1, 2023). Notably, this regulation identifies "core courses" associated with a program major to exclude the "common prerequisites as defined in section 1007.25, Florida Statutes." *Id*. Thus, it appears, based on this regulation, that the Board of Governors could understand "program" to mean either the organized study in a specific academic discipline that results in a certain level of achievement—bachelor's degree, master's degree, doctorate, etc.—or the course of studies for a particular academic field within your relevant degree program.

While certainly not dispositive, these definitions do not suggest that the Board of Governors construes "program" to focus on individual courses or the professor's in-class speech during class time. Moreover, Plaintiffs offer no evidence to demonstrate that either the Board of Governors or the Board of Trustees construes

the statute this way or plans to enforce it against individual professors. Indeed, section 1004.06(2) says nothing about individual professors' in-class speech. And as this Court noted above, one of Plaintiffs' sources in support of their motion suggests that Defendant Rufo would not even agree with Plaintiff's reading of the statute. *See Abolish DEI Bureaucracies and Restore Colorblind Equality in Public Universities*, Manhattan Institute (Jan. 23) at 2, available at https://media4.manhattan-institute.org/sites/default/files/model_dei_legislation01 3023.pdf (last visited Oct. 31, 2023) (proposing model legislation that exempts funding of academic course instruction, among other things, from defunding provision).

Absent any rulemaking by the responsible parties or other facts demonstrating their plan to enforce the challenged provision against Plaintiffs to eliminate their salaries or other funding, Plaintiffs' fears that their salaries and research funding will be cut based on their individual, in-class speech and not as a larger cut to an entire major or department, are purely speculative. Accordingly, their motion as it relates to the funding provisions is also due to be denied for lack of standing.[9]

---

[9] Plaintiffs also include the non-profit organization, NCF Freedom, Inc. This organization does not claim to be a student-led organization subject to the carve out for such groups in the funding provisions. Instead, it claims it has associational standing on behalf of its professor and student members and that it is directly injured, itself, by the challenged provisions because of fears that its fundraising efforts and ability to solicit new members who are members of the New College community will be impaired.

III

This Court recognizes that the average person might find the outcome in this case frustrating. Here we have real professors who teach real subjects at a real school where lawmakers and decisionmakers have demonstrated real hostility toward certain ideas and viewpoints, and there is now a law that could or could not be used to punish them. On the surface, there appears to be a real "case or controversy." But the law governing standing requires more than a generalized view of the interests at stake, the responsible parties, and the possibility of some future consequence.

If you dislike a law or are afraid of possible future consequences, you cannot simply invoke the jurisdiction of this Court based solely on how you feel or what you believe may happen. Instead, you must meet your burden to establish standing.

_____

To start, because none of the individual members who are plaintiffs in this action has demonstrated standing, and because the organization has not provided evidence of any other member who would have standing to sue, the organization lacks associational standing. Likewise, the declaration filed in support of the organization by its President, Jonathan E. Miller, indicates only that the organization "fears that it will be banned from accessing facilities owned by New College of Florida even if invited to speak by students enrolled at New College." ECF No. 5-3 at 5. But Mr. Miller does not indicate whether the organization has previously sought permission to appear on campus, whether it has any pending student invitations, or whether it has any other plans to appear on campus to solicit new members or fundraise. Accordingly, Mr. Miller's subjective fears, on their own, are insufficient to satisfy the injury-in-fact requirement. *See, e.g.*, *LaCroix*, 819 F. App'x at 842 (noting that, in a First Amendment case seeking injunctive relief, "the plaintiff must still demonstrate an unambiguous intention at a reasonably foreseeable time to engage in a course of conduct arguably affected with a constitutional interest"). This organization must demonstrate more than "a keen interest in the issue" to seek relief from this Court. *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013). But NCF Freedom, Inc., has failed to do so and does not even respond to Defendants' arguments concerning the organization's standing aside from a conclusory statement regarding associational standing. *See* ECF No. 22 at 10. Accordingly, NCF Freedom, Inc., also lacks standing to pursue preliminary injunctive relief.

And to do so, you must be able to meet the ever-evolving standards that bind this Court and clear new hurdles as they arise. *See, e.g.*, *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1270 (2020) (Pryor, J., dissenting) ("In holding that the district court lacked jurisdiction to hear any of the plaintiffs' claims, the majority opinion contorts beyond recognition Supreme Court precedent addressing the injury-in-fact, traceability, and redressability requirements for standing . . . . As a result, the majority opinion ends up imposing entirely new or substantially heavier burdens on plaintiffs who seek to challenge state election laws, burdens that the Supreme Court has never recognized.").[10]

---

[10] Indeed, this Circuit's standing jurisprudence has morphed throughout the past few years, starting with *Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019), then *Jacobson* and *Support Working Animals, Inc. v. Governor of Florida*, 8 F.4th 1198 (11th Cir. 2021). *See also Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 957–58 (11th Cir. 2020) (Jordan, J., dissenting) ("That we need to resolve what is essentially a policy question to determine the boundaries of our subject-matter jurisdiction reminds us how far standing doctrine has drifted from its beginnings and from constitutional first principles. Standing, as we know it today, was a twentieth-century innovation."). Judge Jordan opined that the majority in *Lewis* "made standing doctrine even more difficult to understand or defend[,]" and suggested that "[i]f the plaintiffs [in *Lewis*] lack standing, it may be time to rethink the causation and redressability components of Article III standing." *Lewis*, 944 F. 3d at 1326 (Jordan, J., dissenting). Perhaps the starkest example of how standing has shifted in this Circuit is *Support Working Animals*, a case in which the court held that the inability to trace the plaintiffs' injuries to a state actor responsible for enforcing the challenged law doomed plaintiffs' challenge to that law. *See Support Working Animals, Inc. v. Moody*, Case No.: 4:19cv570-MW/MAF, 2020 WL 10728640, *1 (N.D. Fla. Jun. 12, 2020) ("In a prior Order, this Court held, in part, that Plaintiffs had standing to sue Defendant in this action because Defendant's statutory duty to superintend and direct Florida's state attorneys constituted a sufficient connection to the enforcement of the challenged provision of Florida law. Since that time, however, new binding precedent has emerged which instructs that such supervisory authority is insufficient to render state-level Florida authorities proper defendants in cases like the present one."). In effect, the inability to demonstrate traceability foreclosed those plaintiffs' ability to challenge the provision at issue—shuttering their businesses (indeed, an entire industry) indefinitely—until the Florida Legislature chose to pass implementing legislation and designate

Frustrating as it may seem, there is a path to establish standing so long as a plaintiff can present enough evidence to clear the hurdles in their way.[11] In a case like this where free speech is at issue, a plaintiff could point to a law that directly targets them with disciplinary action—and thus, results in their chilled speech—to demonstrate a concrete injury that is both objectively reasonable and tied to the conduct of the defendants. *See, e.g.*, *Wollschlaeger*, 848 F.3d at 1303. Or, in the absence of some law that directly targets their speech, a plaintiff could point to an implementing regulation—like the plaintiffs did in *Pernell*—that enforces a challenged statute and orders the decisionmakers to punish violators, and thus,

---

the responsible "enforcer." Moreover, at the same time the law is shifting, so too have lawmakers refined the way that they craft laws, often with the apparent intent and result of limiting any avenue for judicial review in some cases. *See Link*, 2020 WL 2984726, at *2 n.2 ("Texas has employed an array of strategems designed to shield its unconstitutional law from judicial review . . . . The clear purpose and actual effect of S.B. 8 has been to nullify this Court's rulings." (quoting *Whole Woman's Health v. Jackson*, 142 S.Ct. 522, 543–45 (2021) (Roberts, C.J., concurring in part and dissenting in part)).

[11] Nonetheless, this Court recognizes that the rigor employed in judging one plaintiff's standing versus another's can often seem like one plaintiff is allowed to run the 200 meter dash while the other is forced to compete in the 400 meter hurdles just to get through the courthouse doors. *Compare Biden v. Nebraska*, 143 S. Ct. 2355, 2385 (2023) (Kagan, J., dissenting) ("The Court's first overreach in this case is deciding it at all. Under Article III of the Constitution, a plaintiff must have standing to challenge a government action. And that requires a personal stake— an injury in fact . . . . The plaintiffs in this case are six States that have no personal stake in the Secretary's loan forgiveness plan. They are classic ideological plaintiffs: They think the plan is a very bad idea, but they are no worse off because the Secretary differs. In giving those States a forum—in adjudicating their complaint—the Court forgets its proper role. The Court acts as though it is an arbiter of political and policy disputes, rather than of cases and controversies.") *with Lewis*, 944 F.3d at 1309 (Wilson, J., dissenting) ("[B]ecause the majority applied too strict a standard when evaluating traceability and redressability at the pleading phase, I find it necessary to clarify the appropriate analysis of those elements.").

37

results in chilled speech. *See, e.g.*, *Pernell*, 641 F. Supp. 3d 1218. Or, in the absence of either a statute that directly targets the plaintiff's speech or a regulation that orders punishment for speech in violation of state law, a plaintiff could point to other evidence that the defendants intend to enforce the statute at issue against their speech in the very manner that they fear. *See, e.g.*, *Link*, 2023 WL 2984726, at *5. But Plaintiffs in this case have identified none of these things, and thus, they have failed to demonstrate their standing for purposes of the preliminary injunction motion.

For these reasons, Plaintiffs' motion, ECF No. 5, is **DENIED for lack of standing**.

**SO ORDERED on November 3, 2023.**

**s/Mark E. Walker**
**Chief United States District Judge**