UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**NCF FREEDOM, INC.,**                      )
a Florida not-for-profit corporation,         )
**SARAH HERNANDEZ**,                        )
**MARIBETH CLARK**,                         )
**KIM ANDERSON**,                           )
**SARA J. ENGELS**,                         )
**CARLTON LEFFLER**, and                    )
**SHELBY A. NAGLE**,                        )
                                            ) **CASE NO.: 4:23-cv-00360-MW-MAF**
         Plaintiffs,                         )
                                            )
**v.**                                       )
                                            )
**MANNY DIAZ, JR.,** in his official capacity )
as the Commissioner of the Florida State     )
Board of Education and member of the         )
Florida Board of Governors, et al.,          )
                                            )
         Defendants.                         )
_____/

# PLAINTIFFS' RESPONSE IN OPPOSITION
# TO DEFENDANTS' MOTION TO DISMISS

COME NOW the Plaintiffs, by and through their undersigned attorneys, and

respond to the Defendants' Motion to Dismiss (Doc. 26) and say:

## I.    IMPACT OF THE ORDER DENYING INJUNCTION

Plaintiffs received the Court's Order Denying Motion for Preliminary

Injunction (Doc. 27) while this Response was being finalized. The Response has

been modified to address, so far as time permitted, the Court's analysis and citations

to authority. Plaintiffs begin by noting that the standards for evaluating standing for

purposes of a preliminary injunction are different from those which apply to a motion

to dismiss. For purposes of obtaining a preliminary injunction, plaintiffs must bring

forth actual evidence of standing and the claims are evaluated as they would be at

the summary judgment stage:

> And "where a plaintiff moves for a preliminary injunction, the district
> court ... should normally evaluate standing 'under the heightened
> standard for evaluating a motion for summary judgment.'" Waskul v.
> Washtenaw Cnty. Cmty. Mental Health, 900 F.3d 250, 255 (6th Cir.
> 2018) (quoting Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905,
> 912 (D.C. Cir. 2015)); see also Cacchillo v. Insmed, Inc., 638 F.3d 401,
> 404 (2d Cir. 2011). Thus, "a plaintiff cannot 'rest on such mere
> allegations [as would be appropriate at the pleading stage], but must set
> forth by affidavit or other evidence specific facts, which for purposes
> of the summary judgment motion will be taken to be true.' " Cacchillo,
> 638 F.3d at 404 (some alteration in original) (quoting Lujan, 504 U.S.
> at 561, 112 S.Ct. 2130).

Pernell v. Florida Bd. of Governors of State Univ. Sys., 641 F. Supp. 3d 1218, 1246

(N.D. Fla. 2022).

In contrast, the usual pleading standards apply when evaluating standing for

purposes of a motion to dismiss:

> For purposes of ruling on a motion to dismiss for want of standing, both
> the trial and reviewing courts must accept as true all material allegations
> of the complaint, and must construe the complaint in favor of the
> complaining party. E.g., Jenkins v. McKeithen, 395 U.S. 411, 421-422,
> 89 S.Ct. 1843, 1848-1849, 23 L.Ed.2d 404 (1969).

Warth v. Seldin, 422 U.S. 490, 501 (1975). This Court must also consider the fact that Plaintiffs assert that SB 266 violates the First Amendment on its face. *See*, Pernell, 641 F.Supp. 3d at 1249, *quoting* Harrell v. Fla. Bar, 608 F.3d 1241, 1254 (11th Cir. 2010) ("When First Amendment rights are involved, courts apply the injury-in-fact requirement most loosely, 'lest free speech be chilled even before the law or regulation is enforced.'").

## II.   SUMMARY OF ARGUMENT AND *NEW PERSPECTIVES*

1.     Plaintiffs have standing to bring this pre-enforcement facial challenge for the following reasons:

A.     The Student Plaintiffs at New College are suffering an injury in fact at the present time - not at some time in the future and not at some point when regulations are adopted - because SB 266 prohibits funding and imposes sanctions (direct and indirect) for the dissemination of disfavored viewpoints in the context of already-approved curricula. As willing listeners, the Student Plaintiffs' First Amendment rights are currently being infringed by a law which is hopelessly vague on its face.

B.     The Professor Plaintiffs are suffering an injury in fact because their First Amendment right to teach from their own viewpoint within an approved curriculum has been infringed by SB 266. The Professor Plaintiffs further allege that

the law is so vague that they cannot determine when their salaries and tenure rights may be at risk and when they can and cannot teach certain ideas in a general education class.

C.    NCF Freedom, Inc. has standing to pursue its associational claims because at least one of its members has individual standing.

2.    SB 266 is a hybrid law affecting different levels of government and wielding different levers of power. The Court is correct to note that the direct censorship provisions in §1007.25(c) were adopted for purposes of evaluating the general education curriculum and is primarily a function of the Board of Governors and the Articulation Coordinating Committee. (Doc. 27 at 12-13). In contrast, the provisions prohibiting the funding of DEI and "political and social activism" (§1004.06(2)(b)) control the actions of individual colleges and universities - the direct employers of the Professor Plaintiffs.

3.    SB 266 is properly read as a direct prohibition against funding disfavored viewpoints at the university level. *See*, §1004.06(2) The law does not affect curriculum as the "programs" in question have already been approved by both the Board of Governors and New College. The defunding provisions cannot be construed as governing the relations between the Board of Governors and universities because the statute specifically regulates a "Florida College System institution, state university, Florida College System institution direct-support

organization, or state university direct-support organization". Id. The defunding provisions directly impact Plaintiffs by threatening the Professors' salaries,[1] cutting off funding to student organizations, exposing teachers to discipline,  impacting tenure decisions, and chilling speech.

4.     The Court suggested in its injunction Order that Plaintiffs' reading of the statute was not the only possible construction:

> But Plaintiffs' argument depends upon assigning *the worst possible construction of the statute* to conclude that "no funding" for "programs or campus activities" means cutting professors' salaries based on their individual, in-class speech. (Emphasis added).

(Doc. 27 at 31). For purposes of the Motion to Dismiss, however, this Court must construe all facts in favor of the Plaintiffs' claims. In addition, the Government always bears the ultimate burden of proof to demonstrate that its laws are consistent with the First Amendment. *See*, Edenfield v. Fane, 507 U.S. 761, 770–71 (1993).

This Court went on to suggest that the funding provisions had to be read *in pari materia* with the regulations of the general education classes. Plaintiffs submit that this is not a proper way to construe the statute. That is because the funding and

---

[1] This case is distinguishable from Falls v. DeSantis, 609 F.Supp. 3d 1273 (N.D. Fla. 2022) on this point. In Falls, the threat to salaries was indirect as it posited that schools might be denied funding by the Department of Education and those schools might then be motivated to reduce or withhold teachers' salaries. In contrast, SB 266 is not discretionary when it comes to funding and the link is direct between university and professor without any intervening bureaucracies.

censorship provisions govern different governmental entities, adopt different enforcement mechanisms and regulate different categories of speech. More fundamentally, the two different provisions of SB 266 amend different parts of the Florida Statutes. It is appropriate to read §1004.06(2) - which governs universities - independently from §1007.25(c) - which principally regulates the Board of Governors. Given that perspective, when SB 266 says that universities "may not expend any state or federal funds", Plaintiffs are justified in believing that the statute means just that. Plaintiffs have a reasonable fear that the defunding provisions will be used by New College to threaten their salaries and tenure if they adopt viewpoints contrary to the current party line.

5.      The First Amendment inquiry in this case is controlled by Bishop v. Aronov, 926 F.2d 1066 (11th Cir. 1991). Pernell v. Florida Bd. of Governors of State Univ. Sys., 641 F.Supp. 3d 1218 (N.D. Fla. 2022) is persuasive authority in construing a closely analogous statute in the specific context of university classrooms.

6.      The incorporation of the now-enjoined Stop WOKE Act [§1000.05, Fla.Stat.] into SB 266 [See, §§1004.06(2)(a) and (2)(b) and §1007.25(c)] is a powerful reason for concluding that the challenged statute is intended to regulate classroom instruction. This Court correctly decided in Pernell that the Stop WOKE Act allowed for the direct discipline of teachers who offered instruction in the eight

prohibited concepts. It is important here to note that SB 266 does not just incorporate the substantive standards of §§1000.05. Rather, it adopts the entirety of the law, which would appear to include the ability to directly punish teachers.

7.      SB 266 is unconstitutionally vague on its face. Plaintiffs have identified multiple words and phrases which are obviously terms of art but which are undefined in the statute and all-but-undefinable in practice. (Doc. 1 at 67-69, 71-73). This Court considered a particularly fraught word - "distort" - in its Order and seems to have concluded that no one can be expected to understand which teachings are lawful and which are not. (Doc. 27 at 1-2).

8.      Vagueness is closely linked to overbreadth in this context. *See*, Dream Defenders. v. DeSantis, 559 F.Supp. 3d 1238, 1269 (N.D. Fla. 2021), *quoting* Am. Booksellers v. Webb, 919 F.2d 1493, 1505 (11th Cir. 1990) ("[O]ften a law is both overbroad and vague - a concept the Eleventh Circuit has called "[o]verbreadth from indeterminacy.'"). In this case, the law sweeps up a great deal of speech and particular viewpoints which are within an approved curriculum and are neither disruptive nor a threat to Western civilization as perceived through the Legislature's warped lens.

9.      The funding distinctions between individual students and between student organizations in §§1004.06(2)(b) and (3) violate the Student Plaintiffs' Equal Protection rights under heightened scrutiny.

## III.   STANDARD OF REVIEW

For the purposes of the Motion to Dismiss, the Court must view the allegations of the Complaint in the light most favorable to the Plaintiffs, must consider the allegations of the Complaint as true, and must accept all reasonable inferences therefrom. *See*, Jackson v. Okaloosa County, Fla.*,* 21 F.3d 1531, 1534 (11th Cir. 1994). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 563, 127 S.Ct. 1955, 1969 (2007). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 556.

"[W]hen standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing. Bischoff v. Osceola Cnty., Fla., 222 F.3d 874, 878 (11th Cir. 2000); *See, also*, Florida v. United States, 342 F.R.D. 153, 159 (N.D. Fla. 2022) (Same).

## IV.   INTRODUCTION TO SB 266

Until 2023, it had been a fundamental tenet of our constitutional Republic that:

> [T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge. The right

of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read (Martin v. City of Struthers, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313) and freedom of inquiry, freedom of thought, and freedom to teach (see Wieman v. Updegraff, 344 U.S. 183, 195, 73 S.Ct. 215, 220, 97 L.Ed. 216) - indeed the freedom of the entire university community.

Griswold v. Connecticut, 381 U.S. 479, 482 (1965). SB 266 would throw away that constitutional heritage in favor of a government ideology established by whatever political party happens to control the Legislature at the moment. At the present time, the Legislature is dominated by partisans engaged in a war against "DEI" and "woke ideology".

A curious feature of SB 266 is the fact that the restrictions turn not on any particular curriculum, but on concepts, theories and ideas which may be discussed in a variety of approved curricula. It must also be noted that SB 266 is not confined to the curriculum taught by professors, it is not limited to government employees, and it is not even limited to the classroom. Rather, the law applies to student groups and extracurricular activities as well. SB 266 prohibits funding and access to facilities for those organizations which might wish to pursue activist policies or even discuss the possibility that the prohibited concepts are worth discussion.

Ultimately, the State is not regulating curriculum at all. Instead, it has enacted a "wholesale deterrent to a broad category of expression by a massive number of

potential speakers." <u>NTEU</u>, 513 U.S. 454, 466–67 (1995). And it does so based on the viewpoint of the speaker, allowing some viewpoints while censoring others.

Viewpoint based discrimination is unconstitutional regardless of the means chosen to implement it. The statute relies in part on the denial of funding, but caselaw holds that funding decisions cannot be used to suppress "dangerous ideas". <u>Regan v. Taxation Without Representation of Wash.</u>, 461 U.S. 540, 548 (1983). In addition, viewpoint discrimination is inherently incompatible with any "legitimate pedagogical concerns". *See*, <u>Hazelwood Sch. Dist. v. Kuhlmeier</u>, 484 U.S. 260, 273 (1988).

## V.   **FACTS AND ARGUMENT SUPPORTING STANDING.**

### A.   **The Unique Constitutional Rights of the Student Plaintiffs.**

Most of the briefing and argument in this case to date has centered around the right of the Professor Plaintiffs to teach particular viewpoints within the approved curriculum. This is a natural result of the Court's observation in <u>Pernell</u> that a student's right to learn is merely derivative of his teacher's First Amendment rights:

> It logically follows that a university student's First Amendment right to receive a professor's viewpoints should flow from that professor's First Amendment right to express those viewpoints, for the former cannot be said to exist without the latter. If both claims were viewed and analyzed independently under facts such as this, that analysis could potentially lead to an illogical result - namely, that university students have an independent right to viewpoints that their professors do not have a right to share.

Pernell, 641 F.Supp. 3d at 1244. Plaintiffs respectfully suggest that this is not an accurate assessment of the law and that students have a constitutional right to receive information which is personal to them and independent of the rights of their professors. The facts of this case merit a second look at Pernell's treatment of student speech rights.

The First Amendment protects both the right to speak and the right to receive information:

> Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both.

Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756-57 (1976); See, also, Stanley v. Georgia, 394 U.S. 557, 564 (1969) ("This right to receive information and ideas, regardless of their social worth… is fundamental to our free society.").

Students clearly have their own First Amendment rights to learn and engage at all levels of the educational system:

> More importantly, the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom…
>
> As we recognized in Tinker, students too are beneficiaries of this principle…

Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,  457 U.S.  853, 868-

68 (1982);[2] *See, also*, Kennedy v. Bremerton Sch. Dist., 597 U.S. _, 142 S.Ct. 2407, 2423 (2022) *quoting* Tinker ("[T]he First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'").

The fact that a student's rights are "correlated" with a teacher's right to speak does not imply that they are wholly dependent on the teacher's rights. Those rights are personal to the student and can be asserted whether or not a teacher wishes to speak. *See, e.g.*, Healy v. James, 408 U.S. 169 (1972) (Students had standing to challenge denial of registration of controversial student organization on campus); Flores v. Bennett, 635 F. Supp. 3d 1020 (E.D. Cal. 2022) (Conservative students had standing to challenge college policy banning controversial flyers from bulletin boards).

---

[2]  This Court observed in Pernell that "Pico is a plurality opinion and, thus, is not binding precedent." Pernell, 641 F.Supp. 3d at 1244. However, that does not mean that Pico has nothing to offer in terms of constitutional guidance. Under the Marks doctrine, the binding opinion is the narrowest grounds upon which a majority of the Justices agreed. The Fifth Circuit concluded that the Pico plurality recognized both the First Amendment rights of students and the constitutional limitations placed on school officials when making content-based decisions. *See*, Campbell v. St. Tammany Par. Sch. Bd., 64 F.3d 184, 189 (5th Cir. 1995) ("Justice White's concurrence in Pico represents the narrowest grounds for the result in that case, and it does not reject the plurality's assessment of the constitutional limitations on school officials' discretion to remove books from a school library.").

The emphasis in this case has been on whether the Professor Plaintiffs will suffer any injury in fact as a result of the enforcement of SB 266 now or in the future. Plaintiffs obviously maintain that the Professors have suffered an injury and that it is appropriate for them to bring this pre-enforcement challenge to the law. However, this portion of Plaintiffs' brief will address the unique constitutional injury suffered by the students.

In the context of SB 266, that injury amounts to a categorical prohibition against instruction or funding of the particular viewpoints proscribed by the statute. Some cases suggest that a listener's right to receive information extends no farther than the speaker's right to disseminate the chosen message. From that perspective, courts have sometimes found that the failure of a speaker's First Amendment claim dooms any corollary claim by a willing listener. *See, e.g.*, Doe ex rel. Doe v. Governor of New Jersey, 783 F.3d 150, 155 (3d Cir. 2015) ("[The statute] does not violate the counselors' right to speak… and, as a result, it does not violate Appellants' right to receive information.")

Plaintiffs suggest that this conclusion is not valid when considering standing to sue - at least with respect to the Student Plaintiffs. Here, the Defendants have argued that the Professors have not suffered an injury-in-fact because they will not

be disciplined today for violating the viewpoint-based restrictions.[3] But that does not mean that the Student Plaintiffs can access the censored theories and ideas. That is because universities cannot fund or allow dissemination of the prohibited concepts on their campuses. Individual Professors may or may not choose to disregard the provisions of SB-266 (at their peril). But no student will be able to learn about the prohibited concepts because they are enrolled in institutions which are statutorily prohibited from allowing access to those thoughts and ideas. Put in other words, the Professors may or may not suffer a legal disability as a result of SB 266, but the Students will clearly suffer a First Amendment harm: they will be prevented from learning about information which would otherwise mold their views on the world - to the detriment of us all.

Courts have encountered circumstances in which a statute is shown to harm the listener more grievously than the speaker. For instance, in <u>Conant v. Walters</u>,

---

[3] Defendants argue in the alternative that the Professors are not being injured today because rules and regulations have not yet been enacted. That suggests that the Professors' case may be ripe once those regulations have been adopted. Similarly, the Court suggested that threats to performance funding at universities will not mature until next year when the Board of Governor issues its first directives. However, Defendants have not argued that the viewpoint-based restrictions in SB 266 are not already in effect or that colleges and universities could disregard those provisions after July 1, 2023. Defendants also provide no assurances that the Student Plaintiffs can ever learn anything about the viewpoints prohibited by the statute from any public university in this State.

309 F.3d 629 (9th Cir. 2002), the Ninth Circuit considered a First Amendment challenge to Federal policies which punished physicians if they discussed the medical uses of marijuana. The Court noted that individual physicians would not be seriously harmed if they could not engage in this discussion; they have other patients with other illnesses. However, the individual patients in need of that potentially beneficial advice would be disproportionately harmed by withholding of the information:

> [I]t is perfectly clear that the harm to patients from being denied the right to receive candid medical advice is far greater than the harm to doctors from being unable to deliver such advice.

Id. at 643. Similarly, individual Professors may not be harmed by SB 266 as they can reserve their controversial instruction for upper division classes or can teach a watered-down version of their class. The victims here are the Students who are robbed of interesting viewpoints while being fed only the pablum approved by the State.

From the perspective of the Student Plaintiffs, it does not matter that the statute primarily governs actions at the university level or that it regulates "programs and campus activities" rather than individual classes. The undeniable intent and

actual impact of the statute is to place a cone of silence[4] around viewpoints to which students would otherwise be exposed if their curriculum was robust and uncensored by the Government. That is, the means adopted by the Defendants to censor the objectionable viewpoints is less important than the inevitable effect on the Student Plaintiffs: their right to receive ideas has been infringed because certain viewpoints are no longer available to them.

Moreover, that impact is not deferred until next year when the Board of Trustees begins issuing "directives" to individual universities.[5] Nor is the injury to students dependent upon any individual funding decision, any individual curriculum decision or any individual decisions with respect to university performance funding. Every student attending New College, and every student attending public universities across the state, will be statutorily barred from accessing viewpoints which Legislators deem to be inappropriate. *Cf.*, Pico, 457 U.S. at 866 ("[W]e think

---

[4] With apologies to Maxwell Smart, Agent 86. *See*, Cone of Silence (Get Smart), https://en.wikipedia.org/wiki/Cone_of_Silence_(Get_Smart) (Last accessed 11/1/23).

[5] The fact that §§1007.25(3) and 1007.55(4) do not appear to go into effect until December of 2024 seems to have been a particular concern of the Court at the recent injunction hearing. Those sections only have to do with the Board directives which will eventually be given to universities. In the meantime, the viewpoint-based restrictions on funding went into effect on July 1, 2023, are currently in effect, and are not dependent on the Board of Governor's directives or their eventual promulgation of regulations. *See*, 1004.06(2).

that the First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library.").

The Defendants argue that the direct censorship provisions found in §1007.25(3)(c) only address how governments - specifically the Board of Education and the Board of Governors - interact with other government units - namely colleges and universities. However, that is a blinkered view which ignores reality. One must ask what the end result will be of a statute which intentionally discriminates on the basis of viewpoint and directly censors those views in a college setting. The result is obvious: students will not exposed to those views either at a time when it is pedagogically appropriate or, in some cases, ever.[6]

---

[6] The State Defendants argue that §1007.25(3)(c) is essentially a time, place and manner restriction in that it only delays discussion of the controversial viewpoints until a student is in an upper division class. There are multiple flaws in that analysis. For one thing, many students will be exposed to these concepts only if they take an upper division class. For example, an economic student is likely to take a humanities class only at the general educational level rather than as an elective once she is admitted to her major program. In those common circumstances, that student may never be exposed to any controversial viewpoints. Furthermore, the State has already determined that the general subject matter is appropriate for any given curriculum and would permit discussion of viewpoints that oppose DEI. revisionist history or the idea that racism is built into our institutions. There is no pedagogical purpose in allowing one State-approved viewpoint in a general education class, while excluding other viewpoints. Finally, the State fails to acknowledge that the inherent vagueness of these terms will inevitably lead professors teaching general education classes to self-censor so that the education of all students will suffer: willing listeners will simply have less to hear.

In this case, the State has crafted a law which completely censors disfavored viewpoints in the real world while attempting to immunize the statute from legal challenge by any affected citizen - whether a teacher or a student.[7] That approach cannot succeed in this case. For one thing, there is no question that state actors are at work here. There is also no denying the fact that the statute is designed to deny the Student Plaintiffs the right to receive disfavored information. Plaintiffs' First Amendment rights are infringed now - not at some future date - and they have

---

[7] In this regard, the State may have been inspired by the Supreme Court's bafflement in the face of the SB 8 - the Texas abortion ban that created a private cause of action against abortion providers but precluded state authorities from enforcing it. *See*, Whole Woman's Health v. Jackson, 595 U.S. 30 (2021). The Court ultimately found that certain state licensing officials may be sued under Ex Parte Young - a ruling later thwarted by the Texas Supreme Court [Whole Woman's Health v. Jackson, 642 S.W.3d 569 (Tex. 2022)] and rendered moot by Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228 (2022). In the face of such skullduggery, courts would be wise to follow Justice Sotomayor's concurrence in Whole Woman's Health:

> [F]ederal courts can and should issue relief when a State enacts a law that chills the exercise of a constitutional right and aims to evade judicial review. By foreclosing suit against state-court officials and the state attorney general, the Court effectively invites other States to refine S. B. 8's model for nullifying federal rights. The Court thus betrays not only the citizens of Texas, but also our constitutional system of government.

Whole Woman's Health v. Jackson, 595 U.S. at 63 (J. Sotomayor concurring). In the context of this case, if Plaintiffs do not have standing to challenge SB 266, then nobody does. Would-be censors will be emboldened to enact an endless series of such laws and our constitutional republic will become a distant memory scrubbed from the history books.

standing to pursue those claims before this Court.

   **B.**   **Each of the Plaintiffs has Established an Injury in Fact as well as the other Requirements for Standing.**

   In <u>Pernell</u>, this Court reviewed the basic law relative to pre-enforcement litigation and the fact that the injury-in-fact requirement is relaxed in First Amendment cases:

> When First Amendment rights are involved, courts apply the injury-in-fact requirement most loosely, "lest free speech be chilled even before the law or regulation is enforced." <u>Harrell v. Fla. Bar</u>, 608 F.3d 1241, 1254 (11th Cir. 2010). "When a plaintiff has stated that he intends to engage in a specific course of conduct 'arguably affected with a constitutional interest,' ... he does not have to expose himself to enforcement to be able to challenge the law. 'If the injury is certainly impending, that is enough.'" <u>Taylor v. Polhill</u>, 964 F.3d 975, 980 (11th Cir. 2020) (*quoting* <u>ACLU v. Fla. Bar</u>, 999 F.2d 1486, 1492 (11th Cir. 1993)). A person "c[an] bring a pre-enforcement suit when he 'has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution[.]'" <u>Wollschlaeger</u>, 848 F.3d at 1304 (*quoting* <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 159, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014)).

<u>Pernell</u>, 641 F.Supp. 3d at 1249–50.

   Plaintiffs in this case claim that they face discipline and other adverse action should they violate SB 266 and that they will have to self-censor in order to avoid those consequences. The Court in <u>Pernell</u> found such allegations were sufficient to demonstrate a First Amendment injury:

> The constitutional interest implicated in this case - Plaintiffs' protected speech - is burdened in two ways: (1) some Plaintiffs risk being

disciplined by their universities, yet will speak anyways, and (2) some Plaintiffs plan to self-censor to avoid discipline. Both Plaintiffs' intended speech and self-censorship show an intent to engage in an act "arguably affected with a constitutional interest" under <u>Driehaus</u> and <u>Wollschlaeger</u>.

<u>Pernell</u>, 641 F.Supp. 3d at 1250.

Here, Plaintiffs have asserted that they are professors, students and a concerned activist organization who wish to speak and learn freely at New College without the Government deciding which viewpoints are consistent with the official state ideology. (Doc. 1 at 7-12, 38-35; Miller Decl. at 2-3, ¶¶ 4-7, 3-5, ¶¶ 12-17, 11; Hernandez Decl. at 2-9 ¶¶ 6, 8-10, 13; Engels Decl. at 2-6, ¶¶ 8-9, 11; 48-55, Leffler Decl. at 2-6, ¶¶ 6-8). The Complaint matches specific courses and areas of study with specific provisions of SB 266 to explain how speech is affected.

For instance, Dr. Hernandez, a Sociology professor does not simply say that she thinks the law will impact her ability to teach her approved classes. Rather she explains some of the basic theories underlying sociology – all of which are well within the realm of mainstream thought – and shows how those precepts conflict with specific language in the statute. (Doc. 1 at 38-39, ¶93-A(2); Doc. 5-1 at 2-3). She further identifies particular topics and viewpoints which she has conveyed in previous classes and which she intends to teach this semester and in future years, all of which seem to be prohibited by the language of the statute. (Doc. 1 at 39-40, ¶93-A(4)-(5); Doc. 5-1 at 3-5). Dr. Hernandez also identifies a particular text she

authored which she used in past classes and explains why she reasonably believes that the viewpoints expressed in that scholarly work cannot be taught in future classes on account of specific provisions in SB 266. (Doc. 1 at 40, ¶93-A(4); Doc. 5-1 at 4, ¶8).

Sarah Engels is a student enrolled in Dr. Hernandez's Social Movements class. She explains exactly how and why her education will be compromised by Dr. Hernandez's inability to teach basic elements of the approved curriculum. (Doc. 49-50, ¶93-D(4); Doc. 5-2 at 2-3, ¶8). Ms. Engels also expresses her reasonable concern that her student organization, Feminist Fridays, must be disbanded under SB 266. (Doc. 1 at 50-51, ¶93-D(5); Doc. 5-2 at 3, ¶10). Again, these concerns are not expressed in generalities, but are both specific and specifically tied to statutory prohibitions.

Hernandez, Clark, Anderson and Engels are members of NCFF. (Doc. 1 at 8, ¶22; Doc. 5-1 at 2, ¶4; Doc. 5-2 at 2, ¶3; Doc. 5-4 at 2, ¶4). Because they have individual standing, the entity has organizational standing to pursue its related claims. *See*, Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc., 528 U.S. 167, 181 (2000) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit.").

SB 266 states that universities may not expend any funds which might be used to advance nebulous concepts including DEI, "political or social activism" and any of the eight topics prohibited under the Stop WOKE Act. *See*, §1004.06(2). The statute also prohibits general education classes which might "distort" history, "teach identity politics", violate the Stop WOKE Act or entertain the notion that discrimination is imbedded into society's institutions. *See*, §1007.25(3)(c). Based on those prohibitions and restrictions, Plaintiffs have reasonably and plausibly concluded that the statute will infringe directly on their First Amendment rights. *Compare*, Pernell, 641 F.Supp.3d at 1260 (Finding injury and standing with respect to plaintiff Novoa under similar allegations directed to the Stop WOKE Act).

Plaintiffs have also identified particular terms and phrases in SB 266 which are facially vague because they are undefined and essentially undefinable; that is, different people will have different interpretations of language which positively invites both uncertainty and division. (Doc. 1 at 67-73).

### C.   <u>Threat of Discipline and Other Adverse Consequences.</u>

The statute poses a direct threat to professors' salaries because §1004.06(2) states that no university funds may be spent on "programs or campus activities" that promote or advance the outlawed viewpoints. One has to take the language of the

statute as one finds it. *See, e.g.*, <u>Goldring v. D.C.</u>, 416 F.3d 70, 77 (D.C. Cir. 2005) ("Our job is to interpret the law as it is, not as it should be."). In this context, "no funds" must be construed to mean "no funds". Because the university pays the professors, and the university is prohibited from funding any speech made illicit by SB 266, it follows that the university may not pay professors who discuss or wish to discuss the prohibited viewpoints in their classrooms.

Also, it is not correct to say that professors cannot be disciplined if they fail to comply with SB 266. The current regulations in force at New College include the following express statement concerning "appropriate discipline":

> (2)   College employees who intentionally act to impair, interfere with, or obstruct the mission, purposes, order, operations, processes, and functions of the College shall be subject to appropriate disciplinary action by College authorities as set forth in the applicable rules and laws governing such actions. Misconduct shall include, but not be limited to, the following:
> …
>> (o)   Violation of the Laws of Florida or of the United States – any act that could constitute a violation of the laws of this state or nation will establish cause for legal and/or disciplinary action by the College.

*See*, New College of Florida Regulations Manual, Chap. 3, §3-4007(2)(o).[8] That discipline is mandatory; a violation "*will* establish cause".

---

[8] Accessible on-line at https://www.ncf.edu/wp-content/uploads/2022/01/3-4007-Misconduct.pdf (last accessed 10/8/23).

Defendants overlook other aspects of the statute which expose Plaintiffs to risk and encourage the chilling of speech. If New College permits instruction on any of the prohibited topics, or funds organizations or activities which advocate for those concepts, it stands to lose all of its "performance based funding". *See*, §1007.55(5).[9] Should one of the Plaintiffs be responsible for that denial of funding by offering instruction in violation of SB 266, New College would have a powerful motivation to discipline that professor or deny tenure. *See*, §1001.706(6) and §1001.741; *See, also*, Pernell, 641 F.Supp. at 1255 (Concluding that a parallel denial of performance funding under the Stop WOKE Act would clearly impact the professor plaintiffs as they would "face a credible threat that their universities will discipline them - and potentially terminate their employment - if they promote or compel belief in any of the eight concepts.").

The Government has suggested that a "credible threat of enforcement" is triggered only if there is a risk of arrest and criminal prosecution and that a non-criminal statute can never justify a pre-enforcement challenge. (Doc. 26 at 11-12).

---

[9] For New College, performance funding amounted to $1,814,987.00 for the 2022-23 school year. *See*, State University System of Florida, *Performance-Based Funding Metric Scores and Allocations* at 5, accessible at https://www.flbog.edu/wp-content/uploads/2023/ 04/PBF-Information-2022-23.pdf (last accessed 10/9/23); *See, also*, *Performance-Based Funding Model* at https://www.flbog.edu/wp-content/uploads/2022/08/22-23-PBF-Allocation.pdf (last accessed 10/9/23).

That is not the law. Rather, any threatened enforcement of a statute which will infringe upon constitutional rights is sufficient to confer standing:

> "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). "When a plaintiff has stated that he intends to engage in a specific course of conduct 'arguably affected with a constitutional interest,' however, he does not have to expose himself to enforcement to be able to challenge the law. 'If the injury is certainly impending, that is enough.'" Am. Civil Liberties Union v. Fla. Bar, 999 F.2d 1486, 1492 (11th Cir. 1993) (*quoting* Babbitt, 442 U.S. at 298, 99 S.Ct. 2301) (internal citation omitted).

Taylor v. Polhill, 964 F.3d 975, 980 (11th Cir. 2020).

It is long established that the loss of First Amendment rights is a cognizable injury. Rowe v. Shake, 196 F.3d 778, 781 (7th Cir. 1999) ("A deprivation of First Amendment rights standing alone is a cognizable injury.").

### D.   <u>Threats by Government Officials</u>.

At oral argument, and in the Order denying the preliminary injunction (Doc. 27, 3-4, 21-23), the Court made much of the fact that there is a dearth of public statements by officials threatening to use SB 266 to discipline professors and students. However, this action is brought as a pre-enforcement challenge asserting that the statute is facially unconstitutional. There are no regulations in place and no administrative construction which would limit the apparent scope of the law. In these circumstances, the constitutionality of the law depends upon what *it* says; not what

some government official thinks it says. *Cf.*, <u>United States v. Stevens</u>, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). For purposes of Plaintiffs' facial challenges, the individual facts of this case are largely irrelevant. *See, generally*, <u>Sentinel Communications Co. v. Watts</u>, 936 F.2d 1189, 1197 (11th Cir. 1991) ("In a facial challenge such as this, the facts of the challenging party's case are irrelevant.").

## IV.   <u>PLAINTIFFS HAVE PROPERLY PLED CAUSES OF ACTION BASED ON VIOLATION OF THEIR CONSTITUTIONAL RIGHTS</u>

Plaintiffs have demonstrated through prior briefing that they have stated a cause of action for violation of their First Amendment rights and that SB 266 is irredeemably void for vagueness. Plaintiffs adopt and incorporate those arguments here just as Defendants did in their brief.[10]

---

[10] It is considered poor practice to incorporate arguments from one memorandum into another as the Defendants do in their Motion. (Doc. 26 at 20). *See, e.g.*, <u>Aldini AG v. Silvaco, Inc.</u>, 2023 WL 3749792, at *3 (N.D. Cal. Mar. 27, 2023) ("Aldini also impermissibly seeks to 'incorporate[ ] ... its arguments and supporting authorities' from briefs it filed in opposition to prior motions to dismiss."). Among other things, this practice allows a party to vastly exceed the usual page limitations. <u>Id</u>. Some courts will deny a motion on those grounds alone. *See, e.g.*, <u>Williams v. Cnty. of Alameda</u>, 26 F. Supp. 3d 925, 947 (N.D. Cal. 2014) ("[T]he Court will not consider the arguments that Plaintiff improperly seeks to incorporate by reference. This Court only considers arguments that are specifically and distinctively raised by the parties in their briefs."). Plaintiffs follow Defendants' poor example here only

A.  **The Plaintiffs have Properly Alleged that SB 266 is Void for Vagueness in Violation of the First Amendment and the Due Process Clause**

A law is deemed void for vagueness if it fails to describe an offense "with  sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). Laws must be particularly precise where First Amendment rights are at issue. *See*, Id., at 1320, *citing* NAACP v. Button, 371 U.S. 415 (1963) ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.").

All of the key terms in SB 266 are completely undefined in the law and intrinsically vague.[11] A statute that uses seemingly ordinary words - as many laws do - can still fail to notify citizens of what conduct it prohibits. *See*, Honeyfund.com, Inc. v. DeSantis, 622 F.Supp. 3d 1159, 1181 (N.D. Fla. 2022), *citing* Yates v. United States, 574 U.S. 528, 537 (2015) ("[T]he fact that the IFA uses real words found in

---

because of that hoary legal principle: "what's good for the goose is good for the gander".

[11] Each of the vague terms was specifically identified and discussed in Plaintiffs' Complaint. (Doc. 1 at 67-69, 71-73).

an English dictionary does not magically extinguish vagueness concerns."). SB 266

is also fatally vague because it incorporates the entirety of the Stop WOKE Act

which this Court already enjoined for being unconstitutionally vague. *See*, Pernell,

*supra*.

> **B.** **The Plaintiffs have Properly Alleged that SB 266 Engages in Viewpoint-Based Discriminaion in Violation of their First Amendment Rights**

The State readily admits that SB 266 is viewpoint-based:

> SB 266 is viewpoint-based as its applies to curriculum-level decisions, so it warrants a preliminary discussion about whether curriculum may include viewpoint-based restrictions and preferences.

(Doc. 21 at 52-53).

As a viewpoint-based law affecting speech in a college campus setting, SB

266 must satisfy the balancing test set forth in Bishop:

> In Bishop, the Eleventh Circuit considered three factors under its "case-by-case" approach - namely, (1) "the context," (2) "the University's position as a public employer which may reasonably restrict the speech rights of employees more readily than those of other persons," specifically with respect "to reasonably control[ling] the content of its curriculum, particularly that content imparted during class time," and (3) "the strong predilection for academic freedom as an adjunct of the free speech rights of the First Amendment." Id. at 1074–75.

Pernell, 641 F.Supp. 3d at 1270. Beyond insisting that the "government must always

win" under the Bishop test, the State fails to show any defect in Plaintiffs' pleading.

**C.**     **The Plaintiffs have Properly Alleged that SB 266 is Overbroad in Violation of the First Amendment**

The purpose of the overbreadth doctrine is to avoid "chilling" of constitutionally protected speech. *See, generally*, Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 129 (1992) ("[T]he very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court."); FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1303 (11th Cir. 2017) ("The overbreadth doctrine is designed to remedy the chilling effects of overbroad statutes…"). The overbreadth doctrine creates an exception to the usual rules pertaining to standing. In particular, a litigant can assert the rights of persons not before the Court even if an ordinance could legitimately apply to the plaintiff. *See*, Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973).

Like the plaintiffs in Pernell, these Plaintiffs argue that the law is unconstitutionally overbroad because there is no legitimate government interest which would permit viewpoint-based discrimination in the classroom on the scale contemplated by the statute.

Defendants' primary defense of Plaintiffs' overbreadth challenge is the claim that "Plaintiffs make no allegations identifying protected speech that would be targeted". (Doc. 26 at 21). However, Plaintiffs have done just this by identifying a host of classes taught at New College, past, present and future, which would be

affected by the law. (Doc. 1 at 18-24, ¶48). Plaintiffs have also identified a number of long-established student organizations whose future existence appears to be imperiled by the law. (Doc. 1 at 18). These facts are more than adequate to support an overbreadth claim.

### D.  The Student Plaintiffs State a Claim for Violation of their Right of Equal Protection.

The Equal Protection Clause of the Fourteenth Amendment prohibits disparate treatment of similarly situated individuals. *See*, Hendking v. Smith, 781 F.2d 850, 851 (11th Cir. 1986). In the Eleventh Circuit, "to properly plead an equal protection claim, a plaintiff need only allege that through state action, similarly situated persons have been treated disparately." Thigpen v. Bibb County, 223 F.3d 1231, 1237 (11th Cir. 2000) *abrogated on other grounds by* Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002).

In this case, the Student Plaintiffs allege that SB 266 favors certain students and certain student organizations at the expense of others. Pursuant to §1004.06(2) student organizations such as "Feminist Fridays" which promote viewpoints prohibited by SB 266 can obtain funding only if they qualify under (as yet unwritten) university rules. In contrast, those organizations which promote viewpoints consistent with the Government line, face no such threats to funding. Similarly, under §1004.06(3) students who are associated with certain Federal programs are

categorically exempt from the funding restrictions. The Student Plaintiffs do not fall within those categories and cannot access controversial speech on the same terms.

Because this challenge involves fundamental First Amendment rights, the Court must apply heightened scrutiny to Plaintiffs' claims. *See,* Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 670 (1966) ("We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."). Under heightened scrutiny, the government must show that the distinctions it has drawn between citizens are based on a compelling need and that the classification is narrowly tailored to meet than compelling interest:

> Ordinarily, the strict scrutiny test applies to classifications affecting the exercise of fundamental rights. Fulani v. Krivanek, 973 F.2d 1539, 1542 (11th Cir. 1992); *see also* Duke v. Cleland, 954 F.2d 1526, 1529 (11th Cir. 1992) ("[i]f the challenged law burdens a fundamental constitutional right, then the law can survive only if the State demonstrates that the law advances a compelling interest and is narrowly tailored to meet that interest"); Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). "Under strict scrutiny analysis, once a plaintiff has demonstrated the burden on her fundamental right, the state must show 'that the law advances a compelling interest and is narrowly tailored to meet that interest.'" Fulani, 973 F.2d at 1542–43 (*quoting* Cleland, 954 F.2d at 1529).

U.S. Taxpayers Party of Florida v. Smith, 871 F.Supp. 426, 429 (N.D. Fla. 1993) *aff'd*, 51 F.3d 241 (11th Cir. 1995); *See, also,* City of Cleburne, Tex. v. Cleburne

Living Ctr., 473 U.S. 432, 440, 105 S. Ct. 3249, 3254 (1985) ("[T]hese laws are

subjected to strict scrutiny and will be sustained only if they are suitably tailored to

serve a compelling state interest");

The State does not deny that §§1004.06(2) and (3) create distinctions between

different students and student organizations. Instead, the State simply argues that no

First Amendment rights are at issue:

> Defendants frame their equal protection claim as a violation of
> fundamental rights entitled to heightened scrutiny. However, as argued
> in Sections II-IV, SB 266 does not have an impact on Defendant's free
> speech rights and does not otherwise bear on Defendants' fundamental
> rights.

(Doc. 26 at 23). Defendants make the mistake of confusing their prospects for

ultimate success on the merits with the existence or lack of existence of a

constitutional claim. In this instance, Plaintiffs have properly alleged that their First

Amendment rights are implicated and that the statutory distinctions turn on the

identity of the speaker or the content of his speech.

Defendants do not defend SB 266 under the heightened scrutiny standard. In

fact, they can barely do so under the rational basis test. The best argument that the

State can muster is that the Federal government requires certain speakers and groups

to be funded as a condition for Federal assistance. That explanation does not identify

an important government interest nor does the State explain why a less intrusive

form of regulation would not serve its needs.

WHEREFORE, Plaintiffs pray that Motion to Dismiss be denied in its entirety.

*Respectfully submitted,*

BENJAMIN, AARONSON, EDINGER
& PATANZO, P.A.

   /s/ Gary S. Edinger

| | |
|---|---|
| DANIEL R. AARONSON, Esquire | GARY S. EDINGER, Esquire |
| Florida Bar No.: 314579 | Florida Bar No. 0606812 |
| JAMES S. BENJAMIN, Esquire | 305 N.E. 1st Street |
| Florida Bar No.: 293245 | Gainesville, Florida 32601 |
| 1700 East Las Olas Blvd., Suite 202 | (352) 338-4440  (Fax) (352) 337-0696 |
| Ft. Lauderdale, Florida 33301 | GSEdinger12@gmail.com |
| (954) 779-1700 (Fax) (954) 779-1771 | |
| sexlaw@bellsouth.net | |
| danaaron@bellsouth.net | |

*Attorneys for Plaintiffs*

I HEREBY CERTIFY that a true and correct copy of the foregoing Response was furnished to WILLIAM S. GALVANO, Esquire [bgalvano@grimesgalvano.com], CHADWICK A. MANAUSA, Esquire [cmanausa@grimes galvano.com], and GIANNA M. TOMEO, Esquire [gtomeo@grimesgalvano.com], 1023 Manatee Avenue W., Bradenton, Florida 34205-7816; and to JASON B. GONZALEZ, Esquire [jason@lawsonhuckgonzalez.com], RAYMOND F. TREADWELL, Esquire [ray@lawsonhuckgonzalez.com] and AMBER S. NUNNALLY, Esquire [amber@lawsonhuckgonzalez.com], 215 South Monroe Street, Suite 320,

Tallahassee, Florida 32301, via the CM/ECF System this 3rd day of November,

2023.

                                      __/s/  Gary S. Edinger_____
                                        GARY S. EDINGER, Esquire
                                        Florida Bar No.: 0606812

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F) and (J)

    I hereby certify that this motion and memorandum of law contains 7,899

words.

                                        __/s/  Gary S. Edinger_____
                                        GARY S. EDINGER, Esquire